# 22-60596

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA

*Plaintiff-Appellee*

v.

PATRICK DARNELL DANIELS, JR.

*Defendant-Appellant*

FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION
1:22cr58LG-BWR

## BRIEF OF APPELLEE

DARREN J. LAMARCA
*United States Attorney for the
Southern District of Mississippi*

GAINES H. CLEVELAND
Mississippi Bar Number 6300
*Assistant United States Attorney*

JONATHAN D. BUCKNER
Mississippi Bar Number 104146
*Assistant United States Attorney*
1575 Twentieth Avenue
Gulfport, Mississippi 39501
Telephone: (228) 563-1560

## STATEMEMENT REGARDING ORAL ARGUMENT

The United States agrees that this case is an appropriate candidate for oral argument. Given the constitutional questions presented, oral argument may serve to assist the Court in deciding the case. *See* FED. R. APP. P. 34(a)(2)(C); FIFTH CIR. R. 28.2.3.

# TABLE OF CONTENTS

PAGE

STATEMENT REGARDING ORAL ARGUMENT .......................................... ii

TABLE OF AUTHORITIES ............................................................... v

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ............................................................ 2

A.   Course of Proceedings and Disposition in the Court Below ................. 2

B.   The Proof at Trial ................................................................ 4

    1.   The Government's Evidence ............................................ 4

        a.   DEA Task Force Officer Encounters Daniels
            with Marijuana and Firearms in March 2022 ...................... 4

        b.   DEA Task Force Officer Again Finds Daniels
            with Marijuana and Firearms in April 2022 ...................... 5

        c.   Daniels Admits Extensive Illegal
            Use of Marijuana .................................................. 8

    2.   The Defense Case ...................................................... 10

SUMMARY OF THE ARGUMENT ...................................................... 10

## TABLE OF CONTENTS *(Continued)*

PAGE

ARGUMENT ................................................................................................11

I.   The District Court Properly Held that 18 U.S.C. § 922(g)(3) Is
     Consistent with the 2d Amendment under the Law of this Circuit ...11

    A.    Standard of Review ........................................................................11

    B.    The Challenged Ruling .................................................................12

    C.    Applicable Law .............................................................................15

    D.    Discussion ....................................................................................18

        1.    *Bruen* Did Not Clearly Abrogate this Court's
     Decisions Upholding § 922(g)(3) .........................................18

        2.    In Any Event, § 922(g)(3) Remains Constitutional
     After *Bruen* ............................................................................22

            a.    Congress May Constitutionality Disarm
          Unlawful Users of Controlled Substances
          Who *Per Se* Are Not Law-Abiding Citizens.............23

            b.    Section 922(g)(3) Is Consistent with
          Historical Laws that Kept Firearms Away
          from Lawbreakers and Potentially
          Dangerous Persons .......................................................29

            c.    The *Rahimi* Panel's Consideration of § 922(g)(8)
          Should Be Distinguished from this Court's
          Analysis of § 922(g)(3) ................................................47

# TABLE OF CONTENTS *(Continued)*

PAGE

II.  The District Court Appropriately Denied Daniels's
Vagueness Challenge to 18 U.S.C. § 922(g)(3) .........................................50

    A.  Standard of Review ..........................................................................50

    B.  Consideration of the Issue Below ..................................................51

    C.  Applicable Law .................................................................................52

    D.  Discussion .........................................................................................53

III.  The Jury's Verdict Is Supported by Sufficient Evidence ......................58

    A.  Standard of Review ..........................................................................58

    B.  Consideration of the Issue Below ..................................................59

    C.  Applicable Law .................................................................................60

    D.  Discussion .........................................................................................61

        1.  Daniels Qualified as an Unlawful User ..............................62

        2.  Daniels Was Sufficiently Aware of his Status
           as an Unlawful User ..............................................................64

CONCLUSION .....................................................................................................68

CERTIFICATE OF SERVICE ..........................................................................69

CERTIFICATE OF COMPLIANCE .................................................................70

# TABLE OF AUTHORITIES

**Cases**                                                        Page

*Abramski v. United States*, 573 U.S. 169 (2014)....................................................46

*Baze v. Rees*, 553 U.S. 35 (2008) ............................................................41

*Beers v. Attorney General of the United States*, 927 F.3d 150
    (3d Cir. 2019), *vacated*, 140 S.Ct. 2758 (2020) ..........................................31

*Chapman v. United States*, 500 U.S. 453 (1991) ....................................53

*Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103 (1983) ...................................39

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ..........13, 15, 20, 23-24, 26-27, 30-33, 35, 37, 40, 42-43

*Green v. Bd. of Elections of City of N.Y.*, 380 F.2d 445 (2d Cir. 1967),
    *cert. denied*, 389 U.S. 1048 (1968) ................................................41

*Johnson v. United States*, 576 U.S. 591 (2015) ................................................52, 57

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ........................................45

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019) ........................................58

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) ..................................15, 34

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ............................................43

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,
    Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ........................15, 19

## TABLE OF AUTHORITIES (*Continued*)

**Cases** (*Continued*)                                                    PAGE

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S.Ct. 2111 (2022) ................. 12-13, 17, 20, 24, 25. 27, 37-39, 45-47, 49

*Rehaif v. United States*, 239 S.Ct. 2191 (2019) ......................................64

*Scarborough v. United States*, 431 U.S. 563 (1977) ...............................57

*Serafine v. Branaman*, 810 F.3d 354 (5th Cir. 2016) ............................12

*State v. Hogan*, 63 Ohio St. 202, 58 N.E. 572 (Ohio 1900)...................44

*State v. Shelby*, 2 S.W. 468 (Mo. 1886) ...................................................33

 *State v. Wilfong*, 881 S.E.2d 426 (W.Va. 2022)  ................................30

*303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021) ..................58

*United States v. Bedoy*, 827 F.3d 495 (5th Cir. 2016) ..........................59

*United States v. Beverly*, No. 2:21cr36 (N.D.W.Va. Jan. 3, 2003) ......................30

*United States v. Black*, — F.Supp.3d —,
    2023 WL 122920 (W.D. La. 2023) ......................................19, 30

*United States v. Bramer*, 832 F.3d 908 (8th Cir. 2016) ........................58

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012)  .........................29

*United States v. Clark*, 582 F.3d 607 (5th Cir. 2009) ............................11

# TABLE OF AUTHORITIES (*Continued*)

**Cases** (*Continued*)                                              PAGE

*United States v. Coleman*, 609 F.3d 699 (5th Cir. 2010) ......................................51

*United States v. Connelly*, 2022 WL 17829158 (W.D. Tex. 2022) .....................30

*United States v. Cook*, 970 F.3d 866 (7th Cir. 2020) ...........................................57

*United States v. Copeland*, 820 F.3d 809 (5th Cir. 2016) ....................................50

*United States v. Dugan*, 637 F.3d 998 (9th Cir. 2011) ........................................30

*United States v. Edwards*, 182 F.3d 333 (5th Cir. 1999) .....................................52

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001) .....................................15

*United States v. Gray,* 96 F.3d 769 (5th Cir. 1996) .............................................52

*United States v. Hanson*, 26 F.4th 610 (4th Cir. 2022).........................................57

*United States v. Harrison*, 2023 WL 1771138 (W.D. Okla. 2023) ......................30

*United States v. Hasson*, 26 F.4th 610 (4th Cir.),
        *cert. denied*, 143 S.Ct. 310 (2022) ...............................................................57

*United States v. Herrera*, 313 F.3d 882 (5th Cir. 2002) (en banc) .....................65

*United States v. Hicks*, 958 F.3d 399 (5th Cir. 2020) ..........................................65

*United States v. Howard,* 766 F.3d 414 (5th Cir. 2014) .......................................50

# TABLE OF AUTHORITIES (*Continued*)

**Cases** (*Continued*)                                                    PAGE

*United States v. Hunt*, 961 F.3d 739 (5th Cir. 1999) ...........................................63

*United States v. Kelley*, No. 5:22cr395 (W.D. Okla. Jan. 13, 2023) ..................30

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) .......................41

*United States v. King*, 979 F.3d 1075 (5th Cir. 2020) ..........................................19

*United States v. Lewis*, 2023 WL 187582 (W.D. Okla. 2023) ......................30, 47

*United States v. Lipscomb*, 299 F.3d 303 (5th Cir. 2002) ....................................20

*United States v. Lundy*, 2021 WL 5190899 (6th Cir. 2021) ................................66

*United States v. Majurie*, 419 U.S. 554 (1975) ....................................................54

*United States v. May*, 538 Fed.Appx. 465 (5th Cir. 2013) ..................................16

*United States v. McCowan*, 469 F.3d 386 (5th Cir. 2006)....................................24

*United States v. McGinnis*, 956 F.3d 747 (5th Cir. 2020) ...................................19

*United States v. McGruder*, 254 F.3d 1081,
    2001 WL 563899 (5th Cir. 2001) .................................................................53

*United States v. Mesquias*, 29 F.4th 276 (5th Cir. 2022) .....................................59

*United States v. Ollison*, 555 F.3d 152 (5th Cir. 2009) ........................................51

## TABLE OF AUTHORITIES (*Continued*)

**Cases** (*Continued*)                                                   PAGE

*United States v. Parett*, 260 Fed.Appx. 750 (5th Cir. 2008) ...............................63

*United States v. Patterson*, 431 F.3d 832 (5th Cir. 2005),
   *cert. denied*, 547 U.S. 1138 (2006) ...............................................................14

*United States v. Portillo-Munoz*, 643 F.3d 437 (5th Cir. 2011) ..........................11

*United States v. Posey*, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023) ..................30

*United States v. Powell*, 423 U.S. 87 (1975) ..........................................................53

*United States v. Rahimi*, 59 F.4th 163 (5th Cir. Feb. 2, 2023*),*
   *withdrawn and superseded*, 2023 WL 2317796
   (5th Cir. May 2, 2023) .......................................... 21-22, 26-28, 38-39, 47-48

*United States v. Roach*, 201 Fed.Appx. 969 (5th Cir. 2006) ...............................53

*United States v. Sanchez*, 961 F.2d 1169 (5th Cir. 1992) ....................................64

*United States v. Sanchez*, 2022 WL 17815116 (W.D. Tex. Dec. 19, 2022) ........30

*United States v. Sanders*, 952 F.3d 263 (5th Cir. 2020) .......................................59

*United States v. Seay*, 620 F.3d 919 (8th Cir. 2010) ............................................30

*United States v. Seiwert*, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022) ..............30

*United States v. Stennerson*, 2023 WL 2214351 (D. Mont. Feb. 24, 2023) ........30

*United States v. Swenson*, 25 F.4th 309 (5th Cir. 2022) .......................................59

# TABLE OF AUTHORITIES (*Continued*)

**Cases** (*Continued*)                                                         PAGE

*United States v. Thomas*, 877 F.3d 591 (5th Cir. 2017) ........................................52

*United States v. Trevino*, 989 F.3d 402 (5th Cir. 2021) ........................................66

*United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014) (en banc) ........64

*United States v. Veasley*, No. 4:20cr209 (S.D. Iowa Sept. 22, 2022) .................30

*United States v. Westbrooks*, 858 F.3d 317 (5th Cir. 2017) ..................................52

*United States v. Wilson*, 503 U.S. 329 (1992) ......................................................56

*United States v. Woods*, 811 Fed.Appx. 895 (5th Cir. 2020) .............................65

*United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) ........................................14

