No. 22-60596

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT


UNITED STATES OF AMERICA
Plaintiff-Appellee

v.

PATRICK DARNELL DANIELS, JR.
Defendant-Appellant


Appeal from the United States District Court
For the Southern District of Mississippi
Cause No. 1:22-cr-00058-LG-BWR-1

---

### REPLY BRIEF FOR APPELLANT

---

**Omodare B. Jupiter** (MS Bar #102054)
Federal Public Defender
N. and S. Districts of Mississippi
2510 14th Street, Suite 902
Gulfport, MS 39501
Telephone: 228/865-1202
Fax: 228/867-1907

**Leilani T. Tynes (MS Bar #100074)**
Assistant Federal Public Defender
Leilani_Tynes@fd.org
Attorney for Defendant-Appellant

# <u>TABLE OF CONTENTS</u>

<u>page</u>:

TABLE OF CONTENTS..........................................................................i

TABLE OF AUTHORITIES ................................................................. ii

I. ARGUMENT...................................................................................1

   A. *Bruen* abrogated this Court's Second Amendment precedent.......................1

   B. Mr. Daniels is one of "the people" protected by the Second Amendment ......4

   C. The Government has not met its burden to establish historic analogues to the restrictions set forth in 18 U.S.C. § 922(g)(3)..................................................6

     1. The Nation's historical analogues for users of intoxicants does not support a total restriction of a person's Second Amendment rights.......................7

     2. The "potentially dangerous person" historical analogues that the Government presents do not apply to Mr. Daniels.................................10

     3. The district courts that have addressed 18 U.S.C. § 922(g)(3) since *Bruen* have not conducted the required historical analysis ...............................13

   D. The Government's own argument highlights the unconstitutional vagueness of 18 U.S.C. §922(g)(3). ...............................................................................14

VI. CONCLUSION.................................................................................15

CERTIFICATE OF SERVICE ..............................................................17

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................18

## TABLE OF AUTHORITIES

page(s):

cases:

*District of Columbia v. Heller*,
554 U.S. 570 (2008).................................................................1, 2, 4, 5, 7

*McDonald v. Chicago*,
561 U.S. 742 (2010).......................................................................1, 6, 7

*New York State Rifle & Pistol Association Inc. v. Bruen*,
142 S.Ct. 2111 (2022).............................................................1-7, 13-14

*State v. Shelby*,
2 S.W. 468, 469 (Mo. 1886) .................................................................9

*United States v. Black*, 2023 WL 122920
(W.D. La. Jan. 6, 2023)........................................................................13

*United States v. Connelly*,
2022 WL 17829158 (W.D. Tex. Dec. 21, 2022) ....................................14

*United States v. May*,
538 F. App'x 465 (5th Cir. 2013) ...........................................................3

*United States v. Morales-Lopez*,
2022 WL 2355920 (D. Utah June 30, 2022)..........................................15

*United States v Patterson*,
431 F.3d 832, 836. (5th Cir. 2005) ............................................3, 4, 13, 14

*United States v. Rahimi*,
2023 WL 2317796, (5th Cir. March 2, 2023)....................... 3, 5, 12-14, 16

*United States v. Sanchez*,
2022 WL 17815116 (W.D. Tex. Dec. 19, 2022) ............................. 13-14

statutes:

18 U.S.C. § 922(g)(3)...........................................................................1-4, 7-10, 12-16

historical statutes:

Kansas Gen. Stat., Crimes & Punishment § 282 (1868)........................................ 8-9

3 Laws of the Commonwealth of Massachusetts from November 28, 1780 to
February 28, 1807 , Prefixed 37-38 n* (1897) .......................................................11

1878 Miss. Laws 175-76 § 2.....................................................................................9

Mo. Laws 76, § 1 ................................................................................................. 8-9

Laws and Ordinances of New Netherlands 138 (1868)..........................................11

1 Complete Revisal of All the Acts of Assembly, of the Province of North
Carolina, Now in Force and Use 446-47 (1773).....................................................11

1890 Okla. Sess. Laws 495, art. 47, § 4....................................................................9

1899 S.C. Acts 97, No. 67 ........................................................................................8

1 Hening, Statues at Large; Being a Collection of All the Laws of Virginia, from
the First Session of the Legislature 401-02 .............................................................8

