# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 22-60596

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

PATRICK DARNELL DANIELS, JR.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI, GULFPORT IN CASE NO. 1:22-CR-58-1,

## BRIEF OF THE SECOND AMENDMENT FOUNDATION AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT

EDWARD ANDREW PALTZIK
BOCHNER PLLC
*Attorneys for Amicus Curiae*
1040 Avenue of the Americas, 15th Floor
New York, New York 10018
(516) 526-0341

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

<u>Plaintiff-Appellee</u>:

United States of America

<u>Defendant-Appellant</u>:

Patrick Darnell Daniels, Jr.

<u>Counsel</u>:

For plaintiff-appellee:

> Darren J. LaMarca
> *United States Attorney for*
> *the Southern District of Mississippi*
> Jonathan D. Buckner
> Gaines H. Cleveland
> Erica L. Rose
> *Assistant United States Attorneys for*
> *The Southern District of Mississippi*
> 1575 Twentieth Avenue
> Gulfport, MS 39501

For defendant-appellant:

> Omodare B. Jupiter
> *Federal Public Defender*
> *Northern and Southern Districts of Mississippi*
> John W. Weber, III
> *Assistant Federal Public Defender*
> *Southern District of Mississippi*
> 2510 14th Street, Suite 902
> Gulfport, MS 39501

<u>Amicus and Counsel</u>:

Second Amendment Foundation

> Edward Andrew Paltzik
> Bochner PLLC
> 1040 Avenue of the Americas, 15th Floor
> New York, NY 10018

Dated:    July 6, 2023
       New York, New York                <u>/s/ Edward Andrew Paltzik</u>
                                       Edward Andrew Paltzik
                                       *Counsel for Amicus Curiae*

## Table of Contents

CERTIFICATE OF INTERESTED PERSONS ........................................i

Table of Authorities.................................................................iv

STATEMENT OF COMPLIANCE WITH FEDERAL RULE
OF APPELLATE PROCEDURE 29 ..........................................vi

CORPORATE DISCLOSURE STATEMENT ........................................vii

INTEREST OF AMICUS CURIAE .......................................................1

SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ..........................................................................................4

    I.   THE PROPER ANALYTICAL FRAMEWORK FOR
DETERMINING WHETHER THERE ARE ANY HISTORICAL
ANALOGUES RELEVANT TO THE REGULATION OF GUNS
POSSESSED BY INTOXICATED OR IMPAIRED INDIVIDUALS .....4

        a.  The Proper Analytical Standards ..................................4

        b.  The Proper Analytical Timeframe ................................6

    II.  THE LACK OF PROPER HISTORICAL ANALOGUES TO
§ 922(g)(3) .....................................................................................10

        a.  Founding Era .............................................................11

        b.  Colonial/Pre-Founding Eras ......................................11

        c.  Pre-Civil War 19th Century Laws .............................15

        d.  Post-Civil War 19th Century Laws ...........................16

        e.  The How and the Why.................................................18

CONCLUSION .....................................................................................21

Table of Authorities

**Cases:**

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .................................................................... *passim*

*Gamble v. United States,*
  139 S. Ct. 1960 (2019) ............................................................... 7, 9

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011)................................................... 8

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) .................................................................... 3

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022) ............................................................. *passim*

*Range v. Att'y Gen. United States of Am.,*
  69 F.4th 96 (3d Cir. 2023) ......................................................... 5

*United States v. Black,*
  No. 22-133-01, 2023 U.S. Dist. LEXIS 2781
  (W.D. La. Jan. 6, 2023)............................................................... 20

*United States v. Connelly,*
  No. EP-22-CR-229(2)-KC, 2023 U.S. Dist. LEXIS 62495
  (W.D. Tex. April 6, 2023),
  *appeal filed*, 23-50312 (5th Cir. May 04, 2023) .......................... *passim*

*United States v. Harrison,*
  2023 U.S. Dist. LEXIS 18397 (W.D. Okla. Feb. 3, 2023) ............ 2, 5, 10

*United States v. Rahimi,*
  61 F. 4th 443 (5th Cir. 2023), *cert. granted* No. 22-915,
  2023 U.S. LEXIS 2830 (June 30, 2023) ...................................... *passim*

**Statutes and Other Authorities:**

U.S. Const., amend. II................................................................... *passim*

