No. 22-60596

# In the
# United States Court of Appeals
# for the Fifth Circuit

◆

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

PATRICK DARNELL DANIELS, JR.,

*Defendant-Appellant.*

◆

**Appeal from the United States District Court
for the Southern District of Mississippi
Case No. 1:22-cr-00058-LG-BWR-1**

◆

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY
COALITION AND FPC ACTION FOUNDATION IN
SUPPORT OF APPELLANT AND REVERSAL**

◆

JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org
*Counsel of Record*

Counsel for *Amici Curiae*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1. Plaintiff-Appellee:
    a. United States of America

2. Counsel for Plaintiff-Appellee:
    a. Jonathan David Buckner, U.S. Attorney's Office
    b. Gaines H. Cleveland, U.S. Attorney's Office
    c. Erica Rose, U.S. Attorney's Office
    d. Darren J. LaMarca, U.S. Attorney's Office

3. Defendant-Appellant:
    a. Patrick Darnell Daniels, Jr.

4. Counsel for Defendant-Appellant
    a. Leilani Leith Tynes, Federal Public Defender's Office
    b. Carmen G. Castilla, Federal Public Defender's Office
    c. Kimberly Golden Gore, Federal Public Defender's Office
    d. Thomas Creagher Turner, Jr., Federal Public Defender's Office
    e. John William Weber, III, Federal Public Defender's Office
    f. Omodare B. Jupiter, Federal Public Defender's Office

5. *Amici Curiae*:
    a. Firearms Policy Coalition
    b. FPC Action Foundation

6. Counsel for *Amici Curiae*:
    a. Joseph G.S. Greenlee, FPC Action Foundation

*Amici* Firearms Policy Coalition and FPC Action Foundation are both nonprofit organizations. Neither *amicus* has a parent corporation, and as non-stock nonprofit corporations, no publicly held corporation could own any share of their stock.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF CONTENTS ......................................................... iii

TABLE OF AUTHORITIES.......................................................iv

STATEMENT OF *AMICI CURIAE* ......................................... 1

CONSENT TO FILE ................................................................. 1

SUMMARY OF ARGUMENT ................................................... 2

ARGUMENT .............................................................................3

   I.   Both firearms and alcohol were ubiquitous in the colonial, founding, and early republic periods. .............................................3

   II.   Firearms and alcohol were regularly used together. ....................6

   III.  No historical law completely deprived Americans of Second Amendment rights based solely on their use of intoxicants. ....... 16

      A.   Colonial laws...........................................................18

      B.   Founding era.............................................................24

      C.   The 19th century. ....................................................25

      D.   The late 19th century. .............................................26

   IV.  The only historical justification for disarmament is dangerousness, and the government failed to demonstrate that illegal drug users are dangerous.........................................30

CONCLUSION ......................................................................31

CERTIFICATE OF COMPLIANCE........................................33

CERTIFICATE OF SERVICE..............................................34

# TABLE OF AUTHORITIES

**Cases**

*District of Columbia v. Heller,*
 554 U.S. 570 (2008) ........................................................ 17, 18, 24, 25

*Folajtar v. Attorney Gen. United States,*
 980 F.3d 897 (3d Cir. 2020) ................................................ 30

*Gamble v. United States,*
 139 S. Ct. 1960 (2019) ........................................................ 26

*Kanter v. Barr,*
 919 F.3d 437 (7th Cir. 2019) ............................................... 30

*McDonald v. City of Chicago,*
 561 U.S. 742 (2010) ........................................................... 18

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
 142 S. Ct. 2111 (2022) ................................................. *passim*

**Statutes and Regulations**

18 U.S.C. § 922(g)(3) ........................................................ 17, 31

**Other Authorities**

ACTS AND JOINT RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE
 STATE OF SOUTH CAROLINA, PASSED AT THE REGULAR SESSION OF
 1899 (1899) ....................................................................... 29

ACTS AND LAWS, OF HIS MAJESTY'S COLONY OF RHODE-ISLAND, AND
 PROVIDENCE-PLANTATIONS, IN NEW-ENGLAND, IN AMERICA (1745) ...... 21

ACTS AND RESOLVES PASSED BY THE GENERAL COURT OF
 MASSACHUSETTS, IN THE YEAR 1873 (1873) .................................... 29, 30

Ambrose, Stephen E., UNDAUNTED COURAGE (1996) ............................... 8

AMERICAN FOLKLORE (Don Yoder ed., 1976) ........................................ 15

iv

AN ADDRESS, TO THE CHURCHES AND CONGREGATIONS OF THE
WESTERN DISTRICT OF FAIRFIELD COUNTY (1813) .................................. 6

Arthur, John Preston, WESTERN NORTH CAROLINA: A HISTORY
(FROM 1730 TO 1913) (1914) .................................................................... 12

BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION:
THE AMERICAN TRADITION, Vol. 2, Parts 3, 5, 8, 11 (Arthur
Vollmer ed., 1947) ...................................................... 23, 24, 25

Bryant, William Cullen, LIFE AND WORKS OF WILLIAM CULLEN
BRYANT, vol. 1 (1883) ............................................................ 10

Cramer, Clayton E., THE ORIGINS OF AMERICAN GUN CULTURE (2018) .... 3

Dryden, John, *Cymon and Iphigenia, From Boccace*, *in* FABLES,
ANCIENT AND MODERN (1700) .............................................. 13

Dyer, Charles E., HISTORICAL ADDRESS, DELIVERED BEFORE THE OLD
SETTLERS SOCIETY, OF RACINE COUNTY, WISCONSIN (1871) ................. 11

Esarey, Logan, HISTORY OF INDIANA FROM ITS EXPLORATION TO 1922
(1922) ............................................................................. 15

Fischer, David Hackett, PAUL REVERE'S RIDE (1994) .......................... 6, 7

Göbel, Gert, LANGER ALS EIN MENSCHENLEBEN IN MISSOURI,
vol. 3 (1877) .................................................................... 14

Greenlee, Joseph G.S., *Disarming the Dangerous: The American
Tradition of Firearm Prohibitions*, 16 DREXEL L. REV.
(Forthcoming 2023) ............................................................. 31

Greenlee, Joseph G.S., *The Historical Justification for Prohibiting
Dangerous Persons from Possessing Arms*, 20 WYO L. REV. 249
(2020) ............................................................................ 31

Hening, William Waller, THE STATUTES AT LARGE: BEING A
COLLECTION OF THE LAWS OF VIRGINIA, FROM THE FIRST
SESSION OF THE LEGISLATURE, IN THE YEAR 1619, vol. 1
(1823) .................................................................. 19, 20, 21

LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (E. B. O'Callaghan ed., 1868) .........................................................................22

LAWS OF MISSOURI PASSED AT THE SESSION OF THE GENERAL OF THE THIRTY-SECOND GENERAL ASSEMBLY (1883) ........................................28

LAWS OF THE DISTRICT OF COLUMBIA 1871–1872 (1872)..........................29

LAWS OF THE GENERAL ASSEMBLY OF THE STATE OF PENNSYLVANIA, PASSED AT THE SESSION OF 1864 (1864)................................................29

LAWS OF THE STATE OF MISSISSIPPI, PASSED AT A REGULAR SESSION OF THE MISSISSIPPI LEGISLATURE, HELD IN THE CITY OF JACKSON, COMMENCING JAN. 8TH, 1878, AND ENDING MARCH 5TH, 1878 (1878)..28

LAWS OF THE TERRITORY OF UTAH, PASSED BY THE LEGISLATIVE ASSEMBLY AT ITS THIRTY-FIRST SESSION (1894) ...................................30

Letter from George Washington to Thomas Green (Mar. 31, 1789) ........5

Letter from John Adams to William Willis (Feb. 21, 1819) .....................5

Letter from Thomas Jefferson to Samuel Smith (May 3, 1823)...............5

LETTERS ON THE AMERICAN REVOLUTION 1774–1776 (Margaret Wheeler Willard ed., 1925) ....................................................................8

O'Neall, John Belton & Chapman, John Abney, THE ANNALS OF NEWBERRY (1892) ................................................................................14

Pacificus, Philo, THE FRIEND OF THE PEACE (1827) ...................................9

PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS, AS REVISED BY A COMMITTEE, AND FINALLY ENACTED BY THE GENERAL ASSEMBLY AT THE SESSION IN JANUARY 1844 (1844)................................................................................................26

RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY (1995)........................16

Robbins, Walter L., *Christmas Shooting Rounds in America and Their Background*, THE JOURNAL OF AMERICAN FOLKLORE, vol. 86, no. 339 (1973) ....................................................................14, 15

Robbins, Walter L., *Wishing in and Shooting in the New Year among the Germans in the Carolinas* ........................................... 15, 16

Rorabaugh, W. J., THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION (1979) ................................................................ 4, 5

Sawyer, Charles Winthrop, FIREARMS IN AMERICAN HISTORY, vol. 1 (1910) .......................................................................... 3

THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION, vol. 5 (1894) .............................................. 22

THE JOURNAL OF THE REV. FRANCIS ASBURY, BISHOP OF THE METHODIST EPISCOPAL CHURCH, FROM AUGUST 7, 1771, TO DECEMBER 7, 1815, vol. 3 (1821) .......................................... 10

THE LAWS OF THE STATE OF KANSAS, PASSED AT THE SEVENTH SESSION OF THE LEGISLATURE, COMMENCED AT THE STATE CAPITAL ON TUESDAY, JAN. 8, 1867 (1867) .......................................... 27

THE LAWS OF WISCONSIN, EXCEPT CITY CHARTERS AND THEIR AMENDMENTS, PASSED AT THE BIENNIAL SESSION OF THE LEGISLATURE OF 1883, vol. 1 (1883) ....................................... 27

THE NEW-ENGLAND MAGAZINE, vol. 3 (1832) .......................................... 11

THE PENNSYLVANIA-GERMAN SOCIETY, vol. 33 (1923) ............................ 16

THE PENNSYLVANIA-GERMAN, vol. 8, Jan.-Dec. 1807 ....................... 15, 16

THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES, vol. 10 (Charles Francis Adams ed., 1856) ............................ 5

THE WRITINGS OF GEORGE WASHINGTON 1785–1790, vol. 11 (Worthington Chauncey Ford ed., 1891) ............................................ 5

THE WRITINGS OF THOMAS JEFFERSON, vol. 10 (Paul Leicester Ford ed., 1899) .......................................................................... 5

## STATEMENT OF *AMICI CURIAE*

**Firearms Policy Coalition (FPC)** is a nonprofit organization devoted to advancing individual liberty and defending individual rights, including those protected by the Constitution. FPC accomplishes its mission through legislative, regulatory, legal, and grassroots advocacy, education, and outreach programs.

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to restoring human liberty and protecting the rights enshrined in the Constitution. FPCAF conducts charitable research, education, public policy, and legal programs.

*Amici* have an interest in this case because it concerns who can be denied the fundamental right to keep and bear arms, as protected by the Second Amendment.

## CONSENT TO FILE

All parties have consented to the filing of this brief.[1]

---

[1] No counsel for a party in this case authored this brief in whole or part. No party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No person other than *amici* and their members contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

There is no tradition of disarming Americans based solely on their use of an intoxicant. The only historical justification for disarmament is dangerousness. Therefore, to justify 18 U.S.C. § 922(g)(3), the government must demonstrate a sufficient connection between the use of the intoxicant and danger. Here, it failed to carry that burden.

Firearms were ubiquitous in the colonial, founding, and early republic periods. They were necessary for self-defense, community defense, sport, and food. Alcohol—the preferred intoxicant of early Americans—was ubiquitous, too. Alcohol consumption per capita reached levels in the colonial, founding, and early republic periods that have not been reached since.

Inevitably, alcohol and firearms were used together. From "the shot heard round the world," to the Lewis and Clark Expedition, militia musters, weddings, funerals, Christmas and New Year celebrations, and ordinary entertainment, the mixture of firearms and intoxicants was part of early American life.

While the Founders and their successors were concerned with both excessive use of intoxicants and firearms violence in America, they did

2

not address those concerns by completely prohibiting users of intoxicants from keeping or bearing arms, as § 922(g)(3) does. In fact, no pre-1900 law forbade firearm ownership based on the use of an intoxicant. Nor did any pre-1900 law forbid anyone to carry or use a firearm while sober, due to their regular use of intoxicants.

Historically, Americans were only ever disarmed for being dangerous. But the government here failed to make any serious effort to establish a connection between Mr. Daniels or illegal drug use and dangerousness. 18 U.S.C. § 922(g)(3) should thus be held unconstitutional.

## ARGUMENT

### I.  Both firearms and alcohol were ubiquitous in the colonial, founding, and early republic periods.

In colonial America, "the gun was more abundant than the tool. It furnished daily food; it maintained its owner's claims to the possession of his homestead among the aboriginal owners of the soil; it helped to win the mother country's wars for possession of the country as a whole." 1 Charles Winthrop Sawyer, FIREARMS IN AMERICAN HISTORY 1 (1910). Likewise, in the founding and early republic periods, gun ownership and use "were the norm—not the exception." Clayton E. Cramer, THE ORIGINS OF AMERICAN GUN CULTURE 119 (2018).

Alcohol, too, was ubiquitous. "[I]n 1770 the annual per capita intake of alcohol from all sources was 3.5 gallons. In the years following the Revolution the amount declined [to about 3.0 gallons] as consumption of spirits declined [due to high import duties]. But after 1800, as the quantity of spirits consumed increased, the total quantity of alcohol consumed from all sources increased until it reached a peak of nearly 4 gallons per capita in 1830." W. J. Rorabaugh, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION 10 (1979).[2] Americans' alcohol use has never again reached such rates. *See Alcohol consumption per capita from all beverages in the U.S. from 1850 to 2021*, STATISTICA.COM, May 26, 2023.[3] Thus, alcohol use in America was at its peak during the colonial, founding, and early republic periods.

The Founders were alarmed by Americans' rampant drinking. George Washington, who later operated one of America's largest whiskey distilleries, called alcohol "the source of all evil—and the ruin of half the

[2] Available at https://www.google.com/books/edition/The_Alcoholic_Republic/2AUH0vchHRIC?hl=en&gbpv=1.

[3] https://www.statista.com/statistics/442818/per-capita-alcohol-consumption-of-all-beverages-in-the-us/.

4

workmen in this Country." Letter from George Washington to Thomas Green (Mar. 31, 1789), *in* 11 THE WRITINGS OF GEORGE WASHINGTON 1785–1790, at 377 (Worthington Chauncey Ford ed., 1891).[4] John Adams asked, "is it not mortifying beyond all expression that we, Americans, should exceed all other and millions of people in the world in this degrading, beastly vice of intemperance?" Letter from John Adams to William Willis (Feb. 21, 1819), *in* 10 THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 365 (Charles Francis Adams ed., 1856).[5] Thomas Jefferson lamented that "liquor is spreading through the mass of our citizens." Letter from Thomas Jefferson to Samuel Smith (May 3, 1823), *in* 10 THE WRITINGS OF THOMAS JEFFERSON 252 (Paul Leicester Ford ed., 1899).[6] Thus, "[t]he Founding Fathers, fearful that the American republic would be destroyed in a flood of alcohol, were anguished and perplexed." Rorabaugh, THE ALCOHOLIC REPUBLIC, at 6.

---

[4] Available at https://oll-resources.s3.us-east-2.amazonaws.com/oll3/store/titles/2415/Washington_1450-11_Bk.pdf.

[5] Available at https://www.google.com/books/edition/The_Works_of_John_Adams_Second_President/MZQ8AAAAIAAJ?hl=en&gbpv=1.

[6] Available at https://www.google.com/books/edition/The_Writings_of_Thomas_Jefferson/jlI8AAAAIAAJ?hl=en&gbpv=1.

This concern persisted into the 19th century. An address published by Rev. Herman Humphrey in 1813 declared that "no other people ever indulged, so universally from the highest to the lowest, in their use of ardent spirits, as the people of this country.… Not only do men drink, but women also; and even children are early initiated into the schools of intemperance." An Address, to the Churches and Congregations of the Western District of Fairfield County 6 (1813).[7]

## II.     Firearms and alcohol were regularly used together.

Inevitably, firearms and alcohol mixed. In fact, the combination may have led to "the shot heard round the world," which sparked the Revolutionary War and ultimately led to America's independence. At Lexington Green, many British "Regulars thought that the first shot came from 'the corner of a large house to the right of the Church,' which could only have been the Buckman Tavern.… Many armed men had been in the Buckman Tavern that night, and more than a few had partaken liberally of the landlord's hospitality." David Hackett Fischer, Paul Revere's Ride 193 (1994).

---

[7] Available at https://www.google.com/books/edition/Intemperance/MxkwAAAAYAAJ?hl=en&gbpv=1.

Alcohol was present at the subsequent battle in Concord. Elias Brown of Concord, "a madman [who] wandered unmolested through the center of the action," spent the day "happily pouring cider for men on both sides."[8] *Id.* at 216.

The Battles of Lexington and Concord came about after Paul Revere set off on his famous midnight ride to warn that "the British are coming." According to the Boston Globe, along the way, Captain Isaac Hall "gave Paul a little something to warm his bones" and thus it was "a little rum poured on top of patriotic fervor that caused Paul to sound his cry of alarm." *Id.* at 341.

Throughout the war, alcohol was commonly used by armed American troops. To provide one example, a surgeon wrote in May 1775 that he found "the roads" near Boston "crouded with carts and carriages, bringing [the New England troops] rum, cyder, &c. from the neighboring towns, for without New-England rum, a New-England army could not be kept together … they drink at least a bottle of it a man a day." LETTERS ON THE AMERICAN REVOLUTION 1774–1776, at 120 (Margaret Wheeler

---

[8] Brown's "Concord cider had fermented all winter and was twenty proof by April." Fischer, PAUL REVERE'S RIDE, at 216.

Willard ed., 1925).[9] He disparaged the New England troops as "a drunken … rabble, without order." *Id.*

During the Whiskey Rebellion of 1794—"the greatest threat to national unity between the winning of independence and the outbreak of the Civil War," Stephen E. Ambrose, UNDAUNTED COURAGE 38 (1996)—President Washington had to depend on volunteers because the regular army was fighting an Indian campaign in the Ohio country, *id.* at 38. As during the Revolutionary War, among the volunteers, "[d]runkenness was widespread." *Id.* at 40.

A decade later, the Lewis and Clark expedition set off with 120 gallons of whiskey and enough guns and ammunition to complete the trip a second time. *Id.* at 89.

After Meriwether Lewis returned from the expedition, he spent time drinking and shooting, occasionally at the same time. For example, his friend Mahlon Dickerson—who would later serve as New Jersey's Governor, U.S. Senator, and district court judge—wrote in 1807 that

---

[9] Available at https://www.google.com/books/edition/Letters_on_the_American_Revolu tion_1774/VS_VAAAAMAAJ?hl=en&gbpv=1.

"Capt. Lewis" and he "[s]pent the day very pleasantly in eating drinking and shooting at the trees." *Id.* at 437.

Drinking while armed was especially common during militia musters. Noah Worcester (under the pseudonym "Philo Pacificus")—a pioneer of pacifism in America—explained that near the end of the 18th century, "the officers were in the habit of distributing large quantities of rum to the soldiers," and the militiamen would then "honor[ the] officers by the discharge of muskets near their heads or their feet." 4 Philo Pacificus, THE FRIEND OF THE PEACE 378–79 (1827).[10]

In 1803, the famous circuit-riding Bishop, Francis Asbury, wrote about encountering a drunken mob of militiamen returning—with their arms, no doubt—from a muster: "We met people coming from a militia muster, drunk, and staggering along the lanes and paths; these unhappy souls have had their camp-meeting, and shout forth the praises of the god of strong drink." 3 THE JOURNAL OF THE REV. FRANCIS ASBURY, BISHOP OF

---

[10] Available at
https://www.google.com/books/edition/The_Friend_of_Peace/RDcMAQA
AMAAJ?hl=en&gbpv=1.

THE METHODIST EPISCOPAL CHURCH, FROM AUGUST 7, 1771, TO DECEMBER 7, 1815, at 121 (1821).[11]

The early American poet William Cullen Bryant, who was born in 1794, experienced a militia company drinking with their officer's approval in his "early years":

> It was, to be sure, esteemed a shame to get drunk; but, as long as they stopped short of this, people, almost without exception, drank grog and punch freely with out much fear of a reproach from any quarter….
>
> I remember an instance of this kind. There had been a muster of a militia company on the church green for the election of one of its officers, and the person elected had treated the members of the company and all who were present to sweetened rum and water, carried to the green in pailfuls, with a tin cup to each pail for the convenience of drinking.

1 William Cullen Bryant, LIFE AND WORKS OF WILLIAM CULLEN BRYANT 16–17 (1883).[12]

Writing about his militia career, a retired officer who served in the War of 1812 later wrote that his "habit of drinking" was then "less

---

[11] Available at https://wesleyscholar.com/wp-content/uploads/2019/01/Asbury-Journal-vol-3-1821.pdf.

[12] Available at https://www.google.com/books/edition/The_Life_and_Works_of_William_Cullen_Bry/v0ZaAAAAMAAJ?hl=en&gbpv=1.

thought of, since it was the universal custom, in all regiments of the militia, with which I had any acquaintance, for the officers, on every muster day, to get gloriously drunk in their country's service." 3 THE NEW-ENGLAND MAGAZINE 111 (1832).[13]

An account of an 1840 militia muster in Racine County, Wisconsin, explains that the militiamen "all got so drunk they couldn't muster at all in the afternoon!" Charles E. Dyer, HISTORICAL ADDRESS, DELIVERED BEFORE THE OLD SETTLERS SOCIETY, OF RACINE COUNTY, WISCONSIN 43 (1871).[14]

Musters in North Carolina similarly involved drinking: "The Big Musters called most of the people together, and there was much fun and many rough games to beguile the time. Cider and ginger cakes were sold, and many men got drunk." John Preston Arthur, WESTERN NORTH

---

[13] Available at https://www.google.com/books/edition/The_New_England_Magazine/M8 NSAAAAcAAJ?hl=en&gbpv=1.

[14] Available at https://www.google.com/books/edition/Official_Record_of_the_Old_Settle rs_Soci/XkrCiVOtFT8C?hl=en&gbpv=1.

CAROLINA: A HISTORY (FROM 1730 TO 1913), at 284 (1914).[15] Preston does not specify what period he is referring to, but the context suggests it was the antebellum period. He adds that "Mountain Lager Beer," a "mildly intoxicating drink," was "quite common in the days of … big musters." *Id.* at 271. One might surmise that drinking was involved at the last Big Muster in 1861, when "the militia had a somewhat hilarious time," as "after it was over" the "clerk of the court … vainly waived his sword in a frantic effort to prevent the sheriff and others from riding their horses into the court room, and pawning the big bass drum which some one had placed behind the bar for safe-keeping." *Id.* at 346.

Militia musters, apparently, had long served as an excuse for heavy drinking. England's first official Poet Laureate, John Dryden, suggested in 1700 that the English militia was more concerned with drinking than fulfilling its duties:

> Stout once a Month they march a blust'ring Band,
> And ever, but in times of Need, at hand:
> This was the Morn when issuing on the Guard,
> Drawn up in Rank and File they stood prepar'd
> Of seeming Arms to make a short essay,
> Then hasten to be drunk, the Business of the Day.

---

[15] Available at https://www.google.com/books/edition/Western_North_Carolina/rHNtrk PD8UMC?hl=en&gbpv=1.

John Dryden, *Cymon and Iphigenia, From Boccace*, *in* FABLES, ANCIENT

AND MODERN 556 (1700).[16]

During the 19th century, Christmas shooting rounds became popular.

This tradition was somewhat similar to caroling, except instead of

singing the group would fire guns outside the home and expect to be

reciprocated with liquor and sweets. Gert Göbel, a German immigrant,

described the tradition in Missouri around the 1830s:

> Even less known was the fine German custom of decorating a
> Christmas tree. There was just shooting. On Christmas Eve,
> a number of young fellows from the neighborhood banded
> together, and, after they had gathered together not only their
> hunting rifles but also old muskets and horse pistols from the
> Revolutionary War and had loaded them almost to the
> bursting point, they went from house to house. They
> approached a house as quietly as possible and then fired a
> mighty volley, to the fright of the women and children, and, if
> someone did not appear then, another volley no doubt
> followed. But usually the man of the house opened the door
> immediately, fired his own gun in greeting and invited the
> whole company into the house. There the whiskey jug made
> the rounds, and some pastry was also handed around. After
> everyone had chatted for a little while, the whole band set out
> for the next farm, where the same racket started up anew. In
> this way, this mischief was carried on until morning, and
> since, as a rule, a number of such bands were out and about,

---

[16] Available at
https://www.google.com/books/edition/Fables_Ancient_and_Modern/Jktb
AAAAQAAJ?hl=en&gbpv=1.

one could often hear all night the roaring and rattling of guns from all directions.

Walter L. Robbins, *Christmas Shooting Rounds in America and Their Background*, THE JOURNAL OF AMERICAN FOLKLORE, vol. 86, no. 339, at 48 (1973) (quoting 3 Gert Göbel, LANGER ALS EIN MENSCHENLEBEN IN MISSOURI 80–81 (1877)).

South Carolinians practiced this tradition in the 1830s, too. There, citizens would:

> ramble throughout the night of Christmas Eve, in companies of a dozen persons, from house to house, firing heavily charged guns, and having thus aroused the family they would enter the domicile with stamping scramble to the blazing fire, greedily eat the *praetzilies* and *schneckilies*, imbibe, with many a rugged joke and ringing peal of laughter, heavy draughts of a compound liquor made of rum and sugar, butter and alspice stewed together, and then, "With monie an eldritch screetch an' hollo," rush out into the night to visit the next neighbor.

John Belton O'Neall & John Abney Chapman, THE ANNALS OF NEWBERRY 660 (1892).[17]

Similarly, in Indiana in the 1850s, "[b]ands of young men armed with muskets, horns and conch-shells made the rounds of the neighborhood on

---

[17] Available at https://www.google.com/books/edition/The_Annals_of_Newberry/L2YlA AAAMAAJ?hl=en&gbpv=1.

Christmas eve, shooting in front of houses and demanding treats of liquor, apples, pies or cakes, according to taste or local custom." 2 Logan Esarey, HISTORY OF INDIANA FROM ITS EXPLORATION TO 1922, at 595 (1922).[18]

A related tradition that was "very general" in the 18th century was "the shooting-in of the new year." THE PENNSYLVANIA-GERMAN, vol. 8, Jan.-Dec. 1807, at 16;[19] *see also* Robbins, *Christmas Shooting Rounds*, at 50–51; Walter L. Robbins, *Wishing in and Shooting in the New Year among the Germans in the Carolinas*, *in* AMERICAN FOLKLORE 257 (Don Yoder ed., 1976). "Beginning at sunset on New Year's Eve a group of men known as New Year's shooters, carrying guns loaded only with gunpowder, make the rounds of the homes in their community. When they arrive at a home, one of the group, the wisher, calls out to the man of the house and, when he hears an answer, addresses a New Year's wish to him. After the wish the shooters fire their guns and are then invited

---

[18] Available at https://www.google.com/books/edition/History_of_Indiana_from_Its_Exploration/5mcOAAAAIAAJ?hl=en&gbpv=1.

[19] Available at https://www.google.com/books/edition/The_Pennsylvania_German/z9IwAQAAMAAJ?hl=en&gbpv=1.

in for refreshments. After a short stay, they proceed to the next home on their rounds, which last until dawn of New Year's Day." Robbins, *Wishing in and Shooting in the New Year*, at 257. "Sometimes … when making their rounds, it would happen that one or more of the party indulged too freely in the refreshments offered by their hosts, especially the *Dram un Seidereil*,[20] and came home in a condition ill befitting a New Year's celebration." THE PENNSYLVANIA-GERMAN, vol. 8, Jan.-Dec. 1807, at 16.

Whether in entertainment, celebration, or war, early Americans regularly used firearms while also using intoxicants.

### III.    No historical law completely deprived Americans of Second Amendment rights based solely on their use of intoxicants.

Under the Supreme Court's Second Amendment test,

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

---

[20] A "dram" is "a small drink of liquor." RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 405 (1995). "'Seidereil' is boiled cider with honey added." 33 THE PENNSYLVANIA-GERMAN SOCIETY 231 (1923), available at https://www.google.com/books/edition/The_Pennsylvania_German_Socie ty/AjN3kByrmIcC?hl=en&gbpv=1.

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022) (quotation omitted).

Because the right to keep and the right to bear arms are both protected by the Second Amendment's plain text, *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Bruen*, 142 S. Ct. 2111, the government may justify its law only by demonstrating that 18 U.S.C. § 922(g)(3) is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130.

In determining whether the government has met its burden, *Bruen* identifies two considerations that are relevant here. First, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131. As demonstrated above, the use of firearms by people who also use intoxicants occurred in the 18th century and has persisted ever since. Thus, the government must produce a "distinctly similar historical regulation" to § 922(g)(3), which prohibits all Second Amendment rights based only on the use of an intoxicant. *Id.*

Second, because "individual self-defense is 'the *central component*' of the Second Amendment right … whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599)). Therefore, the government must establish a tradition of regulations that entirely forbid users of intoxicants from exercising any Second Amendment rights, even when they are not intoxicated.

As the following examination of historical laws demonstrates, the government cannot satisfy its burden in this case.

### A. Colonial laws.

*Bruen* valued colonial laws to the extent that they informed the original understanding of the Second Amendment. 142 S. Ct. at 2142–44.

In over 150 years of colonial history, few laws restricted firearms use by intoxicated persons. None restricted firearms use by people who were sober at the time, but otherwise used intoxicants.

A 1623-4[21] Virginia law provided that "[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments." 1 William Waller Hening, THE STATUTES AT LARGE: BEING A COLLECTION OF THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, at 127 (1823).[22] Other laws enacted at the same time demonstrate that the purpose was to preserve gunpowder for emergencies, namely, Indian attacks. The immediately preceding laws required that "every dwelling house shall be pallizaded in for defence against the Indians"; "[t]hat no man go or send abroad without a sufficient partie w[e]ll armed;" "[t]hat men go not to worke in the ground without their arms (and a centinell upon them.)"; "[t]hat the inhabitants" not leave town "in such numbers, as thereby to weaken and endanger the

---

[21] The dual years for some colonial statutes (e.g., 1623-4) are used to account for the change from the Old Style (Julian) calendar to the New Style (Gregorian) calendar. Under the New Style, the new year begins on January 1. Under the Old Style, the new year began on March 25 (the date of the Annunciation to the Virgin Mary). So what we today call "February 1624" was considered by colonists of the time to be "February 1623." The English and their colonies adopted the New Style in 1752.

[22] Available at https://www.google.com/books/edition/The_Statutes_at_large/yDIMAQA AMAAJ?hl=en&gbpv=1.

plantations"; "[t]hat the commander of every plantation take care that there be sufficient of powder and ammunition within the plantation under his command and their pieces fixt and their arms complete"; and "[t]hat there be dew watch kept by night." *Id.* Thus, Virginia's law suggests that it was acceptable to shoot "in drinking or entertainments, &c.," but not when all the powder was needed for the defense of the colony.

Virginia's 1655-6 law called the shooting of guns while drinking "frequent," but restricted the practice to weddings and funerals to prevent false alarms of Indian attacks:

> WHEREAS it is much to be doubted, That the comon enemie the Indians, if opportunity serve, would suddenly invade this collony to a totall subversion of the same, and whereas the only means for the discovery of their plotts is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns and drinking, whereby they proclaim, and as it were, justifie that beastly vice spending much powder in vaine, that might be reserved against the comon enemie, *Be it therefore enacted* that what person or persons soever shall, after publication hereof, shoot any gunns at drinkeing (marriages and ffuneralls only excepted,) that such person or persons so offending shall forfeit 100lb. of tobacco to be levied by distresse in case of refusall and to be disposed of by the militia in amunition towards a magazine for the county where the offence shall be comitted.

*Id.* at 401–02. Virginia's laws, therefore, restricted the "frequent" practice of shooting while drinking—with some exceptions—only for the express purpose of preserving gunpowder and preventing false alarms of Indian attacks. These laws did not restrict keeping or carrying arms and would not have restricted the use of arms in self-defense by an intoxicated person.

A 1731 Rhode Island law fined anyone who "presume[d] to fire any Gun or Pistol, or fire or throw any Squib, Rocket, or other Fire-work, in the Streets of any of the Towns of this Government, or in any Tavern of the same, after dark, on any Night whatsoever." ACTS AND LAWS, OF HIS MAJESTY'S COLONY OF RHODE-ISLAND, AND PROVIDENCE-PLANTATIONS, IN NEW-ENGLAND, IN AMERICA 165 (1745).[23] This law did not restrict keeping or bearing arms, nor did it treat intoxicated persons differently than anyone else.

New York, in 1771, explaining that "great Damages are frequently done on the eve of the last Day of December, and on the first and second Days of January … by persons going armed from House to House, with

---

[23] Available at https://quod.lib.umich.edu/e/evans/N04574.0001.001/1:80.1?rgn=div2;view=fulltext.

Guns and other Fire Arms and being often intoxicated with Liquor," forbade the "discharge of any Gun, Pistol, Rocket, Cracker, Squib, or other fire Work in any House Barn or other Building or before any Door or in any Garden, Street, Lane, or other Inclosure on the said Eve or Days within the County of Richmond; and in the Precincts of Haverstraw and Orange Town in the County of Orange." 5 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 244–45 (1894).[24] This law applied to a limited area—only one full county—and like Rhode Island's 1831 law, it did not restrict keeping or bearing arms, nor did it treat intoxicated persons differently than anyone else.

Three English colonies and the Dutch colony New Netherland limited alcohol use by militiamen. In 1643, New Netherland fined "any one, on the Burgher guard," who "comes fuddled or intoxicated on guard." LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674, at 35 (E. B. O'Callaghan ed., 1868).[25] While Dutch colonial laws say little about the

---

[24] Available at https://www.google.com/books/edition/The_Colonial_Laws_of_New_York_from_the_Y/r4g0AQAAMAAJ?hl=en&gbpv=1.

[25] Available at https://www.google.com/books/edition/Laws_and_Ordinances_of_New_N etherland_16/qOz33EqwG1UC?hl=en&gbpv=1.

English tradition adopted by America's Founders—especially when those laws were not adopted by the English after they seized the colony in 1664—some English colonies later enacted similar laws. In 1746, a New Jersey militia law allowed a "Captain or Commanding Officer to disarm" a soldier who "appear[ed] in Arms disguised in Liquor," and forbade the sale of "any strong liquor" to militiamen before training was completed on training days, "without Leave from the Captain or Commanding Officer." 2 BACKGROUNDS OF SELECTIVE SERVICE: MILITARY OBLIGATION: THE AMERICAN TRADITION, Part 8, at 25, 35 (Arthur Vollmer ed., 1947). Similarly, a 1756 Maryland law fined "any Person of the Militia who shall get drunk on any Muster-day before or at Muster," and "any Person who shall presume to vend Sell or Dispose of any Strong Liquor at any Place of training or at any other Place within Five Miles of any Place of training to any Person belonging to the Militia on any Muster day except between the Time of Discharge from such Training for that day and the Sun sitting." *Id.*, Part 5, at 93. That same year, Delaware forbade "any strong liquor" from being brought to musters or sold there. *Id.*, Part 3, at 13. These laws were intended to ensure that militiamen competently fulfilled their training duties. Had they been intended to prevent intoxicated

people from carrying arms, the New Jersey and Maryland sales restrictions would not have been lifted as soon as training was over. What is more, the laws did not apply to the general population, but applied only to militiamen while training.

## B. Founding era.

"Not all history is created equal"—because "'[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,'" founding era history is paramount. *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35) (emphasis *Bruen*'s).

No founding-era laws that applied to ordinary citizens addressed the use of arms by intoxicated persons or those who use intoxicants.

The only law addressing arms and intoxicants was a Pennsylvania militia law in 1780. Under that law, if "any non-commissioned officer or private," who "on any occasion of parading the company to which he belongs" was "found drunk," he would "be disarmed and put under guard by order of the commanding officer present until the company is dismissed." BACKGROUNDS OF SELECTIVE SERVICE, Part 11, at 97. Additionally, the law provided that "[n]o company or battalion shall meet at a tavern on any of the days of exercise, nor shall march to any tavern

before they are discharged; and any person who shall bring any kind of spiritous liquor to such place of training shall forfeit such liquors so brought for the use of the poor belonging to the township where such offender lives." *Id.* at 100. As with the colonial-era militia laws, Pennsylvania's law was intended to ensure that militiamen competently fulfilled their training duties. It applied only to militiamen while they were training and had no application to the general population.

### C. The 19th century.

"[E]vidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represent[s] a 'critical tool of constitutional interpretation.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605). But "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* Because the Second Amendment's "meaning is fixed according to the understandings of those who ratified it," *id.* at 2132, "to the extent later history contradicts what the text says, the text controls," *id.* at 2137; *see also Heller*, 554 U.S. at 625 (concluding with "our adoption of the *original understanding* of the Second Amendment") (emphasis added).

Rhode Island in 1844 exempted "common drunkards" from the requirement to enroll in the militia but did not prevent them from enrolling voluntarily. PUBLIC LAWS OF THE STATE OF RHODE-ISLAND AND PROVIDENCE PLANTATIONS, AS REVISED BY A COMMITTEE, AND FINALLY ENACTED BY THE GENERAL ASSEMBLY AT THE SESSION IN JANUARY 1844, at 503 (1844).[26] Notably, this law did not prevent "common drunkards" from keeping or bearing arms.

### D. The late 19th century.

*Bruen* deemed late-19th-century evidence relevant only to the extent that it provided "confirmation of what … had already been established" by earlier history. 142 S. Ct. at 2137 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)). The Court was clear that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154. In fact, the Court did not even bother to "address any of the 20th-century historical evidence." *Id.* at 2154 n.28.

---

[26] Available at https://firearmslaw.duke.edu/wp-content/uploads/2020/03/1844-RI-An-Act-to-Regulate-the-Militia-%C2%A71-%C2%A745.pdf.

Three states forbade carrying arms while intoxicated in the late 19th century. Kansas, in 1867, prohibited "any person under the influence of intoxicating drink" from "carrying on his person a pistol, bowie-knife, dirk or other deadly weapon." THE LAWS OF THE STATE OF KANSAS, PASSED AT THE SEVENTH SESSION OF THE LEGISLATURE, COMMENCED AT THE STATE CAPITAL ON TUESDAY, JAN. 8, 1867, at 25 (1867).[27] Wisconsin, in 1883, made it "unlawful for any person in a state of intoxication, to go armed with any pistol or revolver." 1 THE LAWS OF WISCONSIN, EXCEPT CITY CHARTERS AND THEIR AMENDMENTS, PASSED AT THE BIENNIAL SESSION OF THE LEGISLATURE OF 1883, at 290 (1883).[28] And Missouri, that same year, made it unlawful to "have or carry any such weapon [i.e., 'any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon'] upon or about his person when intoxicated or under the influence of intoxicating drinks." LAWS OF MISSOURI PASSED AT THE SESSION OF THE

---

[27] Available at https://www.google.com/books/edition/General_Laws_of_the_State_of_Kansas/Fis4AAAAIAAJ?hl=en&gbpv=1.

[28] Available at https://www.google.com/books/edition/The_Laws_of_Wisconsin/dsE4AAAAIAAJ?hl=en&gbpv=1.

27

GENERAL OF THE THIRTY-SECOND GENERAL ASSEMBLY 76 (1883).[29] These laws applied only to the carrying of arms, and only while the person was intoxicated.

In 1878, Mississippi forbade "any person to sell to any … intoxicated person, knowing him to be … in a state of intoxication," any "bowie knife, pistol, brass knuckles, slung shot or other deadly weapons of like kind or description." LAWS OF THE STATE OF MISSISSIPPI, PASSED AT A REGULAR SESSION OF THE MISSISSIPPI LEGISLATURE, HELD IN THE CITY OF JACKSON, COMMENCING JAN. 8TH, 1878, AND ENDING MARCH 5TH, 1878, at 175 (1878).[30] This law did not restrict the keeping or bearing of arms already owned, and applied only while the person was intoxicated.

In 1899, South Carolina forbade "discharg[ing] any gun, pistol or other firearms while upon or within fifty yards of any public road, except upon his own premises" while "under the influence of intoxicating liquors." ACTS AND JOINT RESOLUTIONS OF THE GENERAL ASSEMBLY OF THE STATE

---

[29] Available at https://www.google.com/books/edition/Laws_of_Missouri/GTLOAAAAMAAJ?hl=en&gbpv=1.

[30] Available at https://www.google.com/books/edition/Laws_of_the_State_of_Mississippi/t_9FAQAAIAAJ?hl=en&gbpv=1.

OF SOUTH CAROLINA, PASSED AT THE REGULAR SESSION OF 1899, at 97 (1899).[31] This did not affect anyone's ability to keep or bear arms.

Lastly, like Rhode Island earlier in the century, Pennsylvania in 1864, the District of Columbia in 1871, Massachusetts in 1873, and Utah in 1894, excluded "common drunkards" from the requirement to enroll in the militia. LAWS OF THE GENERAL ASSEMBLY OF THE STATE OF PENNSYLVANIA, PASSED AT THE SESSION OF 1864, at 222 (1864);[32] LAWS OF THE DISTRICT OF COLUMBIA 1871–1872, at 59 (1872);[33] ACTS AND RESOLVES PASSED BY THE GENERAL COURT OF MASSACHUSETTS, IN THE YEAR 1873, at 760 (1873);[34] LAWS OF THE TERRITORY OF UTAH, PASSED BY THE

---

[31] Available at
https://www.google.com/books/edition/Acts_of_the_General_Assembly_of_South_Ca/Qb44AAAAIAAJ?hl=en&gbpv=1.

[32] Available at
https://www.google.com/books/edition/Laws_of_the_General_Assembly_of_the_Comm/2SpOAQAAIAAJ?hl=en&gbpv=1.

[33] Available at
https://www.google.com/books/edition/Laws_of_the_District_of_Columbia_1871_18/WeYXAAAAYAAJ?hl=en&gbpv=1.

[34] Available at
https://www.google.com/books/edition/Acts_and_Resolves_Passed_by_the_General/1QBAAAAAYAAJ?hl=en&gbpv=1.

LEGISLATIVE ASSEMBLY AT ITS THIRTY-FIRST SESSION 64 (1894).[35] But also like Rhode Island's law, common drunkards could sometimes enroll voluntarily. *See, e.g.*, ACTS AND RESOLVES PASSED BY THE GENERAL COURT OF MASSACHUSETTS, at 760. None of the laws prevented common drunkards from keeping or bearing arms outside of the militia.

There is no historical law depriving anyone of all Second Amendment rights based on the use of intoxicants. The government, therefore, cannot carry its burden of demonstrating a historical tradition of such laws.

## IV. The only historical justification for disarmament is dangerousness, and the government failed to demonstrate that illegal drug users are dangerous.

The only historical justification for disarmament is dangerousness. *See Kanter v. Barr*, 919 F.3d 437, 462–64 (7th Cir. 2019) (Barrett, J., dissenting); *Folajtar v. Attorney Gen. United States*, 980 F.3d 897, 915–20 (3d Cir. 2020) (Bibas, J., dissenting); Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16

---

[35] Available at
https://www.google.com/books/edition/Acts_Resolutions_and_Memorials_Passed_at/IM84AAAAIAAJ?hl=en&gbpv=1.

DREXEL L. REV. (Forthcoming 2023);[36] Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO L. REV. 249 (2020).[37] Therefore, the government could only possibly justify 18 U.S.C. § 922(g)(3) by demonstrating a sufficient connection between illegal drug use and danger. Here, however, the government failed to make any serious effort to establish that connection. *See* Appellee Br. 45–47. The law should thus be held unconstitutional.

## CONCLUSION

This Court should hold 18 U.S.C. § 922(g)(3) unconstitutional because the government failed to demonstrate that it is consistent with the nation's historical tradition of firearm regulation.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320

---

[36] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4317000.

[37] Available at https://scholarship.law.uwyo.edu/cgi/viewcontent.cgi?article=1434&context=wlr.

Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org
*Counsel of Record*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,695 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on July 6, 2023, I served the foregoing with the Clerk of
the Court using the CM/ECF System, which will send notice of such filing
to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
*Counsel for Amici Curiae*