No. 22-60596

———————————

**In the
United States Court of Appeals for the Fifth Circuit**

———————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

PATRICK DARNELL DANIELS, JR.,
*Defendant-Appellant*.

———————————

**On Appeal from the United States District Court
for the Southern District of Mississippi**
No. 1:22-cr-00058-LG-BWR-1

———————————

**Brief *Amicus Curiae* of Gun Owners of America, Inc.,
Gun Owners Foundation, and Tennessee Firearms Association
in Support of Defendant-Appellant and Reversal**

———————————

John I. Harris III
Schulman, Leroy, & Bennett, P.C.
3310 West End Avenue
Suite 460
Nashville, TN  37203

Robert J. Olson
William J. Olson
Jeremiah L. Morgan
William J. Olson, P.C.
370 Maple Avenue West
Suite 4
Vienna, VA  22180
(703) 356-5070
wjo@mindspring.com

July 6, 2023

Case No. 22-60596

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

PATRICK DARNELL DANIELS, JR.,

*Defendant-Appellant.*

---

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Patrick Darnell Daniels, Jr., Defendant-Appellant;

Gun Owners of America, Inc., Gun Owners Foundation, Tennessee Firearms Association, *Amici Curiae.*

Robert J. Olson, William J. Olson, Jeremiah L. Morgan, and John I. Harris III, counsel for *Amici Curiae*.

Pursuant to <u>Federal Rules of Appellate Procedure 26.1</u> and 29(c), and Fifth Circuit Rule 28.2.1, it is hereby certified that *Amici Curiae* Gun Owners of America, Inc., Gun Owners Foundation, and Tennessee Firearms Association are non-stock, nonprofit corporations, have no parent companies, and no person or entity owns them or any part of them.

*/s/ Robert J. Olson*
Robert J. Olson
Attorney of Record for *Amici Curiae*

# TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF AUTHORITIES....................................................................iv

INTEREST OF *AMICI CURIAE*.............................................................1

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT ...........................................................................................4

I.    THERE ARE NO RELEVANT HISTORICAL ANALOGUES
       WHICH SUPPORT SECTION 922(g)(3) ........................................4

      A.    Colonial Conservation of Resource Laws ...............................5

      B.    Military Service Regulations ...................................................5

      C.    Intoxicated Carry Laws .........................................................11

II.   THIS COURT'S QUESTIONS FROM ORAL ARGUMENT
       WOULD BENEFIT FROM ADDITIONAL DISCUSSION ..........17

CONCLUSION ......................................................................................20

# TABLE OF AUTHORITIES

Page

**U.S. Constitution**
Amendment II ........................................................................... 2, *passim*
Amendment XIV ................................................................ 11, 15, 19

**Statutes**
18 U.S.C. § 922(g)(3) .............................................................. 2, *passim*
Firearms Owners' Protection Act of 1986,
    Pub. L. No. 99-308, 100 *Stat.* 449 ..................................... 4
Gun Control Act of 1968,
    Pub. L. No. 90-618, 82 *Stat.* 1213 ..................................... 4

**Cases**
*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................... 10, 18
*Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020) ...... 16, 19, 20
*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ..................................................... 3, *passim*
*Timbs v. Indiana*, 139 S. Ct. 682 (2019) ................................... 19
*United States v. Connelly*, 2023 U.S. Dist. LEXIS 62495 (W.D.
    Tex. Apr. 6, 2023) ................................................................ 13
*United States v. Harrison*, 2023 U.S. Dist. LEXIS 18397
    (W.D. Okla. Feb. 3, 2023) ......................................................... 2, 3

**Miscellaneous**
An Act to Amend Section 1274, Article 2, Chapter 24 of the
    Revised Statutes of Missouri, Entitled "Of Crimes and
    Criminal Procedure," March 5, 1883, § 1, Laws of Missouri,
    Passed at the Session of the Thirty-Second
    General Assembly ..................................................................... 14
An Act Concerning the Militia, April 20, 1837, ch. 240, § 1,
    The General Laws of the Commonwealth of Massachusetts
    Passed at the January Session, 1837 ......................................... 7
An Act for Establishing and Conducting the Military Force
    of New-Jersey, March 11, 1806, ch. CLXXXVII, § 49,
    Acts of the Thirtieth General Assembly of the State of
    New-Jersey, Second Sitting ......................................................... 6
An Act to Prevent the Carrying of Concealed Weapons,

and for Other Purposes, February 28, 1878, ch. XLVI, § 2,
    Laws of the State of Mississippi, Passed at a Regular Session
    of the Mississippi Legislature ................................................. 15, 16
An Act to Prevent the Carrying of Deadly Weapons,
    February 23, 1867, ch. 12, § 1, Laws of Kansas ........................... 14
An Act to Regulate the Militia, June 1843, § 1,
    State of Rhode Island and Providence Plantations
    in General Assembly ...................................................................... 7
An Act for the Regulation of the Militia of This Commonwealth,
    April 2, 1822, ch. CCLXXIV, § LV, art. II,
    General Laws of Pennsylvania, from the Year 1700,
    to April 22, 1846, Chronologically Arranged .................................. 6
B.I. Bustard, "Spirited Republic," Prologue Magazine, National
    Archives (Winter 2014) ................................................................ 15
A. Cargill, "What Did the Founding Fathers Eat and Drink as
    They Started a Revolution?," *Smithsonian Magazine*
    (July 3, 2018) .............................................................................. 9
Ch. 25, art. 47, § 7, The Statutes of Oklahoma: 1890 (1891) .......... 15, 16
P. GODWIN, A BIOGRAPHY OF WILLIAM CULLEN BRYANT, WITH
    EXTRACTS FROM HIS PRIVATE CORRESPONDENCE, vol. I (1883) ........ 8
B. Goggins & S. Strickland, "State Progress in Record Reporting
    for Firearm-Related Background Checks: Unlawful Drug
    Users" (July 2017) ...................................................................... 13
W.W. Henning, A Collection of All the Laws of Virginia (1823) .............. 5
*Historic Tun Tavern and the Marine Corps in Philadelphia*,
    TUN TAVERN ........................................................................... 9, 10
THE JOURNAL OF THE REV. FRANCIS ASBURY, BISHOP OF THE
    METHODIST EPISCOPAL CHURCH, FROM AUGUST 7, 1771,
    TO DECEMBER 7, 1815, vol. III (1821) ........................................... 7
Militia, ch. 252, § 5, Public Laws of the State of Maine (1837) ............ 7
Title XXXII, ch. CLXXXI, § 4397b(3), Laws of Wisconsin (1883) .......... 15
*Reminiscences of a Retired Militia Officer No. IV, in* 3 THE NEW-
    ENGLAND MAGAZINE, at 110 (J. T. & E. Buckingham 1832) ............ 7
B. Stilwell, *What Happened to the Original Tun Tavern,
    Birthplace of the Marine Corps*, MILITARY.COM ........................ 9, 10
F. S. STONE, RACINE BELLE CITY OF THE LAKES AND
    RACINE COUNTY WISCONSIN: A RECORD OF SETTLEMENT,
    ORGANIZATION, PROGRESS AND ACHIEVEMENT, vol. I (1916) ............ 8

# INTEREST OF *AMICI CURIAE*[1]

Gun Owners of America, Inc., Gun Owners Foundation, and Tennessee Firearms Association are nonprofit organizations that work to preserve and defend the Second Amendment rights of gun owners nationwide. *Amici* have filed *amicus* briefs in numerous cases raising Second Amendment issues in an effort to aid courts in a principled analysis of the enumerated right to keep and bear arms.

*Amici* file this brief in response to this Court's June 7, 2023 invitation for *amici curiae* "to supply relevant information regarding the history and tradition of restrictions on the use and possession of firearms as pertinent to the issues presented in this case."[2]

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting this brief. No person other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

[2] Memorandum to Counsel or Parties Listed Below: No. 22-60596 USA v. Daniels, U.S. Ct. Appeals Fifth Cir. (June 7, 2023).

## SUMMARY OF ARGUMENT

The interplay between intoxicating substances and firearms presents no novel societal issue. Indeed, the Framers of our Constitution likely had far greater familiarity with matters involving intoxicating substances and weapons than presently. To be sure, there were certain types of behaviors which occasionally subjected persons to temporary limitations, but those sporadic historical antecedents provide no support for the broad, semi-permanent elimination of Second Amendment rights contained in 18 U.S.C. § 922(g)(3). Rather, any historical regulations from the Founding era implicating firearms and intoxicating substances generally applied only when persons were actually under the influence.[3] To borrow the words of U.S. District Judge Patrick Wyrick when addressing this very issue, our Founders "took a scalpel to the right of armed self-defense" rather than a

---

[3] *Amici* do not take the position that the smattering of historical regulations prohibiting intoxicated possession would even establish a broad and enduring historical tradition sufficient to uphold a narrower intoxicated-possession statute today. But this Court need not answer that question in this case; Section 922(g)(3) does not have even one relevantly similar analogue to support its broad prohibition.

"sledgehammer."[4]  Those in positions of authority in the late 18th Century never would have agreed to such broad and arbitrary categorizations of Americans, such as in Section 922(g)(3), who could then be prohibited from exercising one of the central pre-existing rights that they had just fought against the British to secure.

Under the historical analysis required by *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), today's Section 922(g)(3) fails the Framers' standard.  The current statute lacks any meaningful semblance to the historical tradition, instead imposing an unprecedented, categorical prohibition on all so-called addicts and "unlawful user[s]" of federally controlled substances, irrespective of whether they are actually in possession, actively using, or currently intoxicated at the time they possess firearms.  Section 922(g)(3) takes a "sledgehammer" to the Second Amendment and therefore is unconstitutional.

*Amici* offer a snapshot of life during the period when the Second Amendment was ratified, followed by a discussion of much later

---

[4] *United States v. Harrison*, 2023 U.S. Dist. LEXIS 18397, at *14 (W.D. Okla. Feb. 3, 2023).

restrictions on intoxicated firearm carry.  Finally, having had the

benefit of time to research and provide citations to case law, *amici* offer

information relevant to questions posed by this Court during oral

argument on June 5, 2023.

## ARGUMENT

## I.  THERE ARE NO RELEVANT HISTORICAL ANALOGUES WHICH SUPPORT SECTION 922(g)(3).

For 85 percent of our Nation's history, people were free to possess

firearms even if they sometimes used intoxicating substances.[5]

Virtually all Americans of the time did.  In contrast, Section 922(g)(3)'s

broad ban on firearm possession is a novel one, dating back only to 1986

when it was enacted as part of the ironically named "Firearms Owners'

Protection Act."  Indeed, for the great bulk of our nation's history,

intoxicants and firearms were addressed much differently — at most

---

[5]  The Gun Control Act of 1968, Pub. L. No. 90-618, <u>82 Stat. 1213</u>, <u>1220–21</u>, prohibited only the shipment, transportation, or receipt of firearms by certain substance users.  It was not until 1986 that Congress expanded its coverage to include mere possession.  *See* Firearms Owners' Protection Act of 1986, Pub. L. No. 99-308, <u>100 Stat. 449</u>, <u>452</u>. Thus, for 210 years of this Nation's 247-year history, the mere possession of firearms by substance users (or abusers) was entirely legal.

criminalizing the carrying of arms while a person was currently in a state of impairment, if such conduct was criminalized at all (the vast majority of jurisdictions did not).

### A.  Colonial Conservation of Resource Laws.

Among the earliest examples of laws regulating the interplay of intoxicants and firearms was a colonial 1623 Virginia enactment banning celebratory gunfire — a statute whose text indicates it was designed to conserve scarce resources rather than avoid the dangers associated with intoxication.  *See* W.W. Henning, <u>A Collection of All the Laws of Virginia</u>, Vol. I (1823) at 127 ("no commander of any plantation do either himself or suffer others to spend powder unnecessarily in drinking or entertainments….")[6] (cleaned up).  Importantly, unlike Section 922(g)(3), this statute did not prohibit Virginia colonists from possessing arms — even while intoxicated.

### B.  Military Service Regulations.

Nearly two centuries later, various mustering statutes arose that applied to those who arrived for militia duty in an intoxicated state. For example, New Jersey and Pennsylvania enacted substantially

---

[6] https://archive.org/details/statutesatlargeb01virg.

similar regulations to encourage militia readiness and discipline by providing for the temporary disarmament of intoxicated troops, as follows:

> [I]f any non-commissioned officer or private, shall, on any occasion, of parading the company to which he belongs, **appear drunk**, or shall disobey orders ... he shall be disarmed and put under guard ... **until the company is dismissed,** and shall be fined ... in any sum not exceeding eight dollars.[7]

Not only were these prohibitions limited to military drills, and therefore temporary in nature, but also they appear not to have applied to all soldiers, apparently exempting commissioned officers.  Additionally, they applied only to the possession of "spiritous liquors" within a certain radius of militia activities — a mile in New Jersey and half a mile in Pennsylvania.[8]  Later, Maine, Massachusetts, and Rhode Island would

---

[7] An Act for Establishing and Conducting the Military Force of New-Jersey, March 11, 1806, ch. CLXXXVII, § 49, Acts of the Thirtieth General Assembly of the State of New-Jersey, Second Sitting, at 563 (emphasis added); *see also* An Act for the Regulation of the Militia of This Commonwealth, April 2, 1822, ch. CCLXXIV, § LV, art. II, General Laws of Pennsylvania, from the Year 1700, to April 22, 1846, Chronologically Arranged, at 340 (James Dunlop comp. 1847) (deviating slightly in wording and penalty — "any sum not exceeding twenty dollars, nor less than five").

[8] An Act for Establishing and Conducting the Military Force of New-Jersey, *supra* note 7, § 56, at 565; An Act for the Regulation of the Militia of This Commonwealth, *supra* note 7, § LVII, at 342.

enact militia statutes prohibiting "common drunkards" from militia enrollment but otherwise leaving such persons' rights to keep and bear arms intact.[9]

Whether these militia statutes actually saw meaningful enforcement is another matter. Contrary to what gun control advocates might want the Court to assume, numerous contemporaneous accounts of early militia activities actually depict widespread revelry as a normal aspect of military life. By one account, "[a]t that time ... it was the universal custom, in all regiments of the militia ... for the officers, on every muster day, to get gloriously drunk in their country's service."[10] In 1802, one pastor wrote of encountering "people coming from a militia muster, drunk, and staggering along the lanes and paths."[11] Another

---

[9] Militia, ch. 252, § 5, Public Laws of the State of Maine, at 424 (1837); An Act Concerning the Militia, April 20, 1837, ch. 240, § 1, The General Laws of the Commonwealth of Massachusetts Passed at the January Session, 1837, at 54; An Act to Regulate the Militia, June 1843, § 1, State of Rhode Island and Providence Plantations in General Assembly, at 1.

[10] *Reminiscences of a Retired Militia Officer No. IV*, *in* 3 THE NEW-ENGLAND MAGAZINE, at 110, 111 (J. T. & E. Buckingham 1832), https://bit.ly/3kEqJoJ.

[11] The Journal of the Rev. Francis Asbury, Bishop of the Methodist Episcopal Church, from August 7, 1771, to December 7, 1815, vol. III, at 121 (1821), https://bit.ly/3DgPVrU.

report from the fall of 1840 in the Territory of Wisconsin states: "the Racine Militia gallantly trained till noon, when they adjourned to the Fulton House for dinner, where they all got so drunk they couldn't muster at all in the afternoon."[12]  Surprisingly, even *during* formal, armed assemblies, impairment seems to have occurred with some frequency.  Lawyer and famed journalist William Cullen Bryant once recounted that "[t]here had been a muster of a militia company on the church green for the election of one of its officers, and the person elected had treated the members of the company and all who were present to sweetened rum…."[13]  Bryant later saw one such militiaman "lament his condition in these words:  'Oh dear, I shall die!' 'Oh dear, I wish I hadn't drinked any!'"[14]

---

[12]  Fanny S. Stone, Racine Belle City of the Lakes and Racine County Wisconsin: A Record of Settlement, Organization, Progress and Achievement, vol. I, at 476 (1916), https://bit.ly/3wyv4N4.

[13]  Parke Godwin, A Biography of William Cullen Bryant, with Extracts from His Private Correspondence, vol. I, at 16 (1883), https://bit.ly/3CV7E7B.

[14]  *Id.* at 17.

In other words, uncomfortable to modern sensibilities as it may seem, the truth is that our Founders mixed firearms and intoxicants[15] quite regularly.  A *Smithsonian Magazine* article described practices of that era:  "from morning until night, people in the 18th century drank." A. Cargill, "What Did the Founding Fathers Eat and Drink as They Started a Revolution?," *Smithsonian Magazine* (July 3, 2018).[16] Perhaps the most notable historic example of this habit in early America occurred at the historic Tun Tavern in Philadelphia — known as the birthplace of the U.S. Marine Corps.[17]  During the pre-Revolutionary era, Tun Tavern also housed a brewery, and served as a popular meeting place for various organizations including the Continental Congress.[18]  In 1756, "Colonel Benjamin Franklin

---

[15]  Two-plus centuries ago, the issue was chiefly alcohol, as our Founders had no conception of "controlled substances" divided into "schedules."

[16]  https://www.smithsonianmag.com/history/founding-fathers-july-4th-result-both-american-revolution-and-food-revolution-180969538/.

[17]  *Historic Tun Tavern and the Marine Corps in Philadelphia*, TUN TAVERN, https://www.tuntavern.com/brewery-tours-2/ (last visited July 2, 2023); *see also* Blake Stilwell, *What Happened to the Original Tun Tavern, Birthplace of the Marine Corps*, MILITARY.COM, https://www.military.com/history/what-happened-original-tun-tavern-birthplace-of-marine-corps.html (last visited July 2, 2023).

[18]  *Historic Tun Tavern and the Marine Corps in Philadelphia*, *supra* note 17.

organized the Pennsylvania Militia and utilized the Tavern as a gathering place to recruit the area's first regiment of soldiers to suppress Indian uprisings."[19]  Nineteen years later, the tavern was the site of the Marine Corps' first recruitment drive, raising two battalions.[20]

Yet even though early militia statutes may provide a glimpse into our early traditions, or at least those that were on the books, they cannot serve as relevant historical analogues for Section 922(g)(3) for one simple reason:  the Second Amendment "secure[s] an individual right *unconnected* with militia service." *District of Columbia v. Heller*, 554 U.S. 570, 616 (2008) (emphasis added).  The militia mustering statutes of yesterday were temporary in nature, obviously applying only during militia service, and cannot be used to define the scope of Americans' Second Amendment rights or justify Section 922(g)(3)'s broad and semi-permanent ban on the possession of firearms and ammunition.

---

[19]  *Id.*
[20]  Stilwell, *supra* note 17.

## C. Intoxicated Carry Laws.

Much later 19th Century laws involving intoxicants and firearms primarily concerned intoxicated public carry. However, many of these laws postdated even the Fourteenth Amendment — some by decades. Thus, these laws shed little light on the scope of the individual right known at the Second Amendment's ratification, as they fail to establish a relevant early American tradition as required by *Bruen*, which repeatedly counseled that:

- to the extent that such "19th-century evidence" has any role to play at all, it is "'treated as mere confirmation of what the Court thought had already been established.'" *Id*. at 2137.

- "[T]o the extent later history contradicts what the text says, the text controls." *Id.*

- "[P]ostratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.*

In other words, Reconstruction-era historical sources are to be used, at most, as confirmation of a historical tradition that was already in existence during the Founding. *See Bruen* at 2163 (Barrett, J.,

11

concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution 'against giving postenactment history more weight than it can rightly bear.'").

But even if this Court were to count these late-arriving intoxicated-carry restrictions as relevant evidence of a widespread early American tradition, they still would not support the modern restriction contained within Section 922(g)(3) — as such laws narrowly dispossessed users of intoxicants of firearm possession only **while under the influence** of those substances. Moreover, those late-coming restrictions applied only to carrying firearms in public — a person was still free to be intoxicated anywhere but in public without being disarmed. Finally, merely being an occasional user, even if arguably "addicted" to an intoxicant, would not suffice.

In stark contrast to any possible historical analogue, Section 922(g)(3) disarms Americans, on a semi-permanent basis, merely for being "addicted to any controlled substance," regardless of whether they are currently using it or under its influence. Indeed, the FBI takes the

position that, wholly unrelated to use, the mere "possession" of an

illegal intoxicant (or even so-called drug "paraphernalia") is enough to

bar a person from firearm possession.  Additionally, the FBI claims that

any drug use "within the past year" is sufficient to negate an

individual's Second Amendment rights — a far cry from post-

Ratification laws disarming Americans only while they were

intoxicated.[21]

As one district court characterized the issue:  "Consider instead a

law that would prevent individuals from possessing cars at all if they

regularly drink alcohol on weekends.  Nobody would say that this

hypothetical law is similar to DUI laws in how it regulates cars.  The

hypothetical law's focus on possession, rather than use, of the vehicle

imposes a much greater burden on drivers." *United States v. Connelly*,

2023 U.S. Dist. LEXIS 62495, at *17 (W.D. Tex. Apr. 6, 2023).

The late 19th-century intoxicated-carry laws that did exist

criminalized just that — intoxicated carry of firearms — not the general

possession of arms by those who sometimes consumed intoxicating

---

[21] *See* B. Goggins & S. Strickland, "State Progress in Record Reporting
for Firearm-Related Background Checks: Unlawful Drug Users" (July
2017), https://www.ojp.gov/pdffiles1/bjs/grants/250782.pdf

substances.[22]  Moreover, these intoxicated-carry laws imposed minor

penalties compared to the harsh felony consequences that await

violators of Section 922(g)(3), like Mr. Daniels.  For example, an 1867

Kansas law provided:

> [A]ny person **under the influence** of intoxicating drink ...
> who shall be found within the limits of this State carrying on
> his person a pistol, bowie-knife, dirk, or other deadly
> weapon, shall be subject to arrest upon charge of
> misdemeanor, and upon conviction shall be fined in a sum
> not exceeding **one hundred dollars**, or by imprisonment in
> the county jail not exceeding **three months**, or both, at the
> discretion of the court.[23]

Missouri and Wisconsin enacted similar statutes in 1883, both

providing for jail sentences of up to six months, and with Wisconsin

limiting its prohibition to pistols and revolvers only, ostensibly leaving

open the possibility of drunkenly carrying one's rifle within the bounds

of the law.[24]

---

[22]  Intoxication is certainly not a new "unprecedented societal concern[]
or dramatic technological change[]" as discussed in *Bruen* at 2132.  An
*amicus* brief filed by CATO Institute in *Bruen* provided numerous
authorities referencing widespread marijuana and even cocaine use in
the 1800s.  *See amicus* brief of CATO Institute, *Carnes v. United States*,
Supreme Court Docket No. 22-76 (Aug. 25, 2022), at 10.
[23] An Act to Prevent the Carrying of Deadly Weapons, February 23,
1867, ch. 12, § 1, Laws of Kansas, at 25 (emphases added).
[24] An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised
Statutes of Missouri, Entitled "Of Crimes and Criminal Procedure,"

According to one historical perspective: "In early America, drinking alcohol was an accepted part of everyday life at a time when water was suspect and life was hard."[25]  More specifically, "In 1790, we consumed an average of 5.8 gallons of absolute alcohol annually for each drinking-age individual."  In stark contrast, a century after the ratification of the Second Amendment, and well after the ratification even of the Fourteenth Amendment, some states adopted laws against intoxicated carry, which cannot be historical analogues to Section 922(g)(3).  *See*, *e.g.*, 1896 R.I. Pub. Laws 232; 1909 Idaho Sess. Laws 6.

Mississippi and Oklahoma took a different approach; they criminalized the sale of weapons to those visibly intoxicated and the carry of weapons at "any place where intoxicating liquors [we]re sold," respectively.[26]  Again, penalties were comparatively minor: "a fine not

---

March 5, 1883, § 1, Laws of Missouri, Passed at the Session of the Thirty-Second General Assembly, at 76; Title XXXII, ch. CLXXXI, § 4397b(3), Laws of Wisconsin, at 2226 (1883).

[25] B.I. Bustard, "Spirited Republic," Prologue Magazine, National Archives (Winter 2014).

[26] An Act to Prevent the Carrying of Concealed Weapons, and for Other Purposes, February 28, 1878, ch. XLVI, § 2, Laws of the State of Mississippi, Passed at a Regular Session of the Mississippi Legislature, at 175; Ch. 25, art. 47, § 7, The Statutes of Oklahoma: 1890, at 496 (1891).

exceeding two hundred dollars" in Mississippi and a fine between $50 and $500 or imprisonment of up to a year in Oklahoma.[27]

But like the militia mustering statutes, these intoxicated-carry laws also fail to establish a broad and enduring early American tradition that can save Section 922(g)(3) under *Bruen*. *See Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020) (rejecting the late-1800s adoption of no-aid laws for religious schools by "more than 30 states" as insufficient; "[s]uch a development, of course, cannot by itself establish an early American tradition"). Indeed, the Government would have to proffer the nonexistent: the widespread adoption of intoxicated-carry laws dating back to the 1790s.

There is simply no historical example of depriving a person of the Second Amendment right to possess firearms merely because he uses (or has used) an intoxicating substance. Because the government has not and cannot provide evidence of a broad and enduring historical tradition during the time of the Founding to support Section 922(g)(3),

---

[27] An Act to Prevent the Carrying of Concealed Weapons, and for Other Purposes, *supra* note 26; Ch. 25, art. 47, § 10, The Statutes of Oklahoma: 1890, at 496 (1891).

it has failed to meet its heavy burden under *Bruen*, and the challenged statute cannot stand.

## II. THIS COURT'S QUESTIONS FROM ORAL ARGUMENT WOULD BENEFIT FROM ADDITIONAL DISCUSSION.

*Amici* believe that some of this Court's questions offered during oral argument raise important issues that could benefit from greater development, together with citations to case law.

One such question that was posed is whether the *Bruen* Court had examined the potential penalties of proffered historical analogues under the "how" metric of relevant-similarity analysis.[28]  Of course, the historical analogues offered to New York's "proper cause" statute were facially flawed, and therefore the *Bruen* Court did not need to compare the penalties between them and the New York statute in order to conclude there were no appropriate analogues in that case.  However, consider the New Jersey law, discussed *supra*, which applied to certain military personnel while parading who "appear[ed] drunk," who were to be disarmed "until the company is dismissed, and shall be fined ... in any sum not exceeding eight dollars."  Even if these sanctions had

---

[28] U.S. Court of Appeals for the Fifth Circuit, *22-60596* USA v. Daniels, *June 5, 2023*, YouTube, at 03:30 (June 6, 2023).

applied to civilians, they would not support enactment of federal

*felonies* like Section 922(g)(3), which can result in lifetime forfeiture of

Second Amendment rights.

What is more, in response to Justice Breyer's dissent in *Heller*, the

majority did compare the severity of penalties:

> A broader point about the laws that Justice Breyer cites: All of them punished the discharge (or loading) of guns with a **small fine** and forfeiture of the weapon (or in a few cases a **very brief stay in the local jail**), **not with significant criminal penalties.** They are akin to modern penalties for minor public-safety infractions like speeding or jaywalking.... Likewise, we do not think that a law imposing a **5-shilling fine and forfeiture** of the gun would have prevented a person in the founding era from using a gun to protect himself or his family from violence, or that **if** he did so **the law would be enforced against him**. [*Heller*, 554 U.S. at 633–34 (emphases added) (footnote omitted).]

*Bruen*'s endorsement of the "text, history, and tradition" standard

for Second Amendment challenges was merely a reiteration of

*Heller's* methodology. *See Bruen*, 142 S. Ct. at 2129–30.

Consequently, *Bruen* incorporates the considerations *Heller* made,

regardless of whether it was necessary in *Bruen* to employ those

same considerations to the facts in that case.

Another question raised during oral argument was whether it is

permissible for the Government to proffer Reconstruction-era laws in

defending Section 922(g)(3).[29]  In short — they were not sufficient in
isolation.  Although already discussed *supra*, certain key points bear
emphasis.

In deciding *Bruen*, the Supreme Court noted that "we have made
clear that individual rights enumerated in the Bill of Rights and made
applicable against the States through the Fourteenth Amendment have
the same scope as against the Federal Government."  *Bruen*, 142 S. Ct.
at 2137.  Phrased another way, "if a Bill of Rights protection is
incorporated, there is no daylight between the federal and state conduct
it prohibits or requires."  *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019).
While the Court reserved the precise question of the Fourteenth
Amendment period's relevance for another day, it was explicit in stating
that "to the extent later history contradicts what the text says, the text
controls."  *Bruen*, 142 S. Ct. at 2137.  Axiomatically, then, contradictory
(or wholly novel) analogues arising well after Ratification "obviously
cannot overcome or alter th[e] text," but only confirm that which "had
already been established" in the late 18th century.  *Id.*  *See also*
*Espinoza*, 140 S. Ct. at 2258–59 (post-Ratification enactments "cannot

---

[29] *USA v. Daniels*, 22-60596 June 5, 2023, *supra* note 28, at 13:05.

by [themselves] establish an early American tradition"). Thus, should the Government proffer Reconstruction-era laws as purported analogues to Section 922(g)(3)'s prohibition, this Court should consider them only if the Government first can prove that such laws confirm prohibitions that were in place during the Founding.

## CONCLUSION

It may seem surprising that Americans at the time of the Founding had no great concerns about mixing intoxication and firearms, but modern sensibilities and expectations cannot make the government's case. To be sure, in the Founding era, some lawmakers and military leaders sporadically imposed some limitations on intoxicants and firearms, but none came close to the heavy-handed categorical prohibition Congress invented in 1986. The Constitution demands reversal of Mr. Daniels' conviction.

Dated: July 6, 2023

Respectfully submitted,

/s/ *Robert J. Olson*

John I. Harris III
Schulman, Leroy, & Bennett, P.C.
3310 West End Avenue
Suite 460
Nashville, TN  37203

Robert J. Olson
William J. Olson
Jeremiah L. Morgan
William J. Olson, P.C.
370 Maple Avenue West
Suite 4
Vienna, VA  22180
(703) 356-5070
wjo@mindspring.com

Counsel for Amici Curiae
Gun Owners of America, Inc.,
Gun Owners Foundation, and
Tennessee Firearms Association

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Robert J. Olson*
Robert J. Olson

*Counsel for Amici Curiae*
*Gun Owners of America, Inc.,*
*Gun Owners Foundation, and*
*Tennessee Firearms Association*

Dated: July 6, 2023

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) because it contains 3,895 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief also complies with the typeface requirements of FED R. APP. P. 32(a)(5)(A) and the type style requirements of FED. R. APP. P. 32(a)(6), as well as 5th Cir. R. 32.1, because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font size 14.

*/s/ Robert J. Olson*
Robert J. Olson

*Counsel for Amici Curiae*
*Gun Owners of America, Inc.,*
*Gun Owners Foundation, and*
*Tennessee Firearms Association*

Dated: July 6, 2023