## Current Statutes and Rules

18 U.S.C. § 922(g)..................................................................................46,61

18 U.S.C. § 922(g)(3) ................2-3, 10, 11, 13, 21, 37, 48, 50-53, 56, 57-58, 60-61

18 U.S.C. § 922(g)(8) .......................................................................10, 27

18 U.S.C. § 924(a)(2) ........................................................................3, 61

18 U.S.C. § 3231....................................................................................2

18 U.S.C. § 3742....................................................................................2

## TABLE OF AUTHORITIES (*Continued*)

**Current Statutes and Rules** (*Continued*)                    PAGE

21 U.S.C. § 802.................................................................................24, 60

21 U.S.C. § 844(a) ...........................................................................28, 67

28 U.S.C. § 1291...................................................................................2

ARK. CODE § 5-73-309(7)(A) ................................................................25

MISS. CODE ANN. § 41-29-139..............................................................67

MISS. CODE ANN. § 45- 9-101(e) ..........................................................25

OHIO REV. CODE § 2923.125(o)............................................................25

TEX. GOV'T CODE ANN. § 411.172(a)(6) ..............................................25

FED. R. APP. P. 34(a)(2)(C).................................................................. ii

FED. R. CRIM. P. 29(a) ........................................................................59

FIFTH CIR. R. 28.2.3.............................................................................. ii

### Historical Statutes

The Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13.........................................39, 41

1689 English Bill of Rights ...................................................................39

Eng. Stat. at Large 441 .........................................................................40

# TABLE OF AUTHORITIES (*Continued*)

**Historical Statutes** (*Continued*)                          PAGE

47 Stat. 652, § 7 (1932) (D.C.)...................................................................36

1936 Ala. Laws 52, no. 82, § 8 ..............................................................36

Public Records of the Colony of
    Connecticut 193 (1890) (177535 law) ......................................44

A35n Act for Establishing a Militia in this
Government (1756), Delaware 1947 ...................................................35

Kansas Gen. Stat., Crimes & Punishments § 282 (1868) ..................34

An Act for Regulating the Militia of the Province of
    Maryland (1756) ........................................................................35

3 Laws of the Commonwealth of Massachusetts from
    November 28, 1780 to February 28, 1807 (1783 law) ...........................42

1 Private and Special Statutes of the Commonwealth of
    Massachusetts from the Year 1780 to the Close of the
    Session of the General Court, Begun and Held on the Last
    Wednesday in May, A.D. 1805 (1790 law) ............................................ 42

1878 Miss. Laws 175-76 § 2 ................................................................. 34

1883 Mo. Laws 76, § 1 .........................................................................34

Acts of the General Assembly of the Province of
    New-Jersey 303 (1752) ...............................................................33

# TABLE OF AUTHORITIES (*Continued*)

**Historical Statutes** (*Continued*)                                   PAGE

Acts of the General Assembly of the Province of
  New-Jersey 344 (1776) (1771 law) ............................................42

Acts of the General Assembly of the State of
  New-Jersey 90 (1777 law) .......................................................44

An Act for better settling and regulating the Militia of this
  Colony of New-Jersey, for the repelling of Invasions, and
  Suppressing Insurrections and Rebellions (1746) (§§ 3, 23) ................35

Laws and Ordinances of New Netherlands 138 (1868) ...................................42

1 Complete Revisal of All the Acts of Assembly, of the Province
  of North Carolina, Now in Force and Use 446-47
  (1773) (1768 law) ........................................................42

1890 Okla. Sess. Laws 495, art. 47, § 4 ................................................34

1931 Pa. Laws 499, no. 158, § 8 ............................................................36

An Act for the Regulation of the Militia of the Commonwealth of
  Pennsylvania (1780) (§ XLV and § XLVIII(12)) ......................................35

1844 R.I. Pub. Laws 503-16, §§ 1, 45.....................................................35

1899 S.C. Acts 97, No. 67, § 1 ...............................................................34

1935 S.D. Sess. Laws 356, ch. 208, § 8 .................................................36

# TABLE OF AUTHORITIES (*Continued*)

**Historical Statutes** (*Continued*)       PAGE

7 Statutes at Large; Being a Collection of All the Laws of
Virginia 35-36 (1820) (1756 law) ...............................................43

1935 Wash. Sess. Laws 601, ch. 172, § 8 ...........................................36

1883 Wis. Sess. Laws 290, Offenses Against Lives and
Persons of Individuals, ch. 329 § 3 .........................................34

## Other Authorities

U.S. CONST. amend. II ....................................................................34

U.S. CONST. amend. V ....................................................................53

FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS: CRIMINAL § 2.43D ..............60

BENJAMIN RUSH, AN INQUIRY INTO THE EFFECTS OF
ARDENT SPIRITS ON THE MIND AND BODY (1784) ...............................32

2 BERNARD SCHWARTZ, THE BILL OF RIGHTS:
A DOCUMENTARY HISTORY 662 (1971) ...................................... 42

Beth A. Colgan, *Reviving the Excessive Fines Clause,*
102 CAL. L. REV. 277 (2014) ........................................................41

Brian C. Kalt, *The Exclusion of Felons from Jury Service,*
53 AM. UNIV. L. REV. 65 (2003) .................................................41

CARL ERIK FISHER, URGE: OUR HISTORY OF ADDICTION (2022) .................32

# TABLE OF AUTHORITIES (*Continued*)

**Other Authorities** (*Continued*)                                PAGE

David F. Musto, *The American Experience with Stimulants and Opiates*,
    2 PERSP. ON CRIME & JUST. 51 (1997-1998) .............................35

Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution:*
    *The English Origin of the Right to Keep and Bear Arms,*
    95 NOTRE DAME L. REV. 397 (2019) ........................................40

1 Hening, Statutes at Large; Being a Collection of All the Laws
    of Virginia, from the First Session of the Legislature (1823) ..............33

4 JOURNALS OF THE CONTINENTAL CONGRESS (1906) ...................................44

MICHAEL WALDMAN, THE SECOND AMENDMENT: A BIOGRAPHY (2014)..35

MILITARY OBLIGATION: THE AMERICAN TRADITION (1947) ........................35

*The Origin of Insanity as A Special Verdict: The Trial for Treason*
    *of James Hadfield (1800)*, 19 LAW & SOC'Y REV. 487 (1985) ...................31

Patrick J. Charles, "*Arms for Their Defense*"?: *An Historical, Legal, and*
    *Textual Analysis of the English Right to Have Arms and Whether the*
    *Second Amendment Should Be Incorporated in* McDonald v. City of
    Chicago, 57 CLEV. ST. L. REV. 351 (2009) ................................40

Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit*
    *and the Tree of Knowledge: An Inquiry into the Legal History of*
    *American Marijuana Prohibition*, 56 VA. L. REV. 971 (1970) ...................36

Roy Porter, *The Drinking Man's Disease: The Pre-history of Alcoholism in*
    *Georgian Britain*, 80 BRITISH J. OF ADDICTION 385 (1985) ....................32

# TABLE OF AUTHORITIES (*Continued*)

**Other Authorities** (*Continued*)                                            Page

S. Rep. No. 1097, 1968 U. S. Code Cong. & Ad. News 2112,
    1968 WL 4956 (Leg. Hist.) ........................................................45

Statement from Attorney General Merrick B. Garland Regarding
    *United States v. Rahimi*, https://www.justice.gov/opa/pr/
    statement-attorney-general-merrick-b-garland-regarding-united-
    states-v-rahimi........................................................................22

U.S. Treasury Dep't, State Laws Relating to the
    Control of Narcotic Drugs and the Treatment of
    Drug Addiction (1931) ...........................................................36

4 William Blackstone, Commentaries on
the Laws of England 95 (1769) ......................................................41

## Tables and Figures

*Figure 1*: Weapons Found in Daniels's Truck ....................................6

*Figure 2*: Rifle Located in Daniels's Truck Weapons.........................7

*Figure 3*: Pistol Found in Daniels's Truck .......................................8

# 22-60596

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA

*Plaintiff-Appellee*

v.

PATRICK DARNELL DANIELS, JR.

*Defendant-Appellant*

FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION
1:22cr58LG-BWR

## BRIEF OF APPELLEE

## STATEMENT OF JURISDICTION

This direct appeal challenges a final judgment of conviction for

violation of Title 18, United States Code, Section 922(g)(3), entered by the

United States District Court for the Southern District of Mississippi,

following a two-day trial before the Honorable Louis Guirola, Jr.,

United States District Judge, and a jury. ROA.133-39; R.E.5 (judgment).[1]

Daniels filed a timely notice of appeal. ROA.141; R.E.2.

The district court exercised its jurisdiction pursuant to Title 18,

United States Code, Section 3231.  This Court's jurisdiction is properly

invoked. *See* 28 U.S.C. § 1291; 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

1.    Whether the district court properly held that 18 U.S.C.

§ 922(g)(3) is consistent with the Second Amendment under the law of this

Circuit.

2.    Whether the district court appropriately denied Daniels's

challenge to 18 U.S.C. § 922(g)(3) as unconstitutionally vague.

3.    Whether sufficient evidence supports the jury's verdict.

## STATEMENT OF THE CASE

**A.    Course of Proceedings and Disposition in the Court Below**

In May 2022, Patrick Darnell Daniels, Jr., was charged in a single-

count indictment with knowingly possessing a firearm that had traveled in

---

[1] "ROA.133-39" refers to pages 133 to 139 of the Record on Appeal; "Br." to Daniels's brief; "R.E." to the Record Excerpts, cited by tab; and "GX" to Government exhibit.

interstate or foreign commerce knowing that he was an unlawful user of a

controlled substance, in violation of Title 18, United States Code, Sections

922(g)(3) and 924(a)(2). ROA.149-50; R.E.3.  The indictment incorporated by

reference the definition of unlawful user of a controlled substance, as found

in Title 21, United States Code, Section 802. ROA.149.  The indictment also

called for the forfeiture of an American Tactical rifle, a Springfield Armory

9mm pistol, and any ammunition. ROA.149-50.

In a written opinion, the court denied a pretrial motion to dismiss,

challenging the indictment as facially unconstitutional under the Second

Amendment. ROA.55-65; R.E.6.  The court took under advisement a second

motion that challenged the firearm statute as unconstitutionally vague

under the Due Process clause of the Fifth Amendment. ROA.6 (7/25/22

docket entry).

Trial began on July 25, 2022, and ended the next day, when the jury

found the defendant guilty. ROA.6; R.E.1 (docket entries); ROA.153; R.E.4

(verdict form).  The court denied Daniels's motion for judgment of

acquittal but deferred ruling on his motion challenging 18 U.S.C.

§ 922(g)(3) on vagueness grounds. ROA.246-49.  The court later denied

Daniels's vagueness motion. ROA.125-32; R.E.7.

The court sentenced Daniels to 46 months of imprisonment, to be

followed by three years of supervised release. ROA.134-39; R.E.5

(judgment).  The court also ordered Daniels to pay a $2,000 fine and a $100

special assessment. ROA.138.

## B.  The Proof at Trial

### 1.  The Government's Evidence

#### a.  DEA Task Force Officer Encounters Daniels with Marijuana and Firearms in March 2022

In early March 2022, Ray Bell, a DEA Task Force Officer ("TFO"), had

recently joined the narcotics division of the Hancock County Sheriff's

Department when he encountered Daniels at a Circle K convenience store.

ROA.210, 215-16, 222 (Bell).  Bell found Daniels in possession of "multiple

bags of marijuana and firearms" but did not arrest him at that time even

though Daniels admitted to being a user of marijuana. ROA.210.  Bell

explained that he had just joined the sheriff's department and was trying to

"learn the roadways" of the county. ROA.222-23.

### b.   DEA Task Force Officer Again Finds Daniels with Marijuana and Firearms in April 2022

The next month, TFO Bell was on patrol with another agent in Hancock County when he noticed a truck with a missing license tag. ROA.199.  After pulling the pickup over, Bell recognized the smell of marijuana coming from inside the truck as he approached the driver. ROA.199, 218.  Bell saw that Daniels was the driver, whom he recognized from their encounter at the Circle K the previous month. ROA.199, 210, 222.

Upon looking inside the truck, Bell first saw a handgun "located between the driver's seat and the center console." ROA.199.  Immediately behind the driver's seat was a rifle within reach of Daniels. ROA.200. The agent also "found marijuana blunts that were in the ashtray." ROA.200.  When asked how often he used marijuana, Daniels said he smoked "14 days out of the month." ROA.201.  After finding the weapons in Daniels's truck, Bell propped the rifle against the driver's seat next to the pistol and magazine. ROA.202. *See* Figure 1 *infra*: GX 1 (photo of both guns).  Bell identified the rifle he seized from Daniels's truck as an

American Tactical Mil Sport 5.56 x 45mm rifle.[2] ROA.204, 210-11, 220.  The

rifle had a magazine affixed that "contained 20 rounds of 5[.]56

ammunition." ROA.211. *See* Figure 2 *infra*: ROA.422 (GX 13: photo of rifle).

*See also* GX 25 (rifle); GX 25A (magazine); GX 25B (ammunition);

---

*Figure 1*: WEAPONS FOUND IN DANIELS'S TRUCK



GX 1 (ROA.298): Highlighted in red to show firearms—rifle
in the foreground; pistol and magazine in the background

---

[2] Daniels later told TFO Bell the rifle had belonged to a man who died in a New Year's shooting in nearby Gulfport. ROA.447 (GX 24A).

*Figure 2*: AR-15 RIFLE LOCATED IN DANIELS'S TRUCK

GX 13 (ROA.422): American Tactical Mil Sport 556 rifle
found behind Daniels's driver's seat

ROA.229 (rifle manufactured in Indiana).  Bell also found a handgun and

magazine in Daniels's truck. ROA.205. *See* Figure 3 *infra*: ROA.434 (GX 19:

photo of handgun).  The handgun was identified as a Springfield Armory

Hellcat 9-millimeter pistol made in Croatia. ROA.229-30. *See*



*Figure 3*: PISTOL FOUND IN TRUCK

GX 19 (ROA.434): Springfield Armory Hellcat 9 mm
found next to Daniels

*also* GX 26 (unloaded pistol).  TFO Bell found the pistol "between the
driver's seat and the center console." ROA.199.

### c.    Daniels Admits Extensive Illegal Use of Marijuana

Daniels not only admitted being a marijuana user when he was

found with "multiple bags of marijuana and firearms" at the Circle K in

March 2022, but also acknowledged being a user after he was found with

the marijuana blunts in his ashtray a few weeks later in April 2022.

8

ROA.200-01, 210. *See* ROA.214 (Bell authenticating blunts recovered);

ROA.466-67 (GX 28: marijuana blunts); ROA.235 (DEA lab expert identified

marijuana); ROA.469 (GX 29: DEA lab report confirming marijuana).

Daniels said he smoked marijuana about half the days of the month and

had smoked marijuana since high school. ROA.201.

During a post-arrest interview, Daniels offered a more extensive

description of his marijuana use. ROA.206-08. *See* GX 24 (4/25/22 interview

recording); ROA.446-48 (GX 24A: transcript of interview).  Daniels agreed

he had said he used marijuana "approximately fourteen days out of a

month." ROA.447.  Daniels admitted the blunts found in his truck were

from his having smoked marijuana. ROA.447.  Daniels recalled telling Bell

when he saw him at the Circle K that he had stopped smoking in his house

which is why there were "maybe two or three in there in that little ashtray"

in his truck. ROA.447.  Bell said he found "six or eight" blunts in the

ashtray. ROA.447.

**2.    The Defense Case**

Daniels neither testified nor offered any evidence in his defense. ROA.249-52.

## SUMMARY OF THE ARGUMENT

1.    The district court properly followed the law of this Court in determining that 18 U.S.C. § 922(g)(3) is consistent with the Second Amendment right to keep and bear arms as understood historically.  This Court's recent decision invalidating 18 U.S.C. § 922(g)(8) was directed at different concerns and does not undermine the constitutionality of Congress's prohibition against unlawful drug users possessing firearms.

2.    This Court repeatedly has held that 18 U.S.C. § 922(g)(3) is not unduly vague and satisfies Due Process concerns in circumstances similar to this case.  Judge Guirola properly recognized that Daniels's extensive history with marijuana and his evident and admitted contemporaneous use of marijuana at the same time he possessed loaded firearms placed his conduct squarely within the conduct prohibited by the statute.

3.     The trial proof abundantly showed that Daniels was in possession of two loaded firearms at the time of his arrest and was properly deemed to be an unlawful user based on the detection of marijuana emanating from his truck, the discovery of burnt marijuana blunts in his ashtray, and his own admission that he had used marijuana an average of 14 days a month since leaving high school.

## ARGUMENT

## I.     The District Court Properly Held that 18 U.S.C. § 922(g)(3) Is Consistent with the 2d Amendment under the Law of this Circuit

The district court correctly held that Section 922(g)(3)'s prohibition on possession of firearms by drug users is constitutional under the Second Amendment.  That conclusion is in accord with this Court's prior precedent, the Supreme Court's articulation of the right, and the Nation's historical tradition of firearms regulation.

### A.     Standard of Review

This Court "review[s] *de novo* the constitutionality of federal statutes." *United States v. Portillo-Munoz*, 643 F.3d 437, 439 (5th Cir. 2011). *See United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009) ("a facial

challenge to the constitutionality of a statute presents a pure question of law") (internal quotation marks and citation omitted). "Facial challenges to the constitutionality of statutes should be granted sparingly and only as a last resort." *Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016) (internal quotation marks and citation omitted).

## B.     The Challenged Ruling

While this case was awaiting trial, the Supreme Court held that a restrictive New York State gun licensing provision infringed on the Second Amendment right of "an ordinary, law-abiding citizen" to possess a firearm. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2122, 2156 (2022). Seeking to capitalize on *Bruen*, Daniels moved to dismiss the indictment in this case. ROA.39-40. *See* ROA.41-43 (memorandum in support); ROA.46-49 (Gov't response); ROA.51-53 (reply). The court heard argument on the motion and issued a written order denying the motion. ROA.154-66 (hearing); ROA.55-65, R.E.6 (opinion).

The district court explained that, under *Bruen*, "'when the Second Amendment's plain text covers an individual's conduct, the Constitution

presumptively protects that conduct.'" ROA.57 (quoting *Bruen*, 142 S.Ct. at 2126). In that situation, "'the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.'" ROA.57 (quoting *Bruen*, 142 S.Ct. at 2126). Turning first to the "textual coverage of the Second Amendment," the court concluded that "section 922(g)(3) regulates conduct which is facially covered by the plain text of the Second Amendment" because it "restricts the 'possess[ion]' of 'any firearm or ammunition.'" ROA.58-59 (quoting 18 U.S.C. § 922(g)(3)) (alteration by the court). Nevertheless, the court said there was "some doubt that section 922(g)(3) is textually covered by the Second Amendment" because the Supreme Court has interpreted the right as belonging to "ordinary, law-abiding, responsible citizens concerned with self-defense." ROA.59. *See District of Columbia v. Heller*, 554 U.S. 570, 635 (2008); *Bruen*, 142 S.Ct. at 2138 n.9. The district court did not definitively resolve that question, however, because it held that Section 922(g)(3) was constitutional under a "historical analysis." ROA.60, 64.

The district court observed that this Court has "characterized

§ 922(g)(3) as a 'limited, narrowly tailored specific exception' to the Second

Amendment right which is 'not inconsistent with the right of Americans

generally to individually keep and bear their private arms as historically

understood in this country.'" ROA.60 (quoting *United States v. Patterson*,

431 F.3d 832, 835 (5th Cir. 2005), *cert. denied*, 547 U.S. 1138 (2006)). And it

explained that "[o]ther circuit courts have likewise upheld the

constitutionality of § 922(g)(3) under *Heller*'s standards of history and

tradition." ROA.62 (citing cases).  The court particularly relied on *United

States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), concluding that "the analysis

in *Yancey* demonstrates the historical attestation demanded by the *Bruen*

framework." ROA.64.  This analysis "suffices to show that analogous

statutes which purport[ed] to disarm persons considered a risk to society—

whether felons or alcoholics—were known to the American legal

tradition." ROA.64.  Thus, the court held that Section 922(g)(3) "passes

constitutional muster under the legal framework articulated in *Heller* and

*Bruen*." ROA.64.

### C.    Applicable Law

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. CONST. amend II.  In *United States v. Emerson*, 270 F.3d 203, 221-60 (5th Cir. 2001), this Court conducted a thorough historical analysis and held that the Amendment protects an individual right to keep and bear arms.  The Supreme Court subsequently confirmed that holding in *District of Columbia v. Heller*, 554 U.S. 570 (2008), concluding that the Amendment protects an individual right to possess a handgun in the home for self-defense.  And in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court held that this right applies to the states through the Fourteenth Amendment.

After *Heller* and *McDonald*, this Court adopted a "two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016).  First, the Court asked "whether the conduct at issue f[ell] within the scope of the Second Amendment right," considering "the historical traditions associated with the Second Amendment guarantee." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012).  If the

burdened conduct fell within the scope of the right, the Court applied strict scrutiny to laws that threatened "a right at the core of the Second Amendment" and intermediate scrutiny to laws burdening conduct outside that core. *Id.* at 195.

Even before *Heller*, this Court held that "[p]rohibiting unlawful drug users from possessing firearms is not inconsistent with the [individual] right to bear arms guaranteed by the Second Amendment." *Patterson*, 431 F.3d at 836. As the Court explained, "the Second Amendment's right to bear arms is subject to limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country." *Id*. (quoting *Emerson*, 270 F.3d at 261). And the Court recognized that "unlawful users of controlled substances pose a risk to society if permitted to bear arms." *Id*.

After *Heller*, this Court again rejected the claim that "§ 922(g)(3) is unconstitutional on its face based on its infringement of the Second Amendment." *United States v. May*, 538 Fed.Appx. 465, 466 (5th Cir. 2013)

(unpublished per curiam).  The Court said that the facial challenge there

was "precluded by our precedent: we have recognized previously that

unlawful users of controlled substances pose a risk to society if permitted

to bear arms and that prohibiting such persons from possessing firearms

does not infringe the Second Amendment." *Id*.

In *Bruen*, the Supreme Court held that the Second Amendment

protects the right of "ordinary, law-abiding citizens" to "carry a handgun

for self-defense outside the home." *Bruen*, 142 S.Ct. at 2122.  *Bruen* observed

that, after *Heller*, the courts of appeals had "coalesced around a 'two-step'

framework for analyzing Second Amendment challenges that combines

history with means-end scrutiny." *Id.* at 2125.  *Bruen* observed that "[s]tep

one of the predominant framework is broadly consistent with *Heller*, which

demands a test rooted in the Second Amendment's text, as informed by

history." *Id.* at 2127.  But *Bruen* "decline[d] to adopt" the second step of that

framework, holding that "*Heller* and *McDonald* do not support applying

means-end scrutiny in the Second Amendment context." *Id.* at 2126-27.

"Instead, the government must affirmatively prove that its firearms

17

regulation is part of the historical tradition that delimits the outer bounds

of the right to keep and bear arms." *Id.* at 2127.

## D.    Discussion

### 1.    *Bruen* Did Not Clearly Abrogate this Court's Decisions Upholding § 922(g)(3)

Before *Bruen*, this Court held that "[p]rohibiting unlawful drug users

from possessing firearms is not inconsistent with the right to bear arms

guaranteed by the Second Amendment." *Patterson*, 431 F.3d at 836; *see May*,

538 Fed.Appx. at 466.  Those decisions are best understood not as relying

on means-end scrutiny, but instead as concluding that § 922(g)(3) is

consistent with the historical understanding of the Second Amendment.

*Patterson* relied on this Court's precedent regarding the right to keep and

bear arms "'as historically understood in this country'" to conclude that the

Second Amendment does not prevent Congress from "[p]rohibiting

unlawful drug users from possessing firearms." 431 F.3d at 835-36 (quoting

*Emerson*, 270 F.3d at 261).  To be sure, *Patterson* quoted a section of *Emerson*

that referred to "narrowly tailored" and "reasonable" restrictions on the

right to keep and bear arms. *Patterson*, 431 F.3d at 835 (quoting *Emerson*,

270 F.3d at 261).  But, unlike some of this Court's later decisions, *Patterson* did not explicitly apply means-end scrutiny to § 922(g)(3) or indicate that it was upholding the statute on that basis. *Compare id. with National Rifle Ass'n*, 700 F.3d at 207-11.  And, although this Court later read *Emerson* to have "presumably … appl[ied] some form of means-end scrutiny *sub silentio*" in evaluating a different firearm regulation, *United States v. McGinnis*, 956 F.3d 747, 755 (5th Cir. 2020), *Patterson* should not be understood the same way.  Instead, *Patterson* is best understood as upholding § 922(g)(3) as consistent with the historical tradition of firearm regulation. *See United States v. Black*, — F.Supp.3d —, 2023 WL 122920, at *3 (W.D. La. 2023) ("[B]oth pre- and post-*Heller*, the Fifth Circuit has reaffirmed the constitutionality of § 922(g)(3), seemingly with an eye toward history and tradition, as required by the 2022 opinion in *Bruen*.").

Nothing in *Bruen* clearly abrogates this Court's decisions upholding § 922(g)(3).  "One panel of this court may not overrule another panel's decision without *en banc* reconsideration or a superseding contrary Supreme Court decision." *United States v. King*, 979 F.3d 1075, 1084 (5th Cir.

2020) (citing *United States v. Lipscomb*, 299 F.3d 303, 313 n.34 (5th Cir. 2002)).

"Mere ruminations in Supreme Court opinions do not empower a

subsequent panel of our court to disregard, much less overrule, the holding

of a prior panel." *Lipscomb*, 299 F.3d at 313.

Like *Heller*, *Bruen* repeatedly described the Second Amendment right

as belonging to "law-abiding, responsible" citizens. *Heller*, 554 U.S. at 635;

*Bruen*, 142 S.Ct. at 2131, 2138 n.9, 2156.  And the Court in *Heller* said that

"nothing in [its] opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons and the mentally ill,"

measures the Court said were non-exhaustive examples of "presumptively

lawful regulatory measures." *Heller*, 554 U.S. at 626 & n.26.  And *Bruen* did

not back away from this part of *Heller*.  Justice Alito explained in

concurrence that *Bruen* did not "disturb[ ] anything that [the Court] said in

*Heller* or *McDonald* … about restrictions that may be imposed on the

possession or carrying of guns." *Bruen*, 142 S.Ct. at 2157 (Alito. J.,

concurring).  And Justice Kavanaugh (joined by the Chief Justice)

emphasized that "the Second Amendment allows a 'variety' of gun

regulations" and reiterated *Heller* and *McDonald*'s reassurances that the decisions did not "cast doubt on" numerous such regulations, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 2162 (Kavanaugh, J., concurring) (internal quotation marks and citation omitted). As explained in more detail below, unlawful users of controlled substances are *per se* not law-abiding, and the prohibition on their firearm possession is analogous to longstanding restrictions on firearm possession by felons and the mentally ill. Thus, *Bruen* does not abrogate *Patterson*'s decision upholding the constitutionality of 18 U.S.C. § 922(g)(3).

Nor did (or could) this Court's recent decision in *United States v. Rahimi*, —F.4th—, 2023 WL 2317796 (5th Cir. Mar. 2, 2023),[3] abrogate *Patterson* or *May*. *Rahimi* held that § 922(g)(8)'s prohibition on firearm possession by those subject to domestic violence restraining orders is unconstitutional after *Bruen*. *Id.* at *12. Following the February ruling in

---

[3] *Rahimi* originally was published as *United States v. Rahimi*, 59 F.4th 163 (5th Cir. Feb. 2, 2023). However, the panel withdrew its original opinion and substituted the opinion found at 2023 WL 2317796 (5th Cir. May 2, 2023).

*Rahimi*, the Attorney General announced the Government's intention to seek further review of that decision. *See* Statement from Attorney General Merrick B. Garland Regarding *United States v. Rahimi*, opa/pr/statement-attorney-general-merrick-b-garland-regarding-united-states-v-rahimi. But, in any event, *Rahimi* does not control the outcome here. Most importantly, that decision addressed a different statutory provision and never mentioned § 922(g)(3). True, *Patterson* relied on *Emerson*, and *Rahimi* said *Bruen* rendered *Emerson* (and *McGinnis*) "obsolete." *Rahimi*, 2023 WL 2317796, at *3. But the *Rahimi* panel made this statement in the specific context of § 922(g)(8) and did not purport to recognize the invalidity of other precedents that cited *Emerson*. In short, neither *Bruen* nor *Rahimi* has clearly abrogated this Court's decisions upholding § 922(g)(3).

## 2.    In Any Event, § 922(g)(3) Remains Constitutional After *Bruen*

Even if *Bruen* requires a fresh look at § 922(g)(3)'s constitutionality, that statute nonetheless passes constitutional muster. Persons subject to § 922(g)(3)'s prohibition are, by definition, not "law-abiding, responsible citizens" and can therefore be disarmed consistently with the Second

Amendment.  And § 922(g)(3) is in accord with the Nation's historical

tradition of firearm regulation, particularly longstanding laws disarming

those who were not law-abiding and trustworthy or those who were

intoxicated or whose possession of firearms otherwise could pose a danger

to others.

> **a.    Congress May Constitutionality Disarm Unlawful Users of Controlled Substances Who *Per Se* Are Not Law-Abiding, Responsible Citizens**

The Supreme Court has explained that, "[l]ike most rights, the right

secured by the Second Amendment is not unlimited" and is "not a right to

keep and carry any weapon whatsoever in any manner whatsoever and for

whatever purpose." *Heller*, 554 U.S. at 626.  Although *Heller* did not purport

to give an "exhaustive" list, it indicated that the Second Amendment does

not forbid "presumptively lawful regulatory measures," such as "long-

standing prohibitions on the possession of firearms by felons and the

mentally ill, or laws forbidding the carrying of firearms in sensitive places

such as schools and government buildings, or laws imposing conditions

and qualifications on the commercial sale of arms." *Id.* at 626-27 & n.26.

*Heller* defined the right to bear arms as belonging to "law-abiding, responsible" citizens. *Heller*, 554 U.S. at 635.  And *Bruen* echoed that definition, stating no fewer than fourteen times that the Second Amendment protects the rights of "law-abiding" citizens. *Bruen*, 142 S.Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156.

A person like Daniels who violates § 922(g)(3) is, by definition, not a law-abiding, responsible citizen.  The statute applies only to a person who "is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))."  For § 922(g)(3)'s prohibition to apply, a defendant's illegal drug use must occur both (1) "with regularity and over an extended period of time" and (2) close in time to the gun possession. *United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006). *See Patterson*, 431 F.3d at 839 (explaining that cases addressing § 922(g)(3) require "contemporaneousness and regularity") (collecting cases).  An unlawful, current, and regular user of a federally controlled substance can hardly be termed "law-abiding" or "responsible." *Bruen*, 142 S.Ct. at 2131.  Such unlawful users of intoxicating substances

known to cause impairment of the ability to safely handle firearms are

neither law-abiding nor responsible.

Indeed, *Bruen* endorsed the "shall issue" license-to-carry provisions

of 43 states, a number of which specifically exclude those who unlawfully

use or are addicted to controlled substances. *See, e.g.*, MISS. CODE ANN.

§ 45- 9-101(e); TEX. GOV'T CODE ANN. § 411.172(a)(6); OHIO REV. CODE

§ 2923.125(o); ARK. CODE § 5-73-309(7)(A). *Bruen* explained that "nothing

in our analysis should be interpreted to suggest the unconstitutionality of

the 43 States' 'shall-issue' licensing regimes." *Bruen*, 142 S.Ct. at 2138 n.9.

The Court said those regimes, "which often require applicants to undergo a

background check or pass a firearms safety course, are designed to ensure

only that those bearing arms in the jurisdiction are, in fact, 'law-abiding,

responsible citizens.'" *Id*.  And Justice Kavanaugh, joined by the Chief

Justice, explicitly said that such "shall-issue licensing regimes are

constitutionally permissible." *Id*. at 2162 (Kavanaugh, J., concurring).

*Bruen*'s endorsement of those licensing schemes would make little sense if

the Second Amendment in fact prevented states from disarming unlawful

users of controlled substances.

Daniels does not appear to seriously contend he was a "law-abiding,

responsible citizen" at the time of his conduct. Br. 9-44.  Rather, Daniels

relies on this Court's original decision in *Rahimi*, Br. 13-14, which

concluded that *Heller*'s and *Bruen*'s repeated use of the terms "law-abiding,

responsible citizens" and "ordinary, law-abiding citizens" did "not add an

implied gloss that constricts the Second Amendment's reach." *Rahimi*, 59

F.4th at 171.  Instead, the *Rahimi* panel's original opinion understood this

term to be a rhetorical "shorthand" to exclude "groups that have

historically been stripped of their Second Amendments rights" such as

felons and the mentally ill. *Id.*  Surely, the Supreme Court's selection of that

shorthand has real meaning, particularly given *Heller*'s statement that the

list of regulations for which it used this shorthand was not "exhaustive."

*Heller*, 554 U.S. at 627 n.26.  As further evidenced by the revised *Rahimi*

panel opinion, this Court should agree. 2023 WL 2317796, at **4-5.

In the revised opinion, the panel explained, "*Heller*'s reference to 'law-abiding, responsible citizens' meant to exclude from the Court's discussions groups that have historically been stripped of their Second Amendment rights, i.e., groups whose disarmament the Founders *'presumptively'* tolerated or would have tolerated." *Rahimi*, 2023 WL 2317796, at \*\*4-5 (emphasis added) (quoting *Bruen*, 554 U.S. at 627 n.26). The revised panel opinion further explained that Rahimi did not fit into any of those groups because his domestic violence restraining order was entered in a civil proceeding and he was only "suspected" of other criminal conduct. *Id*. at \*5. *See also id*. at \*15 (Ho, J., concurring) (expressing concern that "18 U.S.C. § 922(g)(8) disarms individuals based on civil protective orders—not criminal proceedings").

Understood in context, this Court's references to "law-abiding" and "responsible" citizens exclude those who have committed serious crimes (such as felonies or dangerous misdemeanors) and who are irresponsible *in relation to gun possession* (such as minors or the mentally ill). *See Heller*, 554 U.S. at 625-26; *Bruen*, 142 S.Ct. at 2138 n.9.  Individuals who commit

ongoing criminal violations cannot be classified as "law-abiding" or "responsible." While drug possession alone typically is a misdemeanor, in order to implicate Section 922(g)(3), defendants must engage in ongoing unlawful drug use at the time they possess firearms.[4] Whatever the Second Amendment implications for other offenses, the continuing conduct required to qualify as an "unlawful user" of a controlled substance surely removes the perpetrator from the class of law-abiding, responsible citizens.

Even though the *Rahimi* panel originally used broad language when rejecting the Government's "non-law-abiding" argument in the context of § 922(g)(8), that decision need not be read as foreclosing the same position in the context of § 922(g)(3). *Rahimi*, as revised, explicitly recognizes that ***some*** groups historically have been stripped of their Second Amendment rights, including "felons" and the "mentally ill" and that the Founders tolerated or would have accepted the disarmament of certain other groups of individuals. *Rahimi*, 2023 WL 2317796, at **4-5. And, as explained

---

[4] While drug possession is a misdemeanor, it is still punishable by up to a year in prison under federal law. *See* 21 U.S.C. § 844(a). Moreover, repeated possession violations can result in a sentence of over one year, a sentence typically associated with a felony conviction. *See id.*

further below, those subject to § 922(g)(3) are analogous not only to both of

those groups, but other groups who historically have been disarmed based

on their illegal and potentially dangerous behavior.  Moreover, even if

*Rahimi* forecloses the claim, the Government preserves for further review

the argument that those subject to § 922(g)(3) can be disarmed because they

are not law-abiding, responsible citizens.

> **b.** **Section 922(g)(3) Is Consistent with Historical Laws that Kept Firearms Away from Lawbreakers and Untrustworthy or Potentially Dangerous Persons**

Even if § 922(g)(3) is deemed to burden the rights of "law-abiding,

responsible citizens," it should pass constitutional muster because it is

consistent with the Nation's historical tradition of firearm regulation.

Courts overwhelmingly have rejected Second Amendment challenges to

Section 922(g)(3), both before and after *Bruen*.  No circuit has ruled

otherwise.  And although some circuit decisions applied the means-ends

test *Bruen* eschewed, *see, e.g.*, *United States v. Carter*, 669 F.3d 411, 414 (4th

Cir. 2012), others—including the Eighth and Ninth Circuits—rest on the

analogy between Section 922(g)(3) and the "longstanding prohibitions"

that *Heller* endorsed, 554 U.S. at 626, and on which six Justices in *Bruen*

took pains not to cast doubt, *see, e.g.*, 142 S.Ct. at 2162 (Kavanaugh, J.,

joined by Roberts, C.J., concurring); *see United States v. Dugan*, 637 F.3d 998,

999 (9th Cir. 2011); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010).

Consistent with these authorities, ten of eleven district courts to confront

challenges to Section 922(g)(3) after *Bruen*, including this case, have

repudiated them.[5]  The lone outlier proceeded primarily not by

distinguishing Section 922(g)(3) from the longstanding prohibition

disqualifying felons, but by questioning the constitutionality of that

prohibition as well, *see United States v. Harrison*, 2023 WL 1771138 (W.D.

Ok. Feb. 3, 2023)—a result which no other federal court has embraced, *see*

*United States v. Posey*, 2023 WL 1869095, at *9 n.9 (N.D. Ind. Feb. 9, 2023)

---

[5] *See United States v. Beverly*, No. 2:21cr36 (N.D.W.Va. Jan. 3, 2003); *United States v. Black*, —F.Supp.3d—2023 WL 122920 (W.D. La. Jan. 6, 2023); *United States v. Connelly*, 2022 WL 17829158 (W.D. Tex. Dec. 21, 2022); *United States v. Kelley*, No. 5:22cr395 (W.D. Okla. Jan. 13, 2023); *United States v. Lewis*,  2023 WL 187582 (W.D. Okla. Jan. 13, 2023); *United States v. Posey*, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Sanchez*, 2022 WL 17815116 (W.D. Tex. Dec. 19, 2022); *United States v. Seiwert*, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Stennerson*, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Veasley*, No. 4:20cr209 (S.D. Iowa Sept. 22, 2022); see *also State v. Wilfong*, 881 S.E. 2d 426, 429 (W. Va. 2022).

(recognizing that *Harrison* represents a "dramatic departure from existing

precedent").  Moreover, the historical analogues discussed in detail below

clearly demonstrate that § 922(g)(3) is constitutional because it follows this

Nation's longstanding tradition of regulating the possession of firearms by

individuals deemed sufficiently dangerous.

*First*, § 922(g)(3)'s prohibition on firearm possession by unlawful

users of controlled substances is analogous to "longstanding prohibitions

on the possession of firearms by … the mentally ill" and the intoxicated.

*Heller*, 554 U.S. at 626.  In England, justices of the peace could lock up

dangerous lunatics and seize their property to pay for the cost of securing

them. *See The Origin of Insanity as A Special Verdict: The Trial for Treason of*

*James Hadfield (1800)*, 19 LAW & SOC'Y REV. 487 (1985).  Similarly, "in

eighteenth-century America, justices of the peace were authorized to 'lock

up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" *Yancey*,

621 F.3d at 586 (citation omitted).  As the Third Circuit reasoned in a

decision vacated on other grounds, these severe restrictions on the liberty

of the mentally ill made any specific restrictions on firearm possession

unnecessary at the time. *Beers v. Attorney General of the United States*, 927 F.3d 150, 157 (3d Cir. 2019), *vacated*, 140 S.Ct. 2758 (2020).  But, as *Heller* recognized, it was beyond dispute that the mentally ill could be disarmed. 554 U.S. at 626.

Although being under the influence of a controlled substance is not tantamount to mental illness, both conditions can render a person incapable of safely and responsibly possessing a firearm.  The Founders placed intoxicated individuals in the same category as the mentally ill, criminals, and others subject to disarmament.  Benjamin Rush, a signer of the Declaration of Independence and a prominent physician, equated drunkenness with a "temporary fit of madness." BENJAMIN RUSH, AN INQUIRY INTO THE EFFECTS OF ARDENT SPIRITS ON THE MIND AND BODY, 2 (1784).  And other eighteenth-century observers likewise designated "habitual drinking" as a form of "insanity." CARL ERIK FISHER, URGE: OUR HISTORY OF ADDICTION 47 (2022) (citing Roy Porter, *The Drinking Man's Disease: The Pre-history of Alcoholism in Georgian Britain*, 80 BRITISH J. OF ADDICTION 385, 390 (1985)).  As the Seventh Circuit has observed,

"habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms." *Yancey*, 621 F.3d at 685. *See Patterson*, 431 F.3d at 836 (observing that "unlawful users of controlled substances pose a risk to society if permitted to bear arms").

Section 922(g)(3) is also analogous to historical laws that prohibited carrying a firearm while under the influence of alcohol.  For example, in 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing." 1 Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 401-02 (1823).  In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages … frequently done on [those days] by persons … being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244–46 (1894)).  And a 1746 New Jersey statute authorized militia officers to "disarm" any soldier who "appear[ed] in Arms disguised in Liquor." Acts of the General Assembly of the Province of New-Jersey 303 (1752).

Similarly, in the era following ratification of the Fourteenth

Amendment in 1868, which extended the Second Amendment to the states,

*see McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010), many states

enacted statutes prohibiting intoxicated persons from possessing, using, or

receiving firearms. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishments § 282

(1868); 1878 Miss. Laws 175-76 § 2; 1883 Mo. Laws 76, § 1; 1883 Wis. Sess.

Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3;

1890 Okla. Sess. Laws 495, art. 47, § 4; 1899 S.C. Acts 97, No. 67, § 1; *see also*

*State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).  As an influential Missouri

Supreme Court decision explained, these laws comport with the right to

bear arms because they mitigate the "mischief" that may result "from an

intoxicated person going abroad with fire-arms." *Shelby*, 2 S.W. at 469.

That legislatures retain significant authority to keep firearms out of

the hands of intoxicated individuals is further illustrated by historical

militia laws.  As the Second Amendment's text indicates, the Framers

recognized that armed members of the militia must be "well-regulated,"

U.S. CONST. amend. II, a term that at the time connoted "discipline," *Heller*,

554 U.S. at 597, and "self-control," MICHAEL WALDMAN, THE SECOND

AMENDMENT: A BIOGRAPHY 61 (2014). For that reason, at least one state

excluded "common drunkards" from the militia, 1844 R.I. Pub. Laws 503-

16, §§ 1, 45, and many others forbade the sale of "any Strong Liquor" near

locations where militias mustered and trained.[6] These laws confirm that

the Founders perceived the risks created when alcohol and firearms

coincide and permitted legislatures substantial latitude to address them.

Drugs other than alcohol were not widely used as intoxicants in the

United States until the late nineteenth and early twentieth centuries. *See,*

*e.g.,* David F. Musto, *The American Experience with Stimulants and Opiates,* 2

PERSP. ON CRIME & JUST. 51, 63 (1997-98). Prohibitions on controlled

substances accordingly did not emerge until around the 1880s and the early

---

[6] *See* An Act for Regulating the Militia of the Province of Maryland (1756), *available in* MILITARY OBLIGATION: THE AMERICAN TRADITION (1947) 93, pt. 5, Maryland; An Act for Establishing a Militia in this Government (1756), *available in* MILITARY OBLIGATION13, pt 3, Delaware; An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling of Invasions, and Suppressing Insurrections and Rebellions (1746) (§§ 3, 23), *available in* MILITARY OBLIGATION 25, pt. 8, New Jersey; An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (1780) (§ XLV and § XLVIII(12)), *available in* MILITARY OBLIGATION pt. 11, Pennsylvania  *see also id.* (excluding "common drunkards" from the militia).

twentieth century respectively. *See* U.S. Treasury Dep't, STATE LAWS RELATING TO THE CONTROL OF NARCOTIC DRUGS AND THE TREATMENT OF DRUG ADDICTION (1931) 1-9 (describing development of state-level laws); Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 VA. L. REV. 971, 985 (1970); *id*. at 1010 (noting Utah passed first state prohibition on cannabis sale or possession in 1915).

As new and often more potent substances proliferated, so too did associated firearms regulations.  For example, a Pennsylvania statute established that "[n]o person shall deliver a firearm . . . to one who he has reasonable cause to believe … is a drug addict." 1931 Pa. Laws 499, no. 158, § 8.  Following Pennsylvania's lead, jurisdictions across the country— including the District of Columbia, Alabama, California, South Dakota, and Washington—all passed laws barring the sale of firearms or pistols to "drug addict[s]." 47 Stat. 652, § 7 (1932) (D.C.). *See* 1936 Ala. Laws 52, no. 82, § 8; 1935 S.D. Sess. Laws 356, ch. 208, § 8; 1935 Wash. Sess. Laws 601, ch. 172, § 8.

In a testament to the strength of this historical tradition, prohibitions on firearms possession by drug users remain prevalent today.  In recent times, at least twenty-six states and the District of Columbia "have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *Yancey*, 621 F.3d at 684 (collecting examples).  Section 922(g)(3) thus stands in stark contrast to the "outlier[]" laws the Supreme Court invalidated in *Bruen* and *Heller*. *Bruen*, 142 S.Ct. at 2156; *see id*. at 2161 (Kavanaugh, J., joined by Roberts, C.J., concurring) (emphasizing the "unusual" nature and "outlier" status of the New York law in *Bruen*); *Heller*, 554 U.S. at 629 (noting that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban").  Unlike those exceptional laws, Section 922(g)(3) reflects a historical tradition that stretches from the Founding to the present, and it therefore comports with the Second Amendment.  Although none of the pre-twentieth century historical analogues is a "dead ringer" or "historical *twin*" for 18 U.S.C. § 922(g)(3), *Bruen*, 142 S.Ct. at 2133, they nevertheless

show that § 922(g)(3) is "analogous enough" to historical laws "to pass

constitutional muster," *id.*

Bruen identified "two metrics" that are relevant to the analogical

inquiry—"how and why the regulations burden a law-abiding citizen's

right to armed self-defense." *Bruen*, 142 S.Ct. at 2133. *See Rahimi*, 2023 WL

2317796, at *6 ("***how*** the challenged law burdens the right to armed self-

defense, and ***why*** the law burdens that right") (emphasis by the Court).

Section 922(g)(3) imposes ***no*** burden on a "law-abiding citizen's" right to

self-defense because establishing a violation of that statute requires proof

that the defendant has violated the law by possessing a controlled

substance.  But, even as to lawbreakers, § 922(g)(3) imposes only a

temporary ban while the person is regularly using a controlled substance.

*McCowan*, 469 F.3d at 392; *Patterson*, 431 F.3d at 839.  "[A]n unlawful drug

user like [Daniels] could regain his right to possess a firearm simply by

ending his drug abuse." *Yancey*, 621 F.3d at 686.  The statute therefore

imposes a burden "comparable" to, or even less severe than, the historical

laws discussed above. *Bruen*, 142 S.Ct. at 2133.  As for "why" such laws

were enacted, the reason such laws existed is the same as for the present law, namely, "to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 113 n.6 (1983).

***Second***, § 922(g)(3) is consistent with Nation's long historical tradition of disarming individuals deemed untrustworthy, potentially dangerous, or otherwise unfaithful to the rule of law. The historical record demonstrates a long Anglo-American tradition allowing the government to categorically limit the gun rights of untrustworthy or potentially dangerous persons. The Militia Act of 1662 permitted officers of the Crown to "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." 13 & 14 Car. 2, c.3, § 13. *Rahimi* reads the 1689 English Bill of Rights as "restrict[ing] the Militia Act's reach in order to prevent the kind of politically motivated disarmaments pursued by Charles II and James II." *Rahimi*, 2023 WL 2317796, at *8 (italics omitted).

But, the English Bill of Rights, which was a "predecessor of our Second Amendment," *Heller*, 554 U.S. at 593, did not guarantee an

unqualified right.  It provided that "Subjects which are Protestants, may have Arms for their Defence *suitable to their Conditions, and as allowed by Law*." *Id.* (citing 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441) (emphasis added).  And the historical scholarship indicates that the English Bill of Rights was *not* intended to curtail the power to disarm the truly dangerous or disaffected, a practice that continued well after the Glorious Revolution and the adoption of the English Bill of Rights. *See* Patrick J. Charles, *"Arms For Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 CLEVE. STATE L. REV. 351, 375-77 (2009) (observing that, during the reign of William and Mary, "the 1662 Militia Act's seizure of arms provision was not only frequently used, but it was also supported by both Houses of Parliament"); Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 NOTRE DAME L. REV. 397, 405-06 (2019) (explaining that the "[u]se of the Militia Act to disarm dangerous and disaffected persons continued unabated" following the Glorious

Revolution). In short, the Militia Act of 1662 and the English Bill of Rights evidence a historical tradition of disarming both lawbreakers and those deemed to be dangerous.

This tradition of disarming individuals deemed to be untrustworthy or potentially dangerous carried over into the American colonies. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (recognizing that during the colonial period certain persons were denied the right to bear arms). Moreover, at the Founding, felony offenders could be punished with the death penalty, *see Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment), or with forfeiture of one's entire estate, *see* 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 95 (1769); Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 CAL. L. REV. 277, 332 & nn.275-76 (2014). Thus, those who committed serious crimes could be stripped of their right to possess firearms just as they could be stripped of other rights, such as the right to vote, *see Green v. Bd. of Elections of City of N.Y.*, 380 F.2d 445, 450 (2d Cir. 1967), *cert. denied*, 389 U.S. 1048 (1968), or to serve on a jury, *see* Brian C. Kalt, *The Exclusion of*

*Felons from Jury Service*, 53 AM. UNIV. L. REV. 65, 179  (2003).  And some states required firearm forfeiture even for misdemeanor offenses involving unauthorized hunting or misuse of a gun.[7]

The Second Amendment's ratification history also indicates that lawbreakers could be disarmed.  In what *Heller* characterized as a "highly influential proposal" and a "Second Amendment precursor," 554 U.S. at 604, a group of Pennsylvania antifederalists advocated an amendment guaranteeing the right to bear arms "*unless* for crimes committed, or real danger of public injury." The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted* in 2 BERNARD SCHWARTZ, THE BILL OF

---

[7] *See* Laws and Ordinances of New Netherlands 138 (1868) (1652 law) (firing a gun within the city of New Amsterdam); 1 Complete Revisal of All the Acts of Assembly, of the Province of North Carolina, Now in Force and Use 446-447 (1773) (1768 law) (hunting by non-freeholders); Acts of the General Assembly of the Province of New-Jersey 344 (1776) (1771 law) (trespassing with a gun by non-residents of the colony); 3 Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, with the Constitutions of the United States of America, and of the Commonwealth, Prefixed 37-38 n* (1897) (1783 law) (storing a loaded gun within Boston); 1 Private and Special Statutes of the Commonwealth of Massachusetts from the Year 1780 to the Close of the Session of the General Court, Begun and Held on the Last Wednesday in May, A.D. 1805 (1805) (1790 law) (possession of a gun on certain islands without permission).

RIGHTS: A DOCUMENTARY HISTORY 662, 665 (1971) (emphasis added).

As the D.C. Circuit has observed, this proposal "indicates that criminals, in addition to those who posed a 'real danger' (such as the mentally ill, perhaps) were proper subjects of disarmament." *Medina v. Whitaker*, 913 F.3d 152, 158-59 (D.C. Cir. 2019).  And although the proposal did not prevail at the Pennsylvania convention, it was vindicated four years later through the adoption of the Bill of Rights, eight provisions of which— including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania delegates. 2 SCHWARTZ, THE BILL OF RIGHTS at 628.  "[I]nfluential" proponents of the Second Amendment thus understood the "pre-existing right" the Amendment codified as permitting legislatures to disarm individuals who either disrespected the law or who otherwise posed a danger if armed. *Heller*, 554 U.S. at 604.

American colonies and states also frequently disarmed those who were deemed dangerous or untrustworthy.  During the French and Indian War, Virginia passed a law disarming Catholics that allowed them to keep their arms if they swore an oath of allegiance to the King. *See* 7 Statutes at

Large; Being a Collection of All the Laws of Virginia 35-36 (1820) (1756

law).  During the Revolutionary War, Connecticut passed a law providing

that any person who "shall libel or defame" any acts or resolves of the

Continental Congress or the Connecticut General Assembly "made for the

defence or security of the rights and privileges" of the colonies "shall be

disarmed and not allowed to have or keep any arms." Public Records of the

Colony of Connecticut 193 (1890) (1775 law).  And, at the recommendation

of the Continental Congress, *see* 4 Journals of the Continental Congress 205

(1906) (resolution of March 14, 1776), at least six states disarmed the

"disaffected" who refused to take an oath of allegiance to those states.[8]

Similarly, in 1900, the Ohio Supreme Court upheld the constitutionality of

a law criminalizing a tramp's possession of a firearm. *See State v. Hogan*, 63

Ohio St. 202, 58 N.E. 572 (Ohio 1900).  Such acts of disarmament were

designed to keep firearms out of the hands of dangerous individuals.

---

[8] *See, e.g.*, 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large; Being A Collection of All the Laws of Virginia 282 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law).

Thus, the "historical evidence" shows that "the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). Moreover, the historical disarmament of individuals deemed to be dangerous or risky was implicitly recognized by *Bruen*, 142 S.Ct. at 2152.[9]

Here, § 922(g)(3)'s prohibition on firearm possession applies only to those in violation of the drug laws. Societal risk was a key consideration in Congress's adoption of the statute which was aimed at keeping guns out of the hands of illegal drug users. *See, e.g.*, S. Rep. No. 1097, 1968 U.S. CODE CONG. & AD. NEWS 2112, *2114, 1968 WL 4956 (Leg. Hist.) (the ready availability of firearms for "***narcotic addicts***, mental defectives, … and others whose possession of firearms is similarly contrary to the public interest … is a matter of serious national concern") (emphasis added).[10]

---

[9] *See Bruen*, 142 S.Ct. at 2152 & n.26 (citing General D.E. Sickles's 1886 decree barring any "disorderly person, vagrant, or disturber of peace" from bearing arms).

[10] As the Supreme Court has concluded: "Congress' intent in enacting [18 U.S.C. § 922(g)] was to keep firearms out of the hands of presumptively risky people." *Dickerson*, 460 U.S. at 113 n.6. *See also Abramski v. United States*, 573 U.S. 169, 172 (2014)

Accordingly, the burdens imposed by Section 922(g)(3) and the referenced

historical analogues are "comparably justified." *Bruen*, 142 S.Ct. at 2133.

Just as historical laws disarmed people based on their mental illness,

intoxication, their status as lawbreakers or their potential dangerousness

justifies disarming individuals who are habitually breaking the law by

using mind-altering substances. "Ample academic research confirms the

connection between drug use and violent crime." *Yancey*, 621 F.3d at 686-87

(discussing research). And even if some drugs like marijuana have less

significant mind-altering effects than other drugs, Congress was entitled to

categorically conclude that those who violate the law by being current

regular users of controlled substances cannot be trusted to use firearms in a

safe and responsible way. As a district judge for the Western District of

Oklahoma recently explained in a case upholding the constitutionality of

§ 922(g)(3), the statute "is relevantly similar to regulations aimed at

preventing dangerous or untrustworthy persons from possessing and

---

(federal firearms laws serve "to prevent guns from falling into the wrong hands" and,
pursuant to 18 U.S.C. § 922(g), "certain classes of people—felons, ***drug addicts***, and the
mentally ill, to list a few—may not purchase or possess any firearm") (emphasis added).

using firearms, such as individuals convicted of felonies or suffering from

mental illness, or individuals who are intoxicated." *United States v. Lewis*,

2023 WL 187582, at *4 (W.D. Okla. Jan. 13, 2023) (internal quotations and

citations omitted).  Because this satisfies the "how" and "why" metrics

explicitly set forth in *Bruen*, § 922(g)(3) is "analogous enough" to these

historical laws "to pass constitutional muster." 142 S.Ct. at 2133.

> **c.    The *Rahimi* Panel's Consideration of § 922(g)(8)
> Should Be Distinguished from this Court's
> Analysis of § 922(g)(3)**

In *Rahimi*, a panel of this Court held that the Government's proposed

historical analogues were not sufficiently similar to § 922(g)(8) to permit a

finding that the challenged law was consistent with this Nation's

regulation of firearms possession. 2023 WL 2317796, at ** 8-11.  The Court

held that § 922(g)(8) was designed to prevent an individual who posed a

danger to another specific individual from possessing a firearm; whereas,

by contrast, the Government's proffered analogues dealt with individuals

who were a danger to society at large. *Id*.  The Court also distinguished

§ 922(g)(8) by noting that, unlike some of the proffered analogues, the

challenged offense was based on possession of a firearm plus a prior civil adjudication. *Id*. *See also id*. at *15 (Ho, J., concurring) (noting that "civil protective orders are too often misused").

The Court emphasized its concern that the firearm prohibition in § 922(g)(8) applies "even when the individual has not been criminally convicted or accused of any offense and when the underlying proceeding is merely civil in nature." *Rahimi*, 2023 WL 2317796, at *7.  Unlike the provision in *Rahimi*—as to which "[t]he distinction between a criminal and civil proceeding [was] important" (*id*.)—the statute at issue here requires that a jury be satisfied that the defendant is "an unlawful user" of an illegal substance in order to convict. 18 U.S.C. § 922(g)(3).  Thus, the challenged statute does not deprive an individual of the right to possess a firearm based "merely [on] civil process." *Id*. at n.7. Accordingly, the *Rahimi* panel's decision is readily distinguishable from this case.

Moreover, Section 922(g)(3) does not permanently ban an unlawful user from possessing a firearm; instead, it imposes only a temporary ban while the person is regularly using a controlled substance. *McCowan*, 469

F.3d at 392; *Patterson*, 431 F.3d at 839.  "[A]n unlawful drug user like [Daniels] could regain his right to possess a firearm simply by ending his drug abuse." *Yancey*, 621 F.3d at 686.  This temporary prohibition is placed upon a group of individuals, deemed by Congress to be dangerous to society at large, when possessing a firearm.

Finally, *Rahimi* is distinguishable because the analogues provided in this case clearly demonstrate that § 922(g)(3) shares its "how" and "why" metrics with historical regulations that prohibited the mentally ill, intoxicated, and those who posed a danger to society at large by possessing, using, or carrying firearms. *See Bruen*, 142 S.Ct. at 2133.  Significantly, the disquiet expressed by the *Rahimi* panel about the perils of a civil proceeding resulting in a defendant's disentitlement to possess a firearm is unwarranted in the context of a statute that demands satisfactory proof of the defendant's unlawful use of a controlled substance contemporaneous with his firearm possession in order to convict.  Thus, the *Rahimi* panel's concerns about § 922(g)(8) are distinct from § 922(g)(3) and provide no basis for declaring the unlawful user provision unconstitutional.

49

**II.    The District Court Appropriately Denied Daniels's Vagueness Challenge to 18 U.S.C. § 922(g)(3)**

In addition to his Second Amendment challenge to Section 922(g)(3), Daniels argues the statute is unconstitutionally vague.  However, binding precedent of this circuit precludes this claim, which this Court has repeatedly rejected.  Section 922(g)(3) prohibits those engaged in regular drug use from contemporaneously possessing firearms.  The statute provides fair notice and poses no risk of arbitrary enforcement.  Daniels's conduct squarely satisfied the statutory requirements.

**A.    Standard of Review**

This Court reviews "*de novo* a preserved challenge to the constitutionality of a criminal statute." *United States v. Copeland*, 820 F.3d 809, 811 (5th Cir. 2016) (citing *United States v. Howard,* 766 F.3d 414, 419 (5th Cir. 2014)).  "Whether a statute is unconstitutionally vague is a question of law, which this court reviews *de novo*." *United States v. Coleman*, 609 F.3d 699, 706 (5th Cir. 2010).  As is true of constitutional challenges generally, this Court reviews *de novo* a claim that a statute "is unconstitutional as applied." *United States v. Ollison*, 555 F.3d 152, 160 (5th Cir. 2009).

## B.　　Consideration of the Issue Below

Shortly before trial, after the dispositive motions deadline had

expired, Daniels filed a second motion to dismiss, this time challenging 18

U.S.C. § 922(g)(3) as unconstitutionally vague. ROA.78 (7/21/22 motion).

*See* ROA.80-92 (memorandum in support); ROA.94-98 (Gov't response);

ROA.27 (7/1/22 dispositive motion deadline).

After the trial began, Judge Guirola turned to the second motion to

dismiss. ROA.187-92.  Following argument, the judge denied the motion

but recognized the question might be revisited after the conclusion of the

Government's case. ROA.192.  After the Government rested, defense

counsel renewed the motion to dismiss for vagueness. ROA.244-49.

Following argument, the court reserved ruling on the motion. ROA.248-49,

261.  The court later issued a written ruling, denying Daniels's challenge to

the vagueness of the statute. ROA.125-32; R.E.7.

## C.　　Applicable Law

 "A criminal statute survives [this Court's] vagueness review if it

'define[s] the criminal offense with sufficient definiteness that ordinary

people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Edwards*, 182 F.3d 333, 335 (5th Cir. 1999) (quoting *United States v. Gray*, 96 F.3d 769, 776 (5th Cir. 1996)).  Unless the conduct at issue involves the First Amendment, "even if a statute might be vague when applied to some situations, 'a defendant whose conduct is clearly prohibited cannot be the one making that challenge.'" *United States v. Thomas*, 877 F.3d 591, 599 (5th Cir. 2017) (quoting *United States v. Westbrooks*, 858 F.3d 317, 325 (5th Cir. 2017), *vacated on other grounds*, 138 S.Ct. 1323 (2018)).   The same is true despite the Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591 (2015).  As this Court has recognized, "*Johnson* did not change the rule that a defendant whose conduct is clearly prohibited cannot be the one making that challenge." *Westbrooks*, 858 F.3d at 325.

This Court specifically has addressed vagueness challenges to the constitutionality of 18 U.S.C. § 922(g)(3) on multiple occasions and has determined that the statute satisfies the Fifth Amendment Due Process requirements. *See, e.g., May*, 538 Fed.Appx. at 466; *United States v. Roach*,

201 Fed.Appx. 969, 974 (5th Cir. 2006) (unpublished per curiam); *United States v. McGruder*, 254 F.3d 1081, 2001 WL 563899, at *3 (5th Cir. 2001) (unpublished per curiam).

### D.    Discussion

In denying Daniels's challenge to 18 U.S.C. § 922(g)(3) as unconstitutionally vague under the Due Process clause of the Fifth Amendment, Judge Guirola correctly analyzed the statute as applied to Daniels's case given that the statute does not implicate First Amendment rights. ROA.127 (citing *Chapman v. United States*, 500 U.S. 453, 467 (1991); *United States v. Powell*, 423 U.S. 87, 92 (1975)). *See* U.S. CONST. amend. V ("[n]o person shall … be deprived of life, liberty, or property without due process of law").  As Judge Guirola explained, "'vagueness challenges to statues which do not involve First Amendment freedoms must be examined in light of the facts at hand.'" ROA.127 (quoting *United States v. Majurie*, 419 U.S. 554, 550 (1975)).  The district judge rightly pointed out that this Court has addressed vagueness challenges to Section 922(g)(3) and

held the statute to be valid. ROA.129-31 (citing *May*, 538 Fed.Appx. At 465;

*Edwards*, 182 F.3d at 336; *Patterson*, 431 F.3d at 836).

In the context of this case, Judge Guirola pointed to the evidence

establishing that Daniels was "in possession of two loaded firearms at the

same time that he was in possession of smoked marijuana blunts."

ROA.129. *See* ROA.199-200, 210-11, 214, 218 (Bell); *see also* Fig. 1 *supra* (GX

1).  The judge also referred to TFO Bell's smelling marijuana upon

approaching Daniels's truck and Daniels's admitting smoking "fourteen

days a month in the years since his graduation from high school."

ROA.129-30. *See* ROA.199, 201,218 (Bell); ROA.446-48 (GX 24A: post-arrest

interview).  Based on this proof, Judge Guirola appropriately determined

that there was no vagueness in the application of the statute here. ROA.130.

As the judge stated: "The facts of concurrence in the possession of both

firearms and marijuana places Defendant's conduct clearly within that

prescribed by the statute." ROA.130.

In mounting a facial challenge to Section 922(g)(3), *see* Br. 24-36,

Daniels disregards the law of this Court upholding the validity of the

statute under the Due Process clause. *See May*, 538 Fed.Appx. at 465; *Edwards*, 182 F.3d at 336; *Patterson*, 431 F.3d at 836.  In *May*, this Court rejected a vagueness claim, concluding that "an ordinary person would understand that May's use of marijuana while in possession of firearms established him as an 'unlawful user' in violation of § 922(g)(3)." 538 Fed.Appx. at 465-66.  Similarly, in *Patterson*, the Court was satisfied that "an ordinary person would understand that Patterson's actions establish him as an unlawful user." 431 F.3d at 836.  *Patterson* in turn looked to this Court's rejection of a vagueness challenge in *Edwards*. *Id*.  In *Edwards*, the Court upheld § 922(g)(3) in the face of a vagueness claim even though the defendant "was not using drugs at the exact moment the police found him in possession of a firearm," but his status as an illegal drug user was sufficient for an ordinary person to understand the prohibition. 182 F.3d at 335.  Daniels's claim that the "unlawful user" language of the statute is unconstitutionally vague is unavailing in the face of this Court's rejection of a similar claim in *Patterson*, where this provision was upheld despite the fact that "the term 'unlawful user' is undefined." *Patterson*, 431 F.3d at 836.

The same is true of the other vagueness claims this Court has considered and denied. *See May*, 538 Fed.Appx. at 465; *Edwards*, 182 F.3d at 336.

Nor is there any validity to Daniels's asserted concern about the supposed absence of "a temporal nexus between substance use and firearm possession." Br. 32. The statute by its own terms prohibits firearm possession only by a "person … who *is* an unlawful user of … any controlled substance." 18 U.S.C. § 922)(g)(3) (emphasis added). As the Supreme Court has explained, "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992). The use of the present tense "is" indicates that Congress intended to preclude only current drug users from possessing a firearm. *See Yancey*, 621 F.3d at 687 ("the prohibition in § 922(g)(3) bars only those persons who are *current* drug users from possessing a firearm, and '[i]t is obvious that the tenses used throughout Title IV [including § 922(g)] were chosen with care'") (quoting *Scarborough v. United States,* 431 U.S. 563, 570 (1977) (emphasis in original)). Daniels's suggestion that the statute could be read to "encompass anyone who ever used a controlled substance unlawfully" (Br.

33) overlooks the present tense language requiring the gun possessor to be a current unlawful user.

Daniels seeks to sidestep the "as applied" Due Process approach by invoking *Johnson v. United States*, 576 U.S. 591, 596-97 (2015). Br. 25. But, as this Court has said, "*Johnson* does not change the rule that a defendant whose conduct is clearly prohibited cannot be the one making that challenge." *Westbrooks*, 858 F.3d at 325. Other courts of appeals agree that *Johnson* did not discard the rule prohibiting litigants whose conduct is clearly prohibited by a statute to bring a facial vagueness challenge, and many of them have done so in the context of a challenge to 18 U.S.C. § 922(g)(3). *See, e.g., United States v. Hasson*, 26 F.4th 610, 620-21 (4th Cir.), *cert. denied,* 143 S.Ct. 310 (2022); *United States v. Cook*, 970 F.3d 866, 877-78 (7th Cir. 2020) (holding that the defendant could not bring a facial challenge to 18 U.S.C. § 922(g)(3)); *United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016) (defendant challenging § 922(g)(3) still must "show that the statute is vague as applied to his particular conduct"); *Kashem v. Barr*, 941 F.3d 358, 376 (9th Cir. 2019); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1190

(10th Cir. 2021). *See generally Hasson*, 26 F.4th at 620 ("no court of appeals to consider the question has concluded" that *Johnson* "worked such a change"). *Johnson* did not abrogate the traditional rule that, where a statute clearly proscribes the defendant's conduct, the defendant may not advance a facial vagueness challenge outside the First Amendment context. Given the evidence amply satisfying the required proof in this case, Daniels should not be heard to complain that Section 922(g)(3) was too vague in its application to his conduct.

## III.  The Jury's Verdict Is Supported by Sufficient Evidence

### A.    Standard of Review

When a defendant timely moves for a judgment of acquittal, this Court reviews challenges to the sufficiency of evidence *de novo*, viewing the proof in the light most favorable to the verdict. *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020). "Our sufficiency review is highly deferential to the jury's verdict." *United States v. Mesquias*, 29 F.4th 276, 279 (5th Cir. 2022). "We will reverse only if no rational jury could have found defendants guilty beyond a reasonable doubt." *Id. See United States v.*

*Swenson*, 25 F.4th 309, 316 (5th Cir. 2022) ("a defendant seeking reversal on

the basis of insufficient evidence swims upstream") (internal quotation

marks and citation omitted); *United States v. Bedoy*, 827 F.3d 495, 504 (5th

Cir. 2016) ("Sufficiency review essentially addresses whether the

government's case was so lacking that it should not have even been

submitted to the jury.") (internal quotation marks and citation omitted).

### B.    Consideration of the Issue Below

At the close of the Government's case, Daniels's counsel moved for a

judgment of acquittal, which the trial court denied. ROA.244-49. *See* FED. R.

CRIM. P. 29(a).  When Daniels's counsel renewed the motion after the

conclusion of all the evidence, the motion again was denied. ROA.261.

### C.    Applicable Law

Section 922(g)(3), makes it "unlawful for any person … who is an

unlawful user of … any controlled substance … to … possess in or affecting

commerce, any firearm … which has been shipped or transported in

interstate or foreign commerce." 18 U.S.C. § 922)(g)(3).  The statute

incorporates by reference the definition of "controlled substance (as

defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." *Id.*

As Judge Guirola correctly instructed the jury, in order to prove a

violation of this statute, the Government was required to establish:

> *First*, that the defendant knowingly possessed a firearm;

> *Second*, that at the time the defendant possessed the firearm,
> the defendant was an unlawful user of a controlled
> substance;

> *Third*, the defendant knew he was an unlawful user of a
> controlled substance;

> And *fourth*, that the firearm possessed traveled in
> interstate or foreign commerce….

ROA.270 (italics added). *See* 18 U.S.C. § 922(g)(3). *Cf.* Fifth Circuit

Pattern Jury Instructions: Criminal § 2.43D ("Possession of a Firearm

by a Convicted Felon, 18 U.S.C. §§ 922(g), 924(a)(2)"); *id*. § 2.43D, note ("If

the defendant is charged under another subsection of § 922(g), the second

and third elements should be modified accordingly.").  The judge

instructed the jury that "[m]arijuana is a controlled substance within the

meaning of the law." ROA.271.

### D.    Discussion

The proof at trial sufficiently established that Daniels, knowing he
was an unlawful user of a controlled substance, knowingly possessed a
firearm that had been transported in interstate commerce, as charged in the
indictment and as prohibited by federal law. ROA.149-50 (indictment);
R.E.3. *See* 18 U.S.C. § 922(g)(3).  A month before the arrest that led to his
indictment in this case, Daniels was found in possession of "multiple bags
of marijuana and firearms" and admitted he was a user of marijuana.
ROA.210.  The task force officer, who was new to the sheriff's department,
did not arrest Daniels then but pulled him over the next month for a traffic
violation and smelled marijuana coming from his truck. ROA.199, 218.
Daniels was found in possession of two firearms that an ATF agent
testified had been transported in interstate commerce. ROA.199-200, 229-
30. *See* Fig. 1 *supra* (weapons found in Daniels's truck).  In addition to
smelling marijuana, TFO Bell also recovered marijuana blunts in the
ashtray, and Daniels admitted he smoked marijuana "14 days out of the

month." ROA.200-01.  This proof adequately satisfies the required

elements.

Daniels challenges the Government's proof as to two of the elements,

namely, his status as an unlawful user when he possessed the firearms and

the knowingness requirement for the firearms possession. Br. 40-44.

Neither argument has merit.

### 1. Daniels Qualified as an Unlawful User

Daniels insists that he "had not used marijuana in an undetermined

number of weeks." Br. 41 (citing GX 24A).  But the jury was entitled to

reject Daniels's denial of recent marijuana usage—especially given TFO

Bell's testimony that he could detect the smell of marijuana coming from

Daniels's truck and he discovered burnt marijuana blunts in the ashtray.

ROA.199-200, 218.  In insisting on his version of the events, Daniels

disregards that this Court's sufficiency review examines the proof in the

light most favorable to the verdict. *Sanders*, 952 F.3d at 273.

Daniels contends that the Government failed to prove his unlawful

use was sufficiently recent to show he "'was actively engaged in such

conduct.'" Br. 41 (quoting ROA.271) (jury instructions).  But this Court has cited the presence of marijuana smoke and the discovery of burnt marijuana cigarettes as indications of its recent use. *See, e.g., United States v. Parett*, 260 Fed.Appx. 750, 752 (5th Cir. 2008) (unpublished per curiam) ("there were remnants of burned marijuana cigarettes found in an ashtray"); *McGruder*, 254 F.3d 1081, 2001 WL 563899, at *1 (unpublished per curiam) (trooper "smelled marijuana smoke in the car").  The jury was entitled to infer that Daniels's use was sufficiently contemporaneous for him to qualify as a prohibited person.

In challenging the sufficiency of the proof, Daniels also relies on the discarded doctrine that, where evidence allows for "equal or nearly equal circumstantial support to a theory of guilt and to a theory of innocence," this Court is to reverse. Br. 42-43 (citing *United States v. Hunt*, 961 F.3d 739, 742 (5th Cir. 1999); *United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir. 1992)).  But, this Court has since abandoned the equipoise rule because it fails to give sufficient regard to the jury's first-hand evaluation of the trial proof.  *United States v. Vargas-Ocampo*, 747 F.3d 299, 300 (5th Cir. 2014) (en

banc) ("this court should no longer refer to the 'equipoise rule'").  This

Court should likewise defer to the jury's evident conclusion that Daniels

qualified as an unlawful user.

### 2.    Daniels Was Sufficiently Aware of his Status as an Unlawful User

Daniels contends the Government failed to "prove that [he] knew his

status made it unlawful for him to possess a firearm." Br. 42 (citing *Rehaif v.*

*United States*, 239 S.Ct. 2191, 2194 (2019)).  Daniels misreads the *Rehaif*

knowledge requirement.  As explained in the passage Daniels quotes,

*Rehaif* requires proof "'that [he] knew he possessed a firearm and also that

he knew he had the relevant status when he possessed it.'" Br. 42 (quoting

*Rehaif*, 139 S.Ct. at 2194).  Daniels need not have known that his status as an

unlawful user "made it unlawful for him to possess a firearm." Br. 42.

This Court has recognized that an "unlawful user" is "a person

whose drug usage occurred 'with regularity and over an extended period

time.'" *United States v. Woods*, 811 Fed.Appx. 895, 895 (5th Cir. 2020)

(unpublished per curiam) (quoting *McCowan*, 469 F.3d at 392 (internal

quotation marks and citation omitted)).  Daniels was aware he used

marijuana regularly, acknowledging he smoked an average of "fourteen days out of a month." ROA.447 (GX 24A).  Daniels also admitted using marijuana over an extended period, telling the police he began after graduating from high school. ROA.448 (GX 24A).  This is sufficient to show that Daniels was aware of his status as an unlawful user. *See Woods*, 811 Fed.Appx. at 896 ("the record provides ample support for the inference that, at the time she possessed the firearms, Woods knew that she used controlled substances regularly and over an extended period of time") (citing *United States v. Hicks*, 958 F.3d 399, 401-02 (5th Cir. 2020); *United States v. Herrera*, 313 F.3d 882, 884-85 (5th Cir. 2002) (en banc)).

In addressing the extent of his knowledge of the illegality of possessing marijuana under federal and state law, Daniels "concedes that marijuana is currently an unlawful status under federal law" but claims "his possession of such a small amount of marijuana" is insufficient. Br. 43. As a factual matter, TFO Bell testified that Daniels possessed "multiple bags of marijuana" when Bell encountered him the previous month and found multiple blunts in the ashtray when he pulled Daniels over in April

2022. ROA.200, 210.   Daniels's unsupported suggestion that he had made a

"decision to discontinue using marijuana … weeks before" (Br. 43) is at

odds with the testimony that TFO Bell could smell marijuana emanating

from the truck when the officer approached Daniels immediately before

finding him in possession of the firearms. ROA.199, 218.

Citing law from this circuit and elsewhere, the Sixth Circuit has

held that the Government must show only that the defendant knew he was

an unlawful drug user, but not that he knew that unlawful drug users are

prohibited from possessing firearms under federal law. *United States v.*

*Lundy*, 2021 WL 5190899, at *3 n.1 (6th Cir. 2021) (citing, *inter alia*, *United*

*States v. Trevino*, 989 F.3d 402, 405 (5th Cir. 2021) ("Our cases applying

*Rehaif* have not required the Government to prove knowledge of the

statutory prohibition contained in § 922(g).")).

As much as Daniels may wish that marijuana possession were legal

for recreational use, it remains unlawful under federal and state law. *See* 21

U.S.C. § 844(a); MISS. CODE ANN. § 41-29-139.   And the fact that someone

convicted of simple possession of marijuana as a matter of federal law later

may be eligible for a pardon (Br. 39 & n.28) provides no relief for Daniels under the circumstances of this case.  The jury had sufficient evidence to find Daniels guilty.

## CONCLUSION

For the foregoing reasons, the judgment of conviction should be affirmed.

Respectfully submitted,

DARREN J. LAMARCA
*United States Attorney for the*
*Southern District of Mississippi*

GAINES H. CLEVELAND
*Assistant United States Attorney*
Mississippi Bar Number 6300

By:    /s/ *Jonathan D. Buckner*

JONATHAN D. BUCKNER
*Assistant United States Attorney*
Mississippi Bar Number 10416
1575 Twentieth Avenue
Gulfport, Mississippi  39501
Dated: March 6, 2023          Telephone: (228) 563-1560

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this day, he caused to be electronically filed a copy of the Brief for Appellee United States of America with the Clerk of the Court using the ECF system, which caused the brief to be served on counsel of record.

CERTIFIED, this the 6th day of March 2023.

/s/ *Jonathan D. Buckner*

JONATHAN D. BUCKNER
*Assistant United States Attorney*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,003 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.       This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the typestyle requirements of FED. R. APP. 32(a)(6) because the brief has been prepared using Palatino Linotype 14-point font produced by Microsoft 360 software; the footnotes are in 12-point type.

3.      Privacy redactions required by FIFTH CIR. R. 25.2.13 have been made to this brief.

4.      The electronic submission of this brief is an exact copy of the paper document as required by FIFTH CIR. R. 25.2.1.

5.      This brief has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

CERTIFIED, this the 6th day of March 2023.

/s/ *Jonathan D. Buckner*

JONATHAN D. BUCKNER
*Assistant United States Attorney*