1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch.
329 § 3.......................................................................................................................8

other sources:

https://www.whitehouse.gov/briefing-room/presidential-
actions/2022/10/06/granting-pardon-for-the-offense-of-simple-possession-of-
marijuana/ (last visited January 27, 2023)..............................................................13

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous
Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 268-69 (2020)...................12

iii

# I.    ARGUMENT

18 U.S.C. § 922(g)(3) is unconstitutional. The statute violates the Second Amendment and is void for vagueness. The Government, in its response brief, attempts to reframe the impact of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), because it cannot meet its burden to establish historical analogues that support completely disarming people who use marijuana or other intoxicants. Additionally, the Government's own argument– that the restriction of Mr. Daniels' Second Amendment rights amounts to a "temporary ban" that could end at any time he stops using marijuana – highlights the unconstitutional vagueness of 18 U.S.C. § 922(g)(3) because, unlike historical temporary firearm restrictions, § 922(g)(3) does not adequately define the scope of the restriction. Because 18 U.S.C. § 922(g)(3) is unconstitutional, this Court should vacate Mr. Daniels' conviction.

## A.  *Bruen* abrogated this Court's Second Amendment precedent.

Contrary to the Government's assertion, *Bruen* did abrogate this Court's Second Amendment precedent. In *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court struck down regulations that limited the right of people to possess firearms in the home for self-defense, thereby establishing the Second Amendment as an individual right. *See Bruen*, 142 S.Ct. at 2125. Following those decisions, Courts of Appeals, including this Court, subsequently coalesced around a two-step analysis when reviewing

firearm regulations. *See Bruen*, 142 S.Ct. at 2126. In the first step, courts analyzed the "original scope of the right based on its historical meaning." *Id.* If the government could establish that the regulation at issue was outside of the scope of the Second Amendment, as it was "originally understood," then courts would uphold the regulation. *Id.* at 2126. If the historical evidence did not establish conclusively that the regulated conduct fell within the scope of protected activity, courts would then conduct a means-end analysis. *See id.* Starting from the premise that the Second Amendment, at its core, protected the right of self-defense in the home, courts would either apply strict scrutiny (for core protections) or intermediate scrutiny. *See id.*

In *Bruen*, the Supreme Court rejected the Circuit Courts' means-end scrutiny test for statutes that restrict Second Amendment rights. *See Bruen*, 142 S.Ct. at 2126-27. Instead, the Supreme Court reiterated the historical approach it established in *Heller*:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S.Ct. at 2129-30. Additionally, because the question of drug use is a "general societal problem that has persisted since the 18th century, the Government must provide proof of "distinctly similar historical regulations" that are consistent with the restriction of § 922(g)(3). *Id.* at 2131.

2

This Court has recently emphasized that *Bruen* upended Second Amendment jurisprudence in the Fifth Circuit, insofar as the Supreme Court "repudiated" means-end scrutiny. *United States v. Rahimi*, 2023 WL 2317796, *3 (5th Cir. March 2, 2023) (substituted opinion). In *Rahimi*, this Court held that "[t]o the extent that the Court did not overtly overrule *Emerson* and *McGinnis* – it did not cite those cases but discussed other circuits' similar precedent – *Bruen* clearly 'fundamentally change[d]' our analysis of laws that implicate the Second Amendment [], rendering our prior precedent obsolete." *Id.* at *3 As such, this Court has pronounced its intent to review Second Amendment restrictions anew under the *Bruen* standard.

Despite the Court's clear, direct language , the Government contends that this Court need look no further than its previous rulings – *United States v. Patterson* and *United States v. May* – to uphold § 922(g)(3) as consistent with historical restrictions on firearms. *See United States v. May*, 538 F. App'x 465 (5th Cir. 2013); *United States v. Patterson*, 431 F.3d 832 (5th Cir. 2005), *cert. denied*, 547 U.S. 1138 (2006). The Government ignores the plain language of *Rahimi*. Moreover, both *Patterson* and *May* rely on the reasoning set forth in *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), which *Rahimi* explicitly overruled. Finally, both *Patterson* and *May* failed to conduct the type of in-depth historical analysis that *Bruen* requires, relying instead on the summary conclusion that "[l]ike the classes of criminals in *Emerson*

and *Everist*, unlawful users of controlled substances pose a risk to society if permitted to bear arms." *Patterson*, 431 F.3d at 836. *Bruen* requires more.

For these reasons, the Government may not rely on this Court's precedent to meet its burden to demonstrate that § 922(g)(3) "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.C.t at 2126.

## B. Mr. Daniels is one of "the people" protected by the Second Amendment.

The Government's argument that Mr. Daniels is not one of "the people" protected by the Second Amendment also fails. First, in establishing the Second Amendment as an individual right, *Heller* explained that when the Constitution "mention[s] 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. And although *Heller* and *Bruen* recognize that the Second Amendment right is not unlimited, proper analysis requires courts to conduct a careful review of historical traditions *before* they strip a citizen of that right. At most, courts may begin with the presumption that such a restriction is lawful. *See Heller*, 554 U.S. at 627, n. 26 (stating that felon in possession law and "the carrying of firearms in sensitive places" are "presumptively lawful regulatory measures").

The Government makes much ado about the Supreme Court's use of the phrase "law-abiding citizen" in *Heller* and *Bruen*, arguing that it limits the application of the Second Amendment to this category of citizens. The

Government's proposed reading of "the people" is precisely the argument that this Court rejected in *Rahimi*. In *Rahimi*, this Court held that excluding less than model citizens from the protections of the Second Amendment, without evaluating whether they are subject to one of the "longstanding prohibitions on the possession of firearms" is improper because it "turns the typical way of conceptualizing constitutional rights on its head." *Rahimi*, 2023 WL 2317796 at *5. Here, as in *Rahimi*, the Government seeks to exclude a group of citizens so broad and so malleable that to adopt the Government's position would be to "risk swallowing the text of the amendment." *Id.* at *5.

The Government's position also inverts the analysis in a way that would render *Bruen* meaningless. The Government essentially argues that when a person violates a law that results in a loss of their Second Amendment rights, the ability to challenge the constitutionality of that law is dependent on that person not having violated the law in the first place, even if that law is, upon evaluation, unconstitutional. This circular reasoning would mean that no defendant, having been convicted of a firearms violation, could ever assert a Second Amendment challenge.

The proper reading of *Bruen* and *Rahimi* is to begin the analysis with the presumption that "the Second Amendment right is exercised individually and belongs to all Americans," even those who are not "model citizen[s]." *Rahimi*, 2023 WL 2317796 at *5 (quoting *Heller*, 554 U.S. at 581). In fact, *Bruen* explicitly orders

reviewing courts to judge the *conduct* at issue, not the status of the person. *Bruen*, 142 S.Ct. at 2129 (stating that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"). In this case, Mr. Daniels' conduct was the possession of two firearms that, all things being equal, are legal to possess. Accordingly, under *Bruen*, this conduct is presumptively protected, and the statute is presumptively unconstitutional. If the Government establishes by submitting evidence of distinctly similar historical analogues that a defendant is in a group whose Second Amendment rights were historically restricted, only then is the statute constitutional. To find that the Second Amendment applies only to "law-abiding citizens" would set it apart from the other individual rights set forth in the Bill of Rights and relegate it to the "second-class" status that the Supreme Court decried as unconstitutional. *Bruen*, 142 S.Ct. at 2156 (citing *McDonald*, 561 U.S. at 780 (plurality opinion)).

## C. The Government has not met its burden to establish historic analogues to the restrictions set forth in 18 U.S.C. § 922(g)(3).

The reason behind the Government's insistence that this Court need not conduct the historical analysis required by *Bruen* is obvious. The Government cannot meet its burden to prove the existence of distinctly similar[1] historical

---

[1] Because the issue of firearm use among people who are under the influence of an intoxicant is "a general societal problem that has persisted since the 18th century," Mr. Daniels asserts that the "distinctly similar" historical standard applies, rather than the less stringent "relevantly similar" standard reserved for "unprecedented

analogues to justify stripping Mr. Daniels of his Second Amendment rights under 18 U.S.C. § 922(g)(3).

In evaluating whether a historical regulation is distinctly similar to the modern regulation being challenged, courts should look to "two metrics," addressed in *Heller* and *McDonald*: "*how* and *why* the regulations burden" Second Amendment rights. *Bruen*, 142 S.Ct. at 2132-33 (emphasis added). Additionally, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (internal punctuation and citations omitted) (emphasis in original).

The Government attempts to place Mr. Daniels into two categories that it claims historically qualify as justifiable restrictions on firearm possession: (1) users of intoxicants and (2) potentially dangerous persons. Neither of these categories justifies the total prohibition on Mr. Daniels' constitutional rights.

> 1. **The Nation's historical analogues for users of intoxicants does not support a total restriction of a person's Second Amendment rights.**

The Government contends that this country has a long tradition of disarming intoxicated persons and cites to multiple colonial-era and 19th-century state laws in

---

societal concerns or dramatic technological changes." *Bruen*, 142 S.Ct. at 2131-32. Under either standard, however, the Government cannot meet its burden to establish that persons similarly situated to Mr. Daniels were historically stripped of their Second Amendment rights.

support.[2] *See* Gov't Br. at 33-34. The Government fails to address, however, multiple issues that are central to the discussion of these statutes that it claims are analogous to the total prohibition on firearms set forth in 18 U.S.C. § 922(g)(3). In fact, these statutes demonstrate that § 922(g)(3) goes too far and runs afoul of the Second Amendment.

First, every single statute that the Government cites applied to disarm people *only while they were actually under the influence* of alcohol. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishment § 282 (1868) ("under the influence of intoxicating drink"); Mo. Laws 76, § 1 ("intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ("in a state of intoxication"); 1899 S.C. Acts 97, No. 67, § ("under the influence of intoxicating liquors"). *See also* 1 Hening, Statues at Large; Being a Collection of All the Laws of Virginia, from the First Session of the

---

[2] The Government asserts that all variants of intoxicants are equal. Given the breadth of substances addressed in the Controlled Substances Act and the unique nature of marijuana, which was slow to be criminalized and is now largely legalized, Mr. Daniels contends that this Court should consider the specifics of marijuana as an intoxicant, rather than intoxicants generally, as the effects vary widely. *See* Initial Br. at 18-24 (outlining the history of marijuana as a controlled substance). For purposes of addressing the Government's argument only, Mr. Daniels accepts the Government's position that all intoxicants are equal.

8

Legislature 401-02 ("shoot any guns at drinking").[3] Notably, Mississippi's law penalized the person who sold a firearm to an intoxicated person, not the person in possession of that firearm. *See* 1878 Miss. Laws 175-76 § 2. And Oklahoma's law applied only to public officials, not ordinary citizens. *See* 1890 Okla. Sess. Laws 495, art. 47, § 4. Contrary to the historical precedent, 18 U.S.C. § 922(g)(3) applies to persons who are not under the immediate influence of a substance. As demonstrated by Mr. Daniels' case, to obtain a conviction under § 922(g)(3), the Government need not prove that the person possessed a firearm while under the influence. The Government did not present – in fact, did not conduct – any drug testing to determine if Mr. Daniels was impaired.

Second, these colonial-era and 19th-century firearms regulations were misdemeanors, not felonies. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishment § 282 (1868). Punishment for violating these statutes was limited primarily to the payment of a fine. *See id.*; *see also* 1883 Mo. Laws 76, § 1. Imprisonment, if applicable was generally limited to a period of three to six months. *See, e.g.*, Kansas Gen. Stat., Crimes & Punishment § 282 (1868); 1883 Mo. Laws 76, § 1. Notably, the Missouri case that the Government cites as "influential" resulted in a fine of $10 and no jail time. *See State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

---

[3] All of these statutes are compiled on the Duke Center for Firearms Law website under the Repository of Historical Gun Laws tab. *See* https://firearmslaw.duke.edu/ (last visited March 23, 2023).

Third, and most importantly, the Government has submitted no historical analogue that justifies the permanent deprivation of Mr. Daniels' Second Amendment right. None of the statues upon which the Government relies even mention a permanent ban on a person's right to keep and bear arms. A conviction under §922(g)(3), however, is a felony, punishable by up to fifteen (15) years in prison. *See* 18 U.S.C. § 922(g)(3). Having been convicted, Mr. Daniels is now subject to the restrictions of 18 U.S.C. §922(g)(1) and will forever be banned from exercising his Second Amendment right. This total and permanent restriction, based on the jury's finding that Mr. Daniels had previously used a controlled substance, has no historical analogues.

For these reasons, 18 U.S.C. §922(g)(3) is not consistent with the Nation's historical tradition of firearm possession; therefore, it runs afoul of the Second Amendment and must be found unconstitutional.

### 2. The "potentially dangerous person" historical analogues that the Government presents do not apply to Mr. Daniels.

The Government next argues that 18 U.S.C. § 922(g)(3) meets the historical tradition of keeping firearms out of the hands of "potentially dangerous" persons. These arguments also fail because they are not distinctly similar historical analogues.

First, the Government cites to several colonial-era laws that it contends disarmed "lawbreakers." Gov't Br. at 42, n. 7. A closer look at these laws disproves the Government's point. These laws were not intended to keep firearms away from

"dangerous" individuals. Rather, they protected such interests as (1) the public safety, by prohibiting hunting for game within the city limits; (2) the rights of landowners, by prohibiting hunting on another person's land; and (3) the safety of firefighters, by prohibiting the storage of loaded guns that increased the risk of explosions in the event of a fire. *See* Laws and Ordinances of New Netherlands 138 (1868) (1652 law) (hunting within city limits); 1 Complete Revisal of All the Acts of Assembly, of the Province of North Carolina, Now in Force and Use 446-47 (1773) (1768 law) (only landowners may hunt on their land); 3 Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807 , Prefixed 37-38 n* (1897) (1783 law) (loaded firearms storage prohibited in Boston). Additionally, rather than completely restricting the rights of these "lawbreakers" to possess firearms, the penalty for hunting in the middle of a city or hunting on another person's land included forfeiture of the firearm that was used. Nothing in these laws prevented a person from lawfully obtaining another firearm.

Second, the Government cites to laws that, in their day, prohibited British Loyalists from owning firearms. *See* Gov't Br. at 44. The danger alleviated by disarming dissidents and protecting the national security of a fledgling United States of America is hardly akin to disarming a man who has been found to use marijuana recreationally. Moreover, even this type of restriction was not always a permanent one. For example, "the treasonous rebels who took up arms to overthrow the

government in Shay's Rebellion" had their right to keep and bear arms restored after just three years. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 268-69 (2020).

Third, the Government cites to laws prohibiting Catholics and "tramps" from owning firearms. Gov't Br. 43-44. This 19th-century trend to limit Second Amendment rights was largely discriminatory and included bans on enslaved people and freedmen owning guns. *See* Greenlee, 20 Wyo. L. Rev. at 269-70. Certainly, this type of discriminatory history should not serve as a basis to justify upholding § 922(g)(3), even if it were "distinctly similar."

In short, the Government's argument that a marijuana user should be a "dangerous person" raises the same sort of concerns that this Court addressed in *Rahimi* in the context of whether the Second Amendment applies only to "law-abiding citizens." To give the Government unfettered discretion to determine who is dangerous and who is not "admits to no true limiting principle" and results in a Second Amendment that is "malleable" in scope and unfaithful to the historical traditions of the Nation. *Rahimi*, 2023 WL 2317796 at *5. That risk is especially great, where as here, the controlled substance at issue is largely legal. Even at the

federal level, simple possession, which would have been the drug charge against Mr.

Daniels in this case, is the subject of a blanket Presidential pardon.[4]

### 3. The district courts that have addressed 18 U.S.C. § 922(g)(3) since *Bruen* have not conducted the required historical analysis.

The Government also asserts that striking down § 922(g)(3) as

unconstitutional would be inconsistent with the majority of district courts that have

considered the question post-*Bruen*. Even a surface evaluation of those cases,

however, demonstrates that the district courts who have addressed this question have

not adhered to the rigorous historical exercise that *Bruen* requires. Three of the cases

that the Government cites are from district courts within this circuit and were decided

without the benefit of this Court's guidance in *Rahimi*. In *United States v. Black*,

2023 WL 122920, *3-4. (W.D. La. Jan. 6, 2023), the district court relied on the

§922(g)(3) analysis in *Patterson*, which this Court has now found to be obsolete,

before string citing other district courts that have recently upheld § 922(g)(3) and

observing that post-*Bruen*, "federal gun laws have been nearly uniformly upheld."

The *Black* court did not conduct any historical analysis. Similarly, in *United States*

*v. Sanchez*, 2022 WL 17815116, *2-3 (W.D. Tex. Dec. 19, 2022), the district court

did not have the benefit of *Rahimi* and concluded (1) that the Second Amendment

---

[4] *See* https://www.whitehouse.gov/briefing-room/presidential-
actions/2022/10/06/granting-pardon-for-the-offense-of-simple-possession-of-
marijuana/ (last visited January 27, 2023).

applied only to law-abiding citizens and (2) that, alternatively *Patterson* upheld the constitutionality of § 922(g)(3). A review of the other district court cases cited in the Government's brief yield the same findings – a complete lack of the in-depth historical analysis that *Bruen* requires. *See* Gov't Br. at 30, n. 5. *Bruen* requires more than a court's cursory finding that cites pre-*Bruen* precedent and calls it a historical review.

Only the district court in *United States v. Connelly*, 2022 WL 17829158 (W.D. Tex. Dec. 21, 2022) approached § 922(g)(3) in the same way that *Bruen* and *Rahimi* require. In *Connelly*, the district court did not have the benefit of the *Rahimi* opinion, and so it ultimately relied on *Patterson*. *See id.* at *3-4. Although the district court believed it was bound by *Patterson*, it did not find that the historical analogues, both for intoxicated persons and for dangerous persons, applied. *See id.* at *2-3. In fact, the *Connelly* court found that history would *not* support a complete and permanent disarming of a regular marijuana user. *See id.* at *2-3. Because *Patterson* no longer applies, this Court should, on the basis of the historical analogues presented in this case, find the same.

## D. The Government's own argument highlights the unconstitutional vagueness of 18 U.S.C. § 922(g)(3).

The Government argues that any restriction of Mr. Daniels' rights under 18 U.S.C. §922(g)(3) is temporary and will be lifted as soon as he ends his drug use. Gov't Br. at 48-49. The Government's argument begs the question: when does the

infringement of Mr. Daniels' Second Amendment rights end? Five weeks after he last uses marijuana? Five months? Who decides how long Mr. Daniels' constitutional right to keep and bear arms should be restricted, and what metric should be used to make that determination?

The evidence presented at trial indicated that Mr. Daniels had not used marijuana for several weeks before he was found in possession of the firearms. *See* Gov. Exhibit 24-A; ROA.447-48. Even if Mr. Daniels assumes, arguendo, that § 922(g)(3) is a justifiable restriction on his Second Amendment rights, he has no way of judging when that right is restored. The statute provides no guidance. There is no triggering event that would put Mr. Daniels or law enforcement on notice that he has recovered the right to possess a firearm. The courts have not coalesced around a timeline for abstention. *See United States v. Morales-Lopez*, 2022 WL 2355920, *9 (D. Utah June 30, 2022) ("Does two weeks between drug use and gun possession constitute contemporaneous possession? Five weeks? Two months?").

The statute fails to define the scope of its ability to infringe on a defendant's Second Amendment rights. As such, it is unconstitutionally vague and this Court should find that it is unconstitutional.

## II.    CONCLUSION

"The question presented in this case is *not* whether prohibiting the possession of firearms by [a marijuana user] is a laudable policy goal. The question is whether

15

18 U.S.C. § 922(g)[3], a specific statute that does so, is constitutional under the Second Amendment of the United States Constitution." *Rahimi*, 2023 WL2317796 at *1. In light of *Bruen* and the Government's failure to identify distinctly similar historical analogues, it is not.

For these reasons, Mr. Daniels respectfully requests that this Court strike 18 U.S.C. § 922(g)(3) as violative of the Second Amendment and void for vagueness. Mr. Daniels' conviction and sentence should be vacated and remanded to the district court for a judgment of acquittal.

Submitted this 27th day of March, 2023.

**Omodare B. Jupiter**
Federal Public Defender

*s/ Leilani L. Tynes*
**Leilani L. Tynes**
Assistant Federal Public Defender
Southern District of Mississippi
2510 14th Street, Suite 902
Gulfport, MS 39501
Telephone: 228/865-1202
Fax: 228/867-1907
Email: leilani_tynes@fd.org

Attorney for Defendant-Appellant

## <u>CERTIFICATE OF SERVICE</u>

I, Leilani L. Tynes, certify that on March 27, 2023, a copy of the Reply Brief for Appellant was filed via this Court's electronic case filing system, which in turn forwarded electronic copies of the Brief to all counsel of record in this case. A copy of the Brief for Appellant was emailed directly to the government's lead counsel on the appeal of this case – Assistant United States Attorney Erica Rose. Also, a copy of the Brief for Appellant has been mailed via U.S. Mail to Mr. Daniels at the Tallahatchie County Correctional Facility.

*s/ Leilani L. Tynes*
**Leilani L. Tynes**
Assistant Federal Public Defender

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this document contains 3,749 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in proportionately spaced typeface using Microsoft Word in 14-point font size and Times New Roman type style.

*s/ Leilani L. Tynes*
**Leilani L. Tynes**
Assistant Federal Public Defender