U.S. Const., amend. XIV ............................................................... 7

18 U.S.C. § 922(g) .................................................................... 1

18 U.S.C. § 922(g)(3) ........................................................ *passim*

21 U.S.C. § 802 ...................................................................... 1

1 REVISED STATUTES OF THE STATE OF MISSOURI 854, CH. 47, § 3502
(SAMUEL C. MAJOR ET AL. EDS., 1889) ................................... 17

1 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A
COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST
SESSION OF THE LEGISLATURE, IN THE YEAR 1619, 401, ACT XII
(1823) ............................................................................. 12, 14

1899 SOUTH CAROLINA ACTS 97, § 1 ........................................ 18

ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW-JERSEY
303 (1752) .......................................................................... 12

CH. 1501, 5 COLONIAL LAWS OF NEW YORK 244 (1894) ............ 12

D.T. VALENTINE, ORDINANCES OF THE MAYOR, ALDERMEN AND
COMMONALTY OF THE CITY OF NEW YORK: REVISED A.D. 1859
ADOPTED BY THE COMMON COUNCIL 235 (1859) ................... 15

GENERAL STATUTES OF THE STATE OF KANSAS 378, CH. 31, § 282
(JOHN M. PRICE ET AL. EDS., 1868) ....................................... 16

John Hailman, *Thomas Jefferson on Wine*, N.Y. Times
(Dec. 3, 2006) ..................................................................... 14

Mark W. Smith, *Attention Originalists: The Second Amendment
was adopted in 1791, not 1868,* HARV. J. L. & PUB. POL'Y
PER CURIAM (Dec. 7, 2022) ................................................ 7-8

REVISED CODE OF THE STATUTE OF LAWS OF THE STATE OF
MISSISSIPPI 776, CH. 77, § 2986 (J.A.P. CAMPBELL ED., 1880) .............. 17

STATUTES OF OKLAHOMA *1890* 495, CH. 25, ART. 47 § 4
(WILL T. LITTLE ET AL. EDS., 1891) ....................................... 18

SUPPLEMENT TO THE REVISED STATUTES OF WISCONSIN 848, CH. 181,
§ 4397B(3) (A.L. SANBORN & J.R. BERRYMAN EDS., 1883) ................... 17

## STATEMENT OF COMPLIANCE WITH FEDERAL RULE OF <u>APPELLATE PROCEDURE 29</u>

All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief. No party, party's counsel or any person other than the amicus curiae, its members, or its counsel contributed money that was intended to finance the preparation or submission of this brief.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Amicus Curiae, Second Amendment Foundation, has no parent corporations. It has no stock; hence no publicly held company owns 10% or more of its stock.

## INTEREST OF AMICUS CURIAE

Amicus Curiae, Second Amendment Foundation, is a non-profit membership organization founded in 1974 with over 720,000 members and supporters, in every State of the Union. Its purposes include education, research, publishing, and legal action focusing on the constitutional right to keep and bear arms. Amicus Curiae has an intense interest in this case because it has many members who reside in the State of Mississippi, and around the United States, who are prevented from exercising their right to keep and bear arms under the statute at issue, 18 U.S.C. § 922(g)(3), contrary to "the Second Amendment's text, as informed by history." *See New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).

## SUMMARY OF ARGUMENT

18 U.S.C. § 922(g) provides, in pertinent part:

It shall be unlawful for any person . . . (3) who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)) . . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Review of "founding-era historical precedent," *District of Columbia v. Heller*, 554 U.S. 570, 631 (2008)—or lack thereof—reveals that § 922(g)(3) lacks *any* "well-established and representative historical *analogue*" from the founding era. *Bruen*, 142 S. Ct. at 2133 (emphasis in original). Moreover, notwithstanding the Supreme Court's admonition "against giving postenactment history more weight than it can rightly bear," even if one were to expand this historical review to include the 19th-century, the result does not change. *Id.* at 2136. There is no historical analogue as sweeping as § 922(g)(3), which applies regardless of whether a person is actually in a state of intoxication. And although this Court expressed interest in "historical gun regulations applicable to intoxicated or impaired individuals" (*see* Memorandum from the Court to Counsel dated June 7, 2023), even the historical laws that applied to actively intoxicated persons are not proper comparators. *See United States v. Harrison*, 2023 U.S. Dist. LEXIS 18397, *14 (W.D. Okla. Feb. 3, 2023) ("Recall that § 922(g)(3) imposes . . . a total prohibition on possessing any firearm . . . regardless of whether the person is actually intoxicated or under the influence of a controlled substance."); *United States v. Connelly*, No. EP-22-CR-229(2)-KC, 2023 U.S. Dist. LEXIS 62495, at *30 (W.D. Tex. April

6, 2023), *appeal filed*, 23-50312 (5th Cir. May 04, 2023) ("Section 922(g)(3) breaks with historical intoxication laws by prohibiting not just firearm use by those who are *actively intoxicated* but also firearm possession by those who use controlled substances, even somewhat irregularly.") (emphasis added). Given the lack of analogous regulations from the Founding Era and prior, coupled with the lack of pre-Civil War and post-Civil War 19th century analogues, it is clear that 18 U.S.C. § 922(g)(3) is not "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Accordingly, 18 U.S.C. § 922(g)(3) violates the Second Amendment right of the people to keep and bear arms as set forth in *Bruen*, *Heller*, and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

This brief offers two important points for this Court's consideration. First, an overview of the proper analytical framework that this Court must utilize in determining whether there are any historical analogues relevant to the regulation of guns possessed by intoxicated or impaired individuals that the Government may draw upon to justify § 922(g)(3). After the relevant analytical framework is established, this brief will then explore the limited history of regulations relating to possession of

guns by intoxicated or impaired individuals that the Government may seek to use in order to justify § 922(g)(3), and explain why this limited history is distinguishable from the statute and therefore does not provide analogues sufficient to save the statute.

## ARGUMENT

I.  **THE PROPER ANALYTICAL FRAMEWORK FOR DETERMINING WHETHER THERE ARE ANY HISTORICAL ANALOGUES RELEVANT TO THE REGULATION OF GUNS POSSESSED BY INTOXICATED OR IMPAIRED INDIVIDUALS**

### a. The Proper Analytical Standards

"*Heller* . . . demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2118. Consistent with this demand, and because "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, "the government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

Further, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is

4

relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at at 2131 (emphasis added). Thus, "[t]o be compatible with the Second Amendment, regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue." *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 103 (3d Cir. 2023) (en banc). Here, this distinctly similar standard should apply, because § 922(g)(3) purports to address a general societal problem that has persisted since the eighteenth century: the possession of firearms by users of illicit or intoxicating drinks or substances. *Harrison*, 2023 U.S. Dist. LEXIS 18397, at *4 ("[W]here the societal problem addressed by § 922(g)(3)—users of illicit substances possessing guns—is nothing new, the government must identify "distinctly similar" laws in our Nation's history and tradition.").

Alternatively, although the "distinctly similar" standard clearly should apply here, the Court may also consider whether there are any historical analogues that are at least "relevantly similar" to § 922(g)(3). *United States v. Rahimi*, 61 F. 4th 443, 460 (5th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2132), *cert. granted* No. 22-915, 2023 U.S. LEXIS 2830 (June 30, 2023); *see also Range*, 69 F.4th at 105.

Either way, the key question is whether the Government can identify historical regulations that are adequately similar both as to "*how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right." *Rahimi*, 61 F. 4th at 454 (quoting *Bruen*, 142 S. Ct. at 2132-33).

### b. The Proper Analytical Timeframe

Beyond identification of appropriate analogues, it is also imperative that this Court look to the proper historical period to ascertain what similar laws, or historical analogues, were in existence that the Government may rely upon to justify § 922(g)(3). "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35) (emphasis in *Bruen*). The Second Amendment was adopted in 1791.

While the Government directs this Court to look at a litany of laws, almost all adopted in the 19th century, to justify 18 U.S.C. § 922(g)(3) (Brief of Plaintiff-Appellee, Doc. 47 at 33-36), the Supreme Court has already explained that 1791 is the controlling time for interpreting the Second Amendment. *See, e.g.*, *Heller*, 554 U.S. at 625 (concluding with

"our adoption of the original understanding of the Second Amendment"); *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Bruen*, 142 S. Ct. at 2132 (The Second Amendment's "meaning is fixed according to the understandings of those who ratified it.").

Proponents of firearms regulations may prefer that this Court, and others, look to the ratification of the Fourteenth Amendment in 1868, or some or all of the rest of the 19th century, as the controlling time for interpretations of the relevant history. But that is improper because "when it comes to interpreting the Constitution, *not all history is created equal.*" *Bruen*, 142 S. Ct. at 2137 (emphasis added). The Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."[1] *Id.*

---

[1] The Court in *Bruen* acknowledged "an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or when the Second Amendment was adopted in 1791. 142 S. Ct. at 2138. But the Court, importantly, did not question its own precedent that adopted the "*original* understanding of the Second Amendment, *Heller*, 554 U.S.at 625, and "the public understanding in 1791 of the right codified by the Second Amendment," *Gamble v. United States*, 139 S. Ct. 1960, 1975 (2019); *see also* Mark W. Smith, *Attention Originalists: The Second*

Indeed, as relates to the use of 19th century firearms regulations in the historical analysis, the Supreme Court, while not rejecting the use of such regulations wholesale, explicitly warned "against giving postenactment history more weight than it can rightly bear." *Bruen*, 142 S. Ct. at 2136; *see also Id*. at 2163 ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.") (Barrett, J., concurring). While the Court in *Bruen* and *Heller* did consider such regulations in order "to determine the public understanding of [the Second Amendment] after its . . . ratification," *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605), it did so with the caveat that "to the extent later history contradicts what the text says, the text controls." *Bruen*, 142 S. Ct. at 2137. "Thus, 'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text cannot overcome or alter that text.' " *Id*. (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (emphasis in original)). This is

---

*Amendment was adopted in 1791, not 1868,* HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022).

based on the sound reasoning that "because post-Civil War of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." *Id.* (quoting *Heller*, 554 U.S. at 614). To that end, the Court in *Bruen* also reiterated of *Heller*:

> And we made clear in *Gamble* that *Heller's* interest in mid-to late-19th century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of its authority for its reading—including the text of the Second Amendment and state constitutions." In other words, this 19th-century evidence was "treated as mere confirmation of what the Court thought had already been established."

*Bruen*, 142 S. Ct. at 2137 (internal citations omitted). Thus, while the Government may prefer to rely primarily on 19th-century history in this case—given the absence of relevant analogues to 18 U.S.C. § 922(g)(3) from the Founding Era—the Supreme Court's caselaw does not countenance support for such an approach. Even if such an approach were favored (which it is not), the Government here fails to cite distinctly similar or relevantly similar 19th-century analogues, because such analogues do not exist.

Having set the stage for the proper analytical framework, attention must be turned to this nation's nonexistent history and tradition of

disarming people who, at some undefined point, may have been intoxicated.

## II. THE LACK OF PROPER HISTORICAL ANALOGUES TO § 922(g)(3)

As discussed below, there were less than a handful of laws enacted during the colonial/pre-Founding Era and *zero* known laws during the Founding Era itself relating to the possession of firearms by users of illicit or intoxicating drinks or substances, and few known such laws during the 19th century, whether before or after the Civil War. None of these laws were distinctly similar or relevantly similar to § 922(g)(3) because (1) in contrast, "the restrictions imposed by each law only applied while an individual was *actively intoxicated* or using intoxicants," (2) "none of the laws appear to have prohibited the mere possession of a firearm," or (3) "appear to have applied to public places or activities" rather than "being a total prohibition applicable to all intoxicated persons in all places . . . ." *Harrison*, 2023 U.S. Dist. LEXIS 18397, at *14. Whereas these laws "took a scalpel" to the right to bear arms, § 922(g)(3) "takes a sledgehammer to the right." *Id*. Indeed, as noted above, some of these laws did not even prohibit gun possession by intoxicated

individuals, but rather, only prohibited certain *activities or behaviors* at certain *times*, irrespective of intoxication.

### a. Founding Era

In this case, it is an inconvenient truth for the Government that there were no laws enacted at or around the time of the Founding governing the possession of firearms by users of illicit or intoxicating drinks or substances. Indeed, the Government does not identify any such Founding-era regulations. Amicus's review of this period reaches the same conclusion—that there were no such Founding-era regulations. Of all the facts that this Court will consider in deciding Defendant-Appellant's appeal, the absence of any relevant regulations enacted at or around the time of Founding is the fact that should carry the most weight, given the Supreme Court's command that the historical analysis required by *Bruen* must flow from 1791. *Heller*, 554 U.S. at 625.

### b. Colonial/Pre-Founding Eras

Lacking Founding-era analogues, the Government identifies three purportedly relevant laws emanating from the colonial/pre-Founding period. Amicus is not aware of any additional relevant colonial/pre-

Founding regulations. Colonial Virginia's 1655 law prohibited "shoot[ing] any guns at drinkeing (marriages and ffunerals [sic] onely [sic] excepted)." 1 WILLIAM WALLER HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, 401-02, ACT XII (1823). A 1746 law in colonial New Jersey authorized militia officers to "disarm" any soldier who "appear[ed] in Arms disguised in Liquor." ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW-JERSEY 303 (1752). Under a 1771 law that expired in 1773, colonial New York prohibited "fir[ing] or discharge [of] any Gun, Pistol, Rocket, Cracker, Squib or other fire Work [sic]" in certain areas between December 31 and January 2, a restriction that was aimed at addressing the "great Damages [] frequently done on . . . New Years Days, by persons going from House to House, with Guns and other Fire Arms and being often intoxicated with Liquor." *Heller*, 554 U.S. at 632 (quoting CH. 1501, 5 COLONIAL LAWS OF NEW YORK 244-46 (1894)); *see also Connelly*, 2023 U.S. Dist. LEXIS, at *17-18.

As with 19th century laws, according any significant weight to a small number of pre-Founding, colonial-era regulations, let alone three isolated regulations such as these laws out of colonial Virginia, New

Jersey, and New York, would be misplaced. *See Bruen*, 142 S. Ct. at 2142 ("In the colonial era, respondents point to only three restrictions on public carry. For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.") (emphasis in original). Even if these laws were entitled to any weight, two of three (Virginia and New York) are not proper analogues to § 922(g)(3) because these laws regulated a particular behavior— the discharge of firearms—rather than a specified class of people (users of intoxicants or illicit substances).[2]

Further separating the Virginia law from being in any way analogous to § 922(g)(3), this colonial law was grounded in the practical goals of protection against Indian attacks and conservation of military resources. *Connelly*, 2023 U.S. Dist. LEXIS 62495, at *15. More importantly, the story does not end there. In 1676, the Virginia colony enacted a law providing that "all persons have hereby liberty to sell armes and ammunition to any of his magest[y's] loyal[] subjects

---

[2]Amicus submits that these two laws are of little utility in lending themselves to a historical inquiry, as they deal with the use (discharge) and not possession of firearms; but includes them in order to highlight the consistent theme across the multiple eras covered in this brief, that when it comes to the subject of regulating public intoxication, regulation tended to focus on prohibition of certain behaviors at certain times, rather than prohibition of gun possession by particular classes of people.

13

inhabiting this colony." 1 HENING, *supra*, at 401-02. The heavy drinking of the founding and colonial eras is well-documented. *See e.g.*, John Hailman, *Thomas Jefferson on Wine*, N.Y. Times (Dec. 3, 2006) (explaining that wine lists from the era showed that tavern-goers had a "great thirst for something high in alcohol which would intoxicate quickly and effectively").[3] Thus, Virginia's sell-to-anyone law necessarily covered people who were regularly intoxicated. In fact, the Commonwealth also required plantation owners to ensure that his arms were "complete," 1 Hening, *supra*, at 401-02, and required that "all persons," except Black people, "be provided with arms." *Id.* at 226. So even if colonial Virginians believed that the intoxicated might use a firearm differently than the sober, they still very much wanted the intoxicated to own firearms.

As for the New York law, which focused on a specific situation (New Year's celebrations), it was more akin to "sensitive places" legislation than to "categorical restrictions on firearm possession by classes of people." *Connelly*, 2023 U.S. Dist. LEXIS, at *18. Finally, regarding the New Jersey law, it is also not a proper analogue because it related only

---

[3]Available    at    https://www.nytimes.com/2006/12/03/books/chapters/1203-1st-hail.html.

to the *temporary* disarmament of an individual perceived to be in a *temporary active* state of intoxication, and for that matter, applied only in the military context.

### c. Pre-Civil War 19th Century Laws

Pre-Civil War 19th Century history lends no favor to the Government's position regarding § 922(g)(3). The Government does not identify any pre-Civil War 19th century regulations restricting intoxicated individuals from keeping or bearing arms. And Amicus's review of this period reveals only a single law of possible relevance, an 1859 New York law that provided:

> [n]o tavern-keeper, keeper of a public house, garden or place of resort, nor any other person, shall suffer or permit any person to practice with or fire off any pistol, gun, fowling-piece or other fire-arms, in or upon his or her premises, nor shall suffer or permit any pistol gallery, erected in his or her house, or upon his or her premises, to be used for the purpose of practicing with any pistol gun, fowling-piece or other fire-arms, upon the first day of the week, *called Sunday*, under the penalty of fifty dollars for each offense.

D.T. VALENTINE, ORDINANCES OF THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK: REVISED A.D. 1859 ADOPTED BY THE COMMON COUNCIL 235 (1859) (emphasis added). But by saying that a "pistol gallery" was prohibited at taverns and public houses, i.e., bars,

on Sundays, that necessarily means that they are permitted every other day of the week. In other words, New York permitted the intoxicated not just to possess guns, but to shoot them. That reality, combined with the law's limitation to the sabbath, suggests that New York was not worried about danger but wanted to keep the noise down on the day of rest. Thus, because the "how and why the regulations burden" one's right to bear arms are different, that provides more evidence that § 922(g)(3) is an unconstitutional deviation from the United States' history of arms regulation. *Rahimi*, 61 F.4th at 460.

### d. Post-Civil War 19th Century Laws

Straying even further in time from the ratification of the Second Amendment, a small number of laws relating to the combination of guns and alcohol were passed after the Civil War. None of these laws imposed permanent prohibitions on firearms possession, instead generally imposing punishment on individuals only to the extent they were armed while actually in a state of intoxication.

An 1868 Kansas law imposed penalties upon armed individuals who were in a *state of intoxication*. GENERAL STATUTES OF THE STATE OF KANSAS 378, CH. 31, § 282 (JOHN M. PRICE ET AL. EDS., 1868) ("[A]ny person

under the influence of intoxicating drink . . . carrying on his person a pistol . . . or other deadly weapon, shall be subject to arrest upon charge of misdemeanor [.]"). A Mississippi law enacted in 1878 targeted the sale of *concealable* weapons to any person who was in a *state of intoxication*. REVISED CODE OF THE STATUTE OF LAWS OF THE STATE OF MISSISSIPPI 776, CH. 77, § 2986 (J.A.P. CAMPBELL ED., 1880) ("It shall not be lawful for any person to sell to any . . . person intoxicated, knowing him to be . . . in a state of intoxication any concealable, deadly weapon."). Moving still further from the Founding, Wisconsin enacted an 1883 law similar to that of Kansas. SUPPLEMENT TO THE REVISED STATUTES OF WISCONSIN 848, CH. 181, § 4397B(3) (A.L. SANBORN & J.R. BERRYMAN EDS., 1883) ("It shall be unlawful for any person in a state of intoxication to go armed with any pistol or revolver."). Missouri sought to address the same narrow issue with an 1889 law. 1 REVISED STATUTES OF THE STATE OF MISSOURI 854, CH. 47, § 3502 (SAMUEL C. MAJOR ET AL. EDS., 1889) ("If any person . . . shall have or carry any [deadly or dangerous weapon] upon or about his person when intoxicated, or under the influence of intoxicating drinks . . . shall, upon conviction, be punish by a fine . . . or by imprisonment[.]"). An 1890 Oklahoma law addressed the related subject

of public officials armed while intoxicated. STATUTES OF OKLAHOMA *1890* 495, CH. 25, ART. 47 § 4 (WILL T. LITTLE ET AL. EDS., 1891) (prohibiting "any public officer" from "carrying" certain specified arms, including a pistol or revolver, "*while under the influence* of intoxicating drinks") (emphasis added). And, almost crossing into the 20th century, a South Carolina law forbade the discharge of firearms *by intoxicated individuals* near roads. 1899 SOUTH CAROLINA ACTS 97, § 1 (forbidding the "discharge [of] any gun, pistol, or other firearms . . . within fifty yards of any public road" while "under the influence of intoxicating liquors").

These post-Civil War 19th century laws, unlike § 922(g)(3), were targeted at perceived dangers potentially posed by armed individuals in a temporary state of intoxication, and to the extent they should be considered at all in any historical analysis, they are just further evidence of the unconstitutionality of § 922(g)(3) and are certainly not proper analogues.

### e. The How and the Why

*Bruen* guides the analysis for useful analogues to how and why the regulation in question burdens the right to keep and bear arms. *Bruen*, 142 S. Ct. at 2132-2133. Can the Government identify historical

analogues that are adequately similar both as to "*how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right[?]" *Rahimi*, 61 F. 4th at 454 (quoting *Bruen*, 142 S. Ct. at 2132-33) (emphasis in *Bruen*)). Or, put differently, does today's modern regulation impose a comparable burden on the right to armed self-defense? In this context, the answer is a resounding no.

As to the "how" and "why" of § 922(g)(3) imposes a *permanent* burden on the right to armed self-defense in order to exclude individuals that the Government deems to be "unlawful user[s] of or addicted to any controlled substance," wording that is unbounded and vague. Moreover, an individual need not be under the immediate influence of a controlled substance to fall within the grasp of the statute. This incredibly broad modern-day statute is a far cry from the small number of laws directly or tangentially relating to guns and intoxication enacted during colonial times or even in the second half of the 19th century. All of these statutes either related only to temporary disarmament of people while they were actually intoxicated, or related to regulating the discharge of firearms, and are thus not proper analogues. As the Court correctly observed in *Connelly*:

> To summarize, the historical intoxication laws . . . generally addressed *specific* societal problems with *narrow* restrictions on gun use, while § 922(g)(3) addresses *widespread* criminal issues with a *broad* restriction on gun possession.

*Connelly*, 2023 U.S. Dist. LEXIS 62495, at *22. Moreover, even if these laws were distinctly or relevantly similar to § 922(g)(3) (which they are not), these laws were not enacted during the time of primary importance to this analysis—the Founding Era. Indeed, as Justice Barrett observed in *Bruen* of Reconstruction-era laws particularly, "appeals to Reconstruction-era history [may] fail for the independent reason that this evidence is simply too late." *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring).

Under *Bruen* and now *Rahimi*, § 922(g)(3) is simply incompatible with the text of the Second Amendment as informed by this nation's history and tradition. This renders obsolete prior district court decisions in which courts declined to declare § 922(g)(3) unconstitutional while failing to conduct a thorough historical analysis as required by *Bruen*. *See e.g., United States v. Black*, No. 22-133-01, 2023 U.S. Dist. LEXIS 2781 (W.D. La. Jan. 6, 2023). To that end, in *Rahimi*, this Court observed that "*Bruen* clearly fundamentally changed our analysis of laws that implicate the Second Amendment . . . rendering our prior precedent

obsolete." *Rahimi*, 61 F. 4th at 450-51 (internal citation and quotation marks omitted). Accordingly, the recent district court decisions in *Connelly* and *Harrison*, cited *supra*, which featured exhaustive analysis in the manner commanded by *Bruen* in order to conclude that § 922(g)(3) is unconstitutional, are more appropriate guideposts for this Court's consideration.

## CONCLUSION

For these reasons, this Court should strike down 18 U.S.C. § 922(g)(3) as violative of the Second Amendment.

Respectfully submitted this 6th day of June, 2023

<div style="margin-left:40%">

s/ Edward Andrew Paltzik
Edward Andrew Paltzik
BOCHNER PLLC
1040 Avenue of the Americas
15th Floor
New York, NY 10018
(516) 526-0341
edward@bochner.law

*Counsel for Amicus Curiae*
*Second Amendment Foundation*

</div>

# CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2023, a true and correct copy of the foregoing Amicus Brief was served via electronic filing with the Clerk of Court and all registered ECF users.

Upon acceptance by the Court of the e-filed document, 7 paper copies will be filed with the Court within the time provided in the Court's rules via Federal Express.


Dated: July 6, 2023

<u>s/ Edward Andrew Paltzik</u>
Edward Andrew Paltzik

## CERTIFICATE OF COMPLIANCE

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word. Excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 4,304 words.


s/ Edward Andrew Paltzik
Edward Andrew Paltzik