# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 9, 2023

Lyle W. Cayce
Clerk

No. 22-60596

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

PATRICK DARNELL DANIELS, JR.,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:22-CR-58-1

Before SMITH, HIGGINSON, and WILLETT, *Circuit Judges.*

JERRY E. SMITH, *Circuit Judge:*

Title 18 U.S.C. § 922(g)(3) bars an individual from possessing a firearm if he is an "unlawful user" of a controlled substance. Patrick Daniels is one such "unlawful user"—he admitted to smoking marihuana multiple days per month. But the government presented no evidence that he was intoxicated at the time of arrest, nor did it identify when he last had used marihuana. Still, based on his confession to regular usage, a jury convicted Daniels of violating § 922(g)(3).

The question is whether Daniels's conviction violates his right to bear

arms. The answer depends on whether § 922(g)(3) is consistent with our nation's "historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). It is a close and deeply challenging question.

Throughout American history, laws have regulated the combination of guns and intoxicating substances. But at no point in the 18th or 19th century did the government disarm individuals who used drugs or alcohol at one time from possessing guns at another. A few states banned carrying a weapon while actively under the influence, but those statutes did not emerge until well after the Civil War. Section 922(g)(3)—the first federal law of its kind—was not enacted until 1968, nearly two centuries after the Second Amendment was adopted.

In short, our history and tradition may support some limits on an intoxicated person's right to carry a weapon, but it does not justify disarming a sober citizen based exclusively on his past drug usage. Nor do more generalized traditions of disarming dangerous persons support this restriction on nonviolent drug users. As applied to Daniels, then, § 922(g)(3) violates the Second Amendment. We reverse the judgment of conviction and render a dismissal of the indictment.

I.

In April 2022, two law enforcement officers pulled Daniels over for driving without a license plate. One of the officers—an agent with the Drug Enforcement Administration ("DEA")—approached the vehicle and recognized the smell of marihuana. He searched the cabin and found several marihuana cigarette butts in the ashtray. In addition to the drugs, the officers found two loaded firearms: a 9mm pistol and a semi-automatic rifle. Daniels was taken into custody and transported to the local DEA office.

At no point that night did the DEA administer a drug test or ask

No. 22-60596

Daniels whether he was under the influence; nor did the officers note or testify that he appeared intoxicated. But after Daniels was Mirandized at the station, he admitted that he had smoked marihuana since high school and was still a regular user. When asked how often he smoked, he confirmed he used marihuana "approximately fourteen days out of a month."

Based on his admission, Daniels was charged with violating 18 U.S.C. § 922(g)(3), which makes it illegal for any person "who is an unlawful user of or addicted to any controlled substance . . . to . . . possess . . . any firearm." An "unlawful user" is someone who uses illegal drugs regularly and in some temporal proximity to the gun possession. *See United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006).

While Daniels was under indictment, the Supreme Court decided *Bruen*. It clarified that firearms regulations are unconstitutional unless they are firmly rooted in our nation's history and tradition of gun regulation. *See* 142 S. Ct. at 2129–30. Daniels immediately moved to dismiss the indictment, claiming that § 922(g)(3) is unconstitutional under that new standard.

The district court denied the motion. *See United States v. Daniels*, 610 F. Supp. 3d 892, 892 (S.D. Miss. 2022). It expressed some doubt that Daniels was part of "the people" whom the Second Amendment protects, as Daniels was not a "law abiding, responsible citizen[]." *Id.* at 894. Nevertheless, assuming that Daniels had a right to bear arms, the court found that § 922(g)(3) was a longstanding gun regulation. *See id.* at 895. It compared § 922(g)(3) to laws disarming felons and the mentally ill that *Heller* called "presumptively lawful." *Id.* at 895 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008)). Congress passed § 922(g)(3) in 1968, only after many states had similarly banned habitual drug abusers from possessing guns. *Id.* at 896. The district court placed great weight on that regulatory tradition. It engaged with few historical sources from the Founding or

No. 22-60596

Reconstruction, but it relied on statements from other courts—notably all predating *Bruen*—that § 922(g)(3) was supported by the historical practice of disarming those who "exhibit a dangerous lack of self-control." *Id.* at 897.

A jury found Daniels guilty. He was sentenced to nearly four years in prison and three years of supervised release. By nature of his § 922(g)(3) felony, Daniels is also barred for life from possessing a firearm. *See* 18 U.S.C. § 922(g)(1).

Daniels appeals his conviction, reasserting the Second Amendment challenge that he raised before trial.[1] As with all constitutional questions, we consider the issue *de novo*. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

## II.

The Second Amendment protects the right of individuals to "keep and bear" firearms for their self-defense. U.S. CONST. amend. II; *see Heller*, 554 U.S. at 595. But even fundamental rights have limits. *See Bruen*, 142 S. Ct. at 2128. Before *Bruen*, our circuit evaluated the legality of gun restrictions using the familiar standards of scrutiny. *See United States v. McGinnis*, 956 F.3d 747, 753–54 (5th Cir. 2020). If legislation infringed on the historical right to bear arms, we asked whether the government had a sufficiently strong interest and whether its firearm regulation was sufficiently tailored. If a law breached the core of the Second Amendment liberty, we applied strict scrutiny; if not, we applied intermediate scrutiny. *Id.* at 754.

*Bruen*, 142 S. Ct. at 2129–31, decisively rejected that kind of analysis. In place of means-end balancing, *Bruen* "requires" us to interpret the Second

---

[1] Daniels also contends that § 922(g)(3) is unconstitutionally vague and that there was insufficient evidence for a reasonable jury to convict. Because we hold that § 922(g)(3) is unconstitutional as applied to Daniels, we need not address his additional challenges.

No. 22-60596

Amendment in light of its original public meaning. *Id.* at 2126, 2131. As the Court explained, the Second Amendment codified a "*pre-existing* right" with pre-existing limits. *Id.* at 2127 (quoting *Heller*, 554 U.S. at 592). To ascertain those limits, history is our heuristic. Because historical gun regulations evince the kind of limits that were well-understood at the time the Second Amendment was ratified, a regulation that is inconsistent with those limits is inconsistent with the Second Amendment. *Id.*

To determine whether a modern firearms law is unconstitutional, we now proceed in two steps. *First*, we ask whether the Second Amendment applies by its terms. *Id.* at 2129–30. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. *Second*, we ask whether a given gun restriction is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. The government bears the burden of demonstrating a tradition supporting the challenged law. *Id.* at 2130. Only by showing that the law does not tread on the historical scope of the right can the government "justify its regulation." *Id.*

The second step requires both close attention to history and analogical reasoning. *Bruen* did not forswear all legislative innovation. To the contrary, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. What we are looking for is a "tradition"—well-accepted limits on the right to bear arms manifested by a tangible practice of comparable gun regulations. But how do we know whether an older regulatory practice is "comparable"?

*Bruen* helpfully gave us two conceptual pathways. If the modern regulation addresses "a general societal problem that has persisted since the 18th century," then "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is incon-

sistent with the Second Amendment." *Id.* at 2131. But if a modern law addresses "unprecedented societal concerns or dramatic technological changes," it calls for a "more nuanced approach." *Id.* at 2132. We must reason by analogy to determine whether older regulations are "relevantly similar" to the modern law. *Id.*

*Bruen* acknowledged the difficulty of determining whether two laws are "relevantly similar." *Id.* *Bruen* clarified that two laws are "relevantly similar" if they share a common "why" and "how"; they must both address a comparable problem (the "why") and place a comparable burden on the rightsholder (the "how"). *Id.* at 2132–33.

In all of that, *Bruen* reminded us that we are looking for a "representative historical analogue, not a historical twin." *Id.* at 2133 (emphasis removed). It is not a death knell to the government that the challenged regulation did not previously exist. What matters is whether a conceptual fit exists between the old law and the new. Deciding whether there is a match between historical and modern regulations requires the exercise of both analogical reasoning and sound judgment. Nevertheless, we hew closely to *Bruen*'s own reasoning and hold the government to its heavy burden.

## A.

We begin with the threshold question: whether the Second Amendment even applies to Daniels.

The right to bear arms is held by "the people." U.S. Const. amend. II. That phrase "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Indeed, the Bill of Rights uses the phrase "the people" five times. In each place, it refers to all members of our political community, not a special group of upright citizens. *Id.* (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Based on that consistent usage, *Heller* concluded that "the Second

No. 22-60596

Amendment right is exercised individually and belongs to *all* Americans." *Heller*, 554 U.S. at 581 (emphasis added).

Even as a marihuana user, Daniels is a member of our political community. Therefore, he has a presumptive right to bear arms. By infringing on that right, § 922(g)(3) contradicts the plain text of the Second Amendment.

True, *Heller* described the Second Amendment as applying to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635. And *Bruen* used the phrase "law-abiding" fourteen times, including in the opening sentence, where it says that the Second Amendment "protect[s] the right of an ordinary, *law-abiding* citizen to possess a handgun." 142 S. Ct. at 2122 (emphasis added). The government seizes on that language and insists that the Second Amendment does not extend to Daniels because he is a criminal.

But we cannot read too much into the Supreme Court's chosen epithet. More than just "model citizen[s]" enjoy the right to bear arms. *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), *cert. granted*, No. 22-915, 2023 WL 4278450 (June 30, 2023). Indeed, *Rahimi* held that citizens accused of domestic violence still had Second Amendment rights. It reasoned that when *Heller* and *Bruen* used the phrase "law-abiding," it was just "short-hand" to "exclude from the . . . discussion" the mentally ill and felons, people who were historically "stripped of their Second Amendment rights." *Id.* at 452. All others are presumptively included in the Second Amendment's ambit. Because Daniels is not a felon or mentally ill, *Rahimi*'s treatment of the "law-abiding" moniker suggests that he has presumptive Second Amendment rights as well.

Still, *Heller*'s and *Bruen*'s emphasis on "law-abiding" citizens hints that Congress and state legislatures have greater latitude to limit the gun liberties of the lawless. But, as a general rule, limitations on the Second Amend-

No. 22-60596

ment come from the traditionally understood restrictions on the right to bear arms, not because ordinary citizens are categorically excluded from the privilege. *See Rahimi*, 61 F.4th at 453.[2]

Once we conclude that Daniels has presumptive Second Amendment rights, the focus shifts to step two of the *Bruen* analysis: whether history and tradition support § 922(g)(3).

## B.

Before we decide whether § 922(g)(3) is consistent with our tradition of gun regulation, we must first ask a methodological question: What kind of similarity are we looking for? "Distinct" similarity or a less precise "relevant" similarity? *See Bruen*, 142 S. Ct. at 2131–32. That depends on whether § 922(g)(3) "addresses a general societal problem that has persisted since the 18th century" or an "unprecedented societal concern[]" that the Founding generation did not experience. *Id.* at 2131–32.

*Bruen* does not require more than "relevant" similarity here. It is true that the Founding generation was familiar with intoxication via alcohol,[3] and it was familiar with marihuana plants.[4] But the Founders grew hemp to make

---

[2] That accords with the holding in *Range v. Att'y General United States of America*, 69 F.4th 96, 101–03 (3d Cir. 2023) (en banc), where the court held that a man convicted of a false statement was part of "the people" and had Second Amendment rights, even though he was not "law-abiding." *Range* relied in part on then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019), in which she reasoned that "all people have the right to keep and bear arms," but "history and tradition support Congress's power to strip certain groups of that right."

[3] W.J. Rorabaugh, The Alcoholic Republic: An American Tradition 10 (1981) ("[I]n 1770 the annual per capita intake of alcohol from all sources was 3.5 gallons. In the years following the Revolution the amount declined . . . . But after 1800, as the quantity of spirits consumed increased, the total quantity of alcohol consumed from all sources increased until it reached a peak of nearly 4 gallons per capita in 1830.").

[4] *See, e.g.*, Benjamin Franklin, A Modest Inquiry into the Nature

No. 22-60596

rope.[5]  They were not familiar with widespread use of marihuana as a narcotic, nor the modern drug trade.[6]  Thus, though intoxication generally was a persistent social problem, *see Bruen* 142 S. Ct. at 2131, the Founding generation had no occasion to consider the relationship between firearms and intoxication via cannabis.[7]  Although marihuana might be comparable in some ways to alcohol or tobacco, merely by making the comparison we have moved past the hunt for a distinctly similar law and are engaged in analogical reasoning.

Indeed, *Bruen*'s discussion of "distinct" and "relevant" similarity seems aimed at interpreting historical silence.  That is, when the historical

-------

AND NECESSITY OF A PAPER CURRENCY (1729), *reprinted in* 2 THE WORKS OF BENJAMIN FRANKLIN 253, 275 (Boston, Hilliard, Gray & Co. 1836) (claiming that America was "very capable" of growing hemp).  George Washington himself cultivated hemp.  1 THE DIARIES OF GEORGE WASHINGTON 1748-1799, at 213 (John C. Fitzpatrick ed., 1925).

[5] *See* THOMAS PAINE, COMMON SENSE (1776), *in* 1 THE POLITICAL WRITINGS OF THOMAS PAINE 15, 52 (Charlestown, George Davidson 1824) ("Hemp flourishes even to rankness, so that we need not want cordage.").

[6] Some post-colonial books and newspapers noted that people in the Middle East used hemp as an intoxicant.  *See, e.g.*, 3 C.S. SONNINI, TRAVELS IN UPPER AND LOWER EGYPT: UNDERTAKEN BY ORDER OF THE OLD GOVERNMENT OF FRANCE 92 (Henry Hunter trans., London 1807).  But the novelty of those reports from faraway lands demonstrates the absence of marihuana intoxication in America at the Founding.

[7] *See* David F. Musto, *The American Experience with Stimulants and Opiates*, 2 PERSPS. ON CRIME & JUST. 51, 51 (1998) ("[M]ost [non-alcoholic] drugs were not familiar products early in the 19th century . . . ."); *see also* Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 VA. L. REV. 971, 985–87, 1010–11 (1970) (describing how American society gradually realized the social effects of narcotics in the late 1800s and began regulating them at the turn of the century); *see also id.* at 1011 ("[From 1914–31], we can find no evidence of public concern for, or understanding of, marijuana, even in those states that banned it . . . .  Observers in the middle and late 1930's agreed that marijuana was . . . a very new phenomenon on the national scene.").

No. 22-60596

record reveals no regulations of a particular kind, we could interpret that silence in one of two ways. We could say that it means nothing (i.e., neither approval nor disapproval), or we could count silence as evidence that the public did not approve of such a regulation. *Bruen* says we should make the latter inference, at least when the public experienced the harm the modern-day regulation attempts to address. *Bruen*, 142 S. Ct. at 2131. By contrast, when the ratifying public did not confront a particular harm, its failure to regulate it says little about whether it approved such regulation.

In that case, we look instead for analogues—similar harms that the Founding generation did confront and the regulations they used to address them. *Id.* at 2132. Just as Founding-era prohibitions on firearms in "sensitive places" can extend to "*new* and analogous sensitive places," *id.* at 2133, we can compare the Founders' treatment of one problem to new problems that the Founders could not have anticipated.

Even so, the government has the burden to find and explicate the historical sources that support the constitutionality of § 922(g)(3). *Rahimi*, 61 F.4th at 455 (citing *Bruen*, 142 S. Ct. at 2132–33). Here, the government's proffered analogues fall into three general buckets: (1) statutes disarming intoxicated individuals, (2) statutes disarming the mentally ill or insane, and (3) statutes disarming those adjudged dangerous or disloyal.[8] Each deserves

_____

[8] We limit ourselves to the record amassed by the district court, the parties, and the *amici* who offered additional historical materials in response to this court's order on June 6, 2023. *See Bruen*, 142 S. Ct. at 2130 n.6 ("*Heller*'s text-and-history test . . . [requires] resolv[ing] *legal* questions presented in particular cases or controversies. . . . Courts are thus entitled to decide a case based on the historical record compiled by the parties."). Still, notable repositories of historical gun laws—such as the database maintained by the Duke Center for Firearms Law—do not reveal additional probative statutes. *See Repository of Historical Gun Laws*, DUKE CTR. FOR FIREARMS L., https://firearmslaw.duke.edu/repository/ (last visited July 20, 2023).

No. 22-60596

independent consideration.

### 1.

Because there was little regulation of drugs (related to guns or otherwise) until the late-19th century,[9] intoxication via alcohol is the next-closest comparator. Throughout the colonial period and into the 19th century, Americans drank alcohol—and lots of it.[10] Common sense indicates that individuals who are impaired by alcohol lack the self-restraint to handle deadly weapons safely. So it is unsurprising to find historical laws dealing with guns and alcohol. Such rules are relevant to our history and tradition of gun regulation.

Unfortunately for the government, that regulatory tradition is sparse and limited during the relevant time periods. Despite the prevalence of alcohol and alcohol abuse, neither the government nor *amici* identify any restrictions at the Founding that approximate § 922(g)(3). Although a few states after the Civil War prohibited carrying weapons while under the influence, none barred gun possession by regular drinkers.

### a.

Founding-era statutes concerning guns and alcohol were few. They were also limited in scope and duration. The laws that did exist had two primary concerns: (1) the misuse of weapons while intoxicated and (2) the

---

[9] *See* Bonnie & Whitebread, *supra* note 7, at 985–86.

[10] John Adams claimed that Americans "exceed all other and millions of people in the world in this degrading, beastly vice of intemperance." Letter from John Adams to William Willis (Feb. 21, 1819), in 10 THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 365, 365 (Charles Francis Adams ed., Boston, Little, Brown & Co. 1856); *see also* Musto, *supra* note 7, at 52 (finding that "[i]n the early Republic," there was "an extremely high level of alcohol consumption (chiefly, distilled spirits)").

No. 22-60596

discipline of state militias.

Consider the first group of statutes. In 1656, Virginia banned "shoot[ing] any gunns at drinkeing."[11] But in historical context, that was not a disarming regulation like § 922(g)(3). Virginia was a brand-new colony at the time. The 1656 statute was explicitly passed to conserve gunpowder, which was at a premium, and because ill-timed gunshots might be mistaken for a signal that local Indians were attacking.[12] Not only was the statute enacted for a different purpose, but it did not even ban gun possession or carry—it only prevented the colonists from misusing the guns they did have during bouts of drinking.

Another law, passed by New York in 1771, prohibited citizens from firing guns from December 31 to January 2 because of the "great Damages" done by those "intoxicated with Liquor" during New Year's celebrations.[13]

---

[11] Acts of Mar. 10, 1655–56, Act 12, *reprinted in* 1 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 401, 401–02 (William Waller Hening ed., New York, R. & W. & G. Bartow 1823). As a historical note, some old statutes are dated with dual years because, until 1752, the British colonies dated the new year from March 25 (the Feast of the Annunciation). Thus, a law marked "1655" between January 1 and March 24 was actually passed in 1656 according to the New Style (Gregorian) Calendar. *See Colonial Records & Topics*, CONN. STATE LIBR., https://libguides.ctstatelibrary.org/hg/colonialresearch/calendar (last visited July 9, 2023).

[12] According to the statute, the misuse of weapons while intoxicated furthered "that beastly vice[:] spending much powder in vaine" instead of "reserve[ing] [it] against the comon enemie," "the Indians." Acts of Mar. 10, 1655–56, Act 12, *reprinted in* 1 THE STATUTES AT LARGE, *supra* note 11, at 401. Plus, "[t]he only means for the discovery of [Indian] plotts is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns in drinking." *Id.* at 401. The 1656 law was a descendant of a 1632 law, which prevented "spend[ing] powder unnecessaril[y] . . . in dringinge or enterteynments." Acts of Feb. 24, 1631–32, Act 50, *reprinted in* 1 THE STATUTES AT LARGE, *supra* note 11, at 155, 173.

[13] Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 THE COLONIAL LAWS OF NEW

No. 22-60596

The statute had a similar purpose as § 922(3) does—preventing public harm by individuals under the influence.  Nevertheless, the law was strikingly narrow.  It applied on only three days out of the year; it only prevented firing guns (not possessing them); and it applied only to those under the influence, not habitual drinkers.

Beyond that duet of colonial regulations—separated by over a century—the government identifies no Founding-era law or practice of disarming ordinary citizens for drunkenness, even if that intoxication was routine.

Instead, the government points to a second group of statutes regulating militia service.  For example, a soldier could be "disarm[ed]" if he showed up for militia service in New Jersey "disguised in Liquor."[14] Pennsylvania did the same in 1780.[15]  For related reasons, dram shops were prohibited from selling to local soldiers.[16]

---

York from the Year 1664 to the Revolution 244, 244–245 (Albany, James B. Lyon 1894).

[14] Act of May 8, 1746, ch. 200, § 3, *reprinted in* Acts of the General Assembly of the Province of New-Jersey 140, 140–41 (Samuel Allison ed., Burlington, Isaac Collins 1776).

[15] Act of Mar. 20, 1780, ch. 902, § 45, *reprinted in* 2 Military Obligation: The American Tradition, pt. 11, at 75, 97 (Arthur Vollmer ed., 1947) ("[I]f any non-commissioned officer or private shall . . . be found drunk . . . he shall be disarmed . . . until the company is dismissed . . . .").  Later, some states excluded "common drunkards" from militia service. *See, e.g.*, An Act to regulate the Militia, § 1, *reprinted in* Public Laws of the State of Rhode-Island and Providence Plantations 501, 503 (Providence, Knowles & Vose 1844).

[16] *See, e.g.*, Act of May 22, 1756, *reprinted in* 2 Military Obligation, *supra* note 15, pt. 5, at 83, 93 (Arthur Vollmer ed., 1947) (Maryland statute); Act of May 8, 1703, § 19, *reprinted in* 2 Military Obligation, *supra* note 15, pt. 13, at 8, 13 (South Carolina statute).  It is not clear how strictly those laws were enforced, however.  Founding-era militias were notorious for imbibing heavily.  One officer wrote that it was "the universal custom, in all regiments of the militia . . . for the officers, on every muster day, to get

No. 22-60596

Those laws, however, are even less probative. For one thing, their purpose is different. They exist to ensure a competent military—a service-member cannot perform his duties if he is impaired. Furthermore, the limitations applied only to the militia; none of the laws spoke to the ability of militiamen to carry outside of their military service. At the Founding, as today, restrictions on the liberties of servicemen tell us little about the limits acceptable for the general public.

Given the prevalence of drinking at the Founding, that handful of laws puts the government on shaky footing. The government has failed to identify any relevant tradition at the Founding of disarming ordinary citizens who consumed alcohol.

b.

The government's Reconstruction-era evidence, though stronger, still falls short of the history and tradition that could validate § 922(g)(3).

Between 1868 and 1883, three states prohibited carrying firearms while intoxicated: Kansas, Missouri, and Wisconsin.[17] Missouri's law was

---

gloriously drunk in their country's service." *See* Reminiscences of a Retired Militia Officer: No. IV, *reprinted in* 3 The New-England Magazine 110, 111 (Boston, J. T. & E. Buckingham 1832).

[17] Art. 9, § 282, *in* The General Statutes of the State of Kansas 378, 378 (Lawrence, John Speer 1868) ("[A]ny person under the influence of intoxicating drink . . . who shall be found . . . carrying on his person a pistol . . . or other deadly weapon, shall be subject to arrest . . . ."); Act of Mar. 5, 1883, § 1, *reprinted in* Laws of Missouri Passed at the Session of the Thirty-Second General Assembly 76, 76 (Jefferson City, State J. Co. 1883) ("If any person . . . shall have or carry any [firearms] upon or about his person. when intoxicated or under the influence of intoxicating drinks . . . he shall [be punished]."); Act of Apr. 3, 1883, ch. 329, § 3, *reprinted in* 1 The Laws of Wisconsin 290, 290 (Madison, Democrat Printing Co. 1883) ("It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."). Oklahoma Territory banned all public carry of pistols in 1890 and specifically prohibited public officers from carrying while intoxicated. *See Bruen*, 142 S. Ct. at 2154; Art. 47, § 4, *in* The

challenged under the state constitution but was upheld by the Missouri Supreme Court. *State v. Shelby*, 2 S.W. 468 (Mo. 1886). The opinion acknowledged that the state constitution "secure[d] to the citizen the right to bear arms in the defense of his home, person, and property." *Id.* at 469. But the court reasoned that if the state could regulate the "manner in which arms may be borne," there is "no good reason . . . why the legislature may not do the same thing with reference to the condition of the person who carries such weapons." *Id.* The ban on intoxicated carry was therefore "in perfect harmony with the constitution." *Id.*

Those laws come closer to supporting § 922(g)(3), but they are notably few. The *Bruen* Court doubted that three colonial-era laws could suffice to show a tradition, let alone three laws passed eighty to ninety years after the Second Amendment was ratified. *See* 142 S. Ct. at 2142.

More fatally, § 922(g)(3) is substantially broader than the postbellum intoxication laws. On *Bruen*'s two axes of relevant similarity, the postbellum laws and § 922(g)(3) share a common "why": preventing public harm by individuals who lack self-control and carry deadly weapons.[18] But the "how"

---

STATUTES OF OKLAHOMA 495, 495 (Will T. Little et al. eds., Guthrie, State Capital Printing Co. 1891).

In a similar vein (but less relevant here), Mississippi limited the *sale* of small firearms to people who were actively intoxicated. Ch. 77, § 2986, *in* THE REVISED CODE OF THE STATUTE LAWS OF THE STATE OF MISSISSIPPI 776, 776 (J.A.P. Campbell ed., Jackson, J.L. Power 1880). And in 1899, South Carolina prohibited the "*discharge* [of] any gun, pistol, or other firearm . . . within fifty yards of any public road" while "under the influence[] of intoxicating liquors." Ch. 12, § 252, *in* 2 CODE OF LAWS OF SOUTH CAROLINA, 1902, at 318, 318 (1902) (emphasis added).

[18] *Compare Shelby*, 2 S.W. at 469 (acknowledging the obvious "mischief to be apprehended from an intoxicated person going abroad with fire-arms"), *with Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 112 n.6 (1983) ("Congress' intent in enacting [§ 922(g)] was to keep firearms out of the hands of presumptively risky people.").

No. 22-60596

is different.  At most, the postbellum statutes support the banning the *carry* of firearms *while under the influence*.  Section 922(g)(3) bans all possession, and it does so for an undefined set of "user[s]," even if they are not under the influence.

As applied to Daniels, § 922(g)(3) is a significantly greater restriction of his rights than were any of the 19th-century laws.  Although the older laws' bans on "carry" are likely analogous to § 922(g)(3)'s ban on "posses-s[ion],"[19] there is a considerable difference between someone who is actively intoxicated and someone who is an "unlawful user" under § 922(g)(3).  The statutory term "unlawful user" captures regular users of marihuana, but its temporal nexus is vague—it does not specify how recently an individual must "use" drugs to qualify for the prohibition.[20]  Daniels himself admitted to smoking marihuana fourteen days a month, but we do not know how much he used at those times, and the government presented no evidence that Daniels was intoxicated at the time he was found with a gun.  Indeed, under the government's reasoning, Congress could ban gun possession by anyone who has multiple alcoholic drinks a week from possessing guns based on the postbellum intoxicated carry laws.  The analogical reasoning *Bruen* pre-scribed cannot stretch that far.

A further problem with the Reconstruction-era statutes is precisely

---

[19] Possession for the purposes of § 922(g)(3) includes either "direct physical control" over a weapon or "'dominion or control' over the thing itself or the area in which it was found."  *United States v. Jones*, 484 F.3d 783, 787 (5th Cir. 2007).  Though that is not coextensive with the concept of "carry," it is analogous, at least here, where Daniels was in the same vehicle as his firearms.

[20] According to the implementing rules for § 922(g)(3), "[a] person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person . . . possesses a firearm."  27 C.F.R. § 478.11.  An inference of "current use" can even be drawn from "a conviction for use or possession of a controlled substance *within the past year*."  *Id.* (emphasis added).

No. 22-60596

that they emerged during and after Reconstruction. *Bruen* did not discount the relevance of late-19th-century history, but it insisted that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it." *Bruen*, 142 S. Ct. at 2132. A tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later. *Id.*; *see also id.* at 2162–63 (Barrett, J., concurring). When 19th-century practice is inconsistent with the categorical protection of the Second Amendment, the "*text* controls." *Id.* at 2137 (emphasis added).

Admittedly, there is an "ongoing scholarly debate" about whether the right to bear arms acquired new meaning in 1868 when it was incorporated against the states. *Id.* at 2137–38; *see also McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) (incorporating the Second Amendment against the states via the Fourteenth Amendment). But the instant case involves a federal statute and therefore implicates the Second Amendment, not the Fourteenth. Even if the public understanding of the right to bear arms *did* evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791.[21]

And even if late-century practice sheds some dim light on Founding-era understandings,[22] the most the Reconstruction-era regulations support is a ban on gun possession while an individual is *presently* under the influence. By regulating citizens like Daniels based on a pattern of drug use, § 922(g)(3)

---

[21] *See Bruen*, 142 S. Ct. at 2137 ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."); *see also* Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 Notre Dame L. Rev. 1, 15 (2015).

[22] *See Bruen*, 142 S. Ct. at 2137 (calling 19th-century commentary "secondary," and "mere confirmation" of what Founding-era sources reveal) (quotation omitted).

No. 22-60596

goes further. Our history and tradition do not support the leap.

2.

As an alternative, the government posits that the tradition of disarming the mentally ill supports § 922(g)(3). To quote *Heller*'s now-famous caveat, "longstanding prohibitions on the possession of firearms by . . . the mentally ill" are still "presumptively lawful."[23] Obviously, mental illness and drug use are not the same thing. But there is an intuitive similarity: Those who are "briefly mentally infirm as a result of intoxication" are similar to those "permanently mentally infirm" because of illness or disability.[24]

We note at the outset that there is not a clear set of positive-law statutes concerning mental illness and firearms. In fact, the federal ban on gun possession by those judged mentally ill was enacted in 1968, the same year as § 922(g)(3). *See* 18 U.S.C. § 922(g)(4); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010). But scholars have suggested that the tradition was implicit at the Founding because, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'"[25] In other words, the greater restriction included the lesser. If the insane could be wholly deprived of their liberty and property, the government could necessarily take away their firearms.

Of course, the practice of institutionalizing so-called "lunatics" does not give clear guidance about which lesser impairments are serious enough to

---

[23] 554 U.S. at 626, 627 n.26; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting that portion of *Heller*); *McDonald*, 561 U.S. at 786 (quoting the same).

[24] Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 U.C.L.A. L. Rev. 1443, 1535 (2009).

[25] *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (per curiam) (quoting Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009)).

No. 22-60596

warrant the loss of constitutional freedoms.  But we can assume that intoxication with marihuana is analogous to short-term mental illness.  Dr. Benjamin Rush—who signed the Declaration of Independence—said a "temporary fit of madness" was a symptom of drunkenness.[26]  And in an influential treatise on constitutional law, Thomas Cooley described drunkenness as a form of "temporary insanity."[27]  The same could be said of intoxication via marihuana.

Still, that comparison could justify disarming a citizen only while he is in a state comparable to lunacy.  Just as there was no historical justification for disarming a citizen of sound mind, there is no tradition that supports disarming a sober citizen who is not currently under an impairing influence.

Indeed, it is helpful to compare the tradition surrounding the insane and the tradition surrounding the intoxicated side-by-side.  The Founders purportedly institutionalized the insane and stripped them of their guns; but they allowed alcoholics to possess firearms while sober.  We must ask, in *Bruen*-style analogical reasoning, which is Daniels more like: a categorically "insane" person?  Or a repeat alcohol user?  Given his periodic marihuana usage, Daniels is firmly in the latter camp.  If and when Daniels uses marihuana, he may be comparable to a mentally ill individual whom the Founders would have disarmed.  But while sober, he is like the repeat alcohol user in between periods of drunkenness.

---

[26] Benjamin Rush, An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind 6 (8th ed., Boston, James Loring 1823).

[27] Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 660 n.1 (2d ed., Boston, Little Brown & Co. 1871).  He suggests that some states prohibited intoxicated people from voting on that basis. *Id.*

No. 22-60596

In short, neither the restrictions on the mentally ill nor the regulatory tradition surrounding intoxication can justify Daniels's conviction. Perhaps the government could show that the drugs Daniels used were so powerful that anyone who uses them is permanently impaired in a way that is comparable to ongoing mental illness. Or the government could demonstrate that Daniels's drug use was so regular and so heavy that he was continually impaired. Here, it has shown evidence of neither.

3.

Finally, the government asserts that Congress can limit gun possession by those "dangerous" to public peace or safety. It contends that principle was well understood when the Second Amendment was ratified. And it posits that Daniels—a repeat marihuana user—was presumptively dangerous enough to be disarmed. Although there is some historical evidence for the government's underlying principle, the historical examples of danger-based disarmament do not justify § 922(g)(3)'s application here.

a.

As Justice Barrett detailed when she was a judge on the Seventh Circuit, history supports the intuitive proposition that the government can keep deadly firearms away from dangerous people. *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting).[28] Even the *amici* who believe that Daniels should prevail on his Second Amendment challenge suggest that the government *can* disarm the dangerous, even under *Bruen*'s history-and-tradition test.[29]

---

[28] *See also Folajtar v. Att'y Gen. of U.S.*, 980 F.3d 897, 913–15 (3d Cir. 2020) (Bibas, J., dissenting) (urging the same); *see generally* Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. (forthcoming 2023), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4317000 (collecting historical regulations).

[29] Brief of *Amicus Curiae* Scholars of Second Amendment Law and the Inde-

No. 22-60596

That said, no one piece of historical evidence suggests that when the Founders ratified the Second Amendment, they authorized Congress to disarm anyone it deemed dangerous. Instead, the government collects different statutes disarming discrete classes of persons at various points in history. Those laws suggest an abstract belief that an individual's right to bear arms could be curtailed if he was legitimately dangerous to the public.

The government's examples fall into two general buckets. *First*, states barred political dissidents from owning guns during periods of conflict. Many American states, for instance, disarmed those who failed to take an oath of allegiance during the Revolutionary War.[30] *Second*, both British and American governments disarmed religious minorities—especially Catholics.[31]

––––––––––––––––––––

pendence Institute at 9 ("Dangerousness should be the key feature for firearms prohibitors, and a person whose conduct is never dangerous may not be disarmed."); Brief of *Amici Curiae* Firearms Policy Coalition and FPC Action Foundation at 30 ("The only historical justification for disarmament is dangerousness.").

[30] *See, e.g.*, Act of June 13, 1777, ch. 756, § 3, *reprinted in* 9 The Statutes at Large of Pennsylvania from 1682 to 1801, at 110, 112–13 (Wm. Stanley Ray ed., 1903) (allowing local law enforcement to freeze the assets and "disarm[]" those who did not take a loyalty oath); Act of May 1, 1776, ch. 21, *reprinted in* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479, 479 (Boston, Wright & Potter Printing Co. 1886) (ordering those "notoriously disaffected to the cause of America" to be "disarmed" and their weapons given to the Continental Army); Act of June 1776, *reprinted in* 7 Records of the Colony of Rhode Island and Providence Plantations in New England 566, 567 (John Russell Bartlett ed., Providence, A. Crawford Greene 1862) (permitting county sheriffs to take the "arms, ammunition[,] and warlike stores" of those refusing to take loyalty oaths and transfer the weapons to the local militia).

[31] During the English Interregnum, Oliver Cromwell's government disarmed "all known Popish and dangerous or seditious persons." Council: Day's Proceedings (Feb. 15, 1654–55), *reprinted in* 8 Calendar of State Papers, Domestic Series, 1655, at 42, 43–44 (Mary Anne Everett Green ed., London, Longmans & Co. et al. 1881). Several American states disarmed Catholics as well. *See, e.g.*, Act of March 25, 1756, ch. 4, *reprinted in* 7 Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature in the Year 1619,

No. 22-60596

Each of those laws was generally based on concerns for the safety of the polity, but each disarmament also had its own unique political or social motivations. Almost all the laws disarming dissidents were passed during wartime or periods of unprecedented political turmoil. Indeed, Founding-era governments did not disarm Loyalists because they were thought to lack self-control; it was because both were viewed as potential threats to the integrity of the state.[32] The same was true of religious minorities—the perceived threat was as much political as it was religious.[33]

Independent of those class-based restrictions, the government relies

---

at 9, 35–36 (William Waller Hening ed., Richmond, Franklin Press 1820) (disarming "Papists" because it was "dangerous at this time to permit [them] to be armed").

But disarmament was not limited to Catholics. The civil government disarmed fifty-eight supporters of John Wheelwright, a clergyman who was expelled from Massachusetts for his religious views around the same time as Anne Hutchinson. *See* James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 N. Eng. Q. 381, 391 (1988). Quakers and other pacifist sects were also perceived to be Tory sympathizers or traitors because they refused to support the American Revolution. Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51–52 (2006).

[32] Greenlee, *supra* note 288, at 42–43.

[33] *Id.* at 38–40. Although the government does not mention it, perhaps the most categorical firearm restrictions at the Founding were the discriminatory gun bans applicable to blacks and Indians. *See* Stephen P. Halbrook, *To Bear Arms for Self-Defense: A "Right of the People" or a Privilege of the Few?*, 21 Federalist Soc'y Rev. 46, 53 (2020); Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders, in* New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society (Joseph Blocher et al. eds., forthcoming) (manuscript at 4–5), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3702696. Americans feared that slaves, free blacks, and Indians would stage violent attacks or revolts. Greenlee, *supra* note 28, at 28, 31. Although those laws are also examples of danger-based disarmament, we need not build our history and tradition on repugnant laws that today would be struck down as unconstitutional. There are plenty of examples at the Founding of states' disarming citizens who were considered a violent threat to society.

No. 22-60596

heavily on the Militia Act of 1662, which allowed the Crown to disarm those whom he judged "dangerous to the Peace of the Kingdome." 14 Car. 2 c. 3, § 13 (1662). That is the most direct support for the government's principle that the legislature could prophylactically disarm any citizen who could potentially be dangerous.

But *Rahimi* held that the Militia Act was not incorporated into American law. After all, the Act was the justification for the widespread disarming of political opponents by Charles II and James II. *Rahimi*, 61 F.4th at 456. After the Glorious Revolution, the 1689 English Bill of Rights expanded the right to bear arms in order to curtail the Militia Act's reach and limit the Crown's "politically motivated disarmaments." *Id.* Our Second Amendment is a direct descendant of that latter guarantee. *Id.* (citing *Heller*, 554 U.S. at 593). If anything, our constitutional right to bear arms was purposefully broader than its English ancestor. *See* William Rawle, A View of the Constitution of the United States of America 122–23 (Philadelphia, H.C. Carey & I. Lea 1825). Although some historians maintain that the Militia Act was still frequently used after the Glorious Revolution,[34] its limitations likely did not survive the categorical command of the Second Amendment. *See Rahimi*, 61 F.4th at 456.

Finally, the government posits that Congress can disarm dangerous citizens because the idea was discussed during the ratification of the Consti-

---

[34] *See* Patrick J. Charles, *"Arms For Their Defense"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 Cleve. State L. Rev. 351, 376 (2009) (noting that "the 1662 Militia Act's seizure of arms provision was not only frequently used" after the English Bill of Rights, "but it was also supported by both Houses of Parliament"); *see also* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 405–06 (2019).

No. 22-60596

tution. Samuel Adams, for example, proposed an amendment at the Massachusetts ratifying convention that would have limited the right to bear arms to "peaceable citizens."[35] At the Pennsylvania ratifying convention, the dissenting minority suggested several constitutional amendments, including one that would have protected the right to bear arms "unless for crimes committed, or real danger of public injury from individuals."[36] *Heller* described the Pennsylvania proposal as an "influential" precursor to our Second Amendment, 554 U.S. at 604, as many of the Pennsylvania minority's suggestions ended up in our current Bill of Rights.[37]

Again, however, we must pause. The predecessors of the Second Amendment gave concrete language to possible limits on the right to bear arms. Yet that language was not adopted. Instead, the People ratified the unqualified directive: "shall not be infringed." U.S. CONST. amend. II. Usually, when the relevant lawmaking body does not adopt language in a draft, we presume that the stricken language was not intended. *See Skoien*, 614 F.3d at 648 (Sykes, J., dissenting). Indeed, *Rahimi* also considered those Second Amendment precursors and concluded that the unadopted language could not supplant the Amendment's enacted text. *Rahimi*, 61 F.4th at 457.

That said, there is an undeniable throughline in all those historical sources: Founding-era governments took guns away from persons perceived to be dangerous. Even if the disarming of Loyalists and Catholics was limited

---

[35] Convention Journal (Feb. 6, 1788), *reprinted in* 6 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1452, 1453 (J. Kaminski et al. eds. 2000).

[36] The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to their Constituents (1787), *reprinted in* 2 DOCUMENTARY HISTORY OF THE RATIFICATION, *supra* note 35, at 618, 624.

[37] *See* Address and Reasons of Dissent, *supra* note 36, at 623–24.

No. 22-60596

to exigent historical contexts, no party identifies "disputes regarding the lawfulness of such prohibitions" at the time. *Bruen*, 142 S. Ct. at 2133. Indeed, some states such as Pennsylvania disarmed dissident citizens while their state constitutions guaranteed a right to bear arms.[38] And even if the Founders repudiated the Militia Act and rejected the Second Amendment precursors, the language of those documents says something about the outer limit of the right to bear arms in the English tradition.

Perhaps the Second Amendment was meant to do away with all those restrictions of liberty, and we can chalk such restrictions up to reactionary excess during the birth of a nation. On the other hand, we cannot completely discount the sheer number of disarming statutes at the time of the Founding. Together, they suggest a public understanding that when a class of individuals was thought to pose a grave danger to public peace, it could be disarmed.

b.

Assuming the Second Amendment encodes some government power to disarm the dangerous, the question becomes: At what level of generality may we implement that principle? *Bruen* requires us to interrogate the historical record for "relevantly" similar regulations. It does not allow us to enforce unenacted policy goals lurking behind the Second Amendment.

Indeed, any ability to implement a "dangerousness principle" is fenced in by at least two strictures in the applicable caselaw. On the one hand, the legislature cannot have unchecked power to designate a group of persons as "dangerous" and thereby disarm them. Congress could claim that immigrants, the indigent, or the politically unpopular were presumptively "dangerous" and eliminate their Second Amendment rights without judicial

---

[38] *Compare* PA. CONST., Decl. of Rights, § XIII (1776), *with* Act of June 13, 1777, *supra* note 30.

No. 22-60596

review. That would have "no true limiting principle," *Rahimi*, 61 F.4th at 454, and would render the Second Amendment a dead letter.

On the other hand, we cannot inspect a legislature's judgment of dangerousness using traditional standards of scrutiny. *Bruen* forbids us from balancing a law's justifications against the burden it places on rightsholders. 142 S. Ct. at 2127, 2129. Imagine, for example, that a state legislature disarms all men, citing statistics that men commit more violent crimes than do women.[39] Before *Bruen*, we would have considered whether the evidence supporting male dangerousness was substantial enough—and whether the law was sufficiently tailored—to justify such a categorical restriction on gun rights. But *Bruen* forswears that kind of review. *Bruen*, 142 S. Ct. at 2129. Similarly, imagine that the government bars all convicted cybercriminals from owning guns, referencing the "dangerousness" of cybercrime. Cybercrime is assuredly dangerous, but in a different way than is violent crime. Applying a standard of scrutiny, we might have interrogated whether Congress had adequately demonstrated that someone who spreads ransomware or pirates television shows is likely to be dangerous with a firearm. Again, *Bruen* heads that analysis off at the pass. *Id.*[40]

How, then, do we square the post-*Bruen* circle? To remain faithful to *Bruen*, the solution is to analogize to particular regulatory traditions instead

---

[39] In 2012, approximately 80% of offenders arrested for violent crimes were men. *Crime in the United States 2012*, Fed. Bureau Invest. (2012), https://ucr.fbi.gov/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/tables/42tabledatadecoverviewpdf/table_42_arrests_by_sex_2012.xls.

[40] Indeed, when then-Judge Barrett wrote in *Kanter* that danger-based disarmament was consistent with the original understanding of the Second Amendment, *Bruen* had not yet been decided. 919 F.3d at 451 (Barrett, J., dissenting). So she explicitly relied on means-end scrutiny to cabin the government's modern-day determinations that a particular group is too dangerous to possess guns. *Id.* at 465. But post-*Bruen*, that judicial check is no longer available to us. *Bruen*, 142 S. Ct. at 2129–30.

of a general notion of "dangerousness." The government must show that a historical danger-based disarmament is analogous to the challenged regulation.[41] We must use *Bruen*'s "why" and "how" analysis to assess whether the Founding-era restriction is relevantly similar to the modern one. We must ask: *Why* was the group considered dangerous at the Founding and therefore disarmed? And *why* does the modern law classify a person as presumptively dangerous? Is the comparison supported by the record? Furthermore, *how* did the historical regulation limit the rights of the dangerous class? And *how* does the modern regulation do so?[42]

c.

Applying *Bruen*'s framework to the proffered analogues, it follows that the government's theory of danger-based disarmament falls apart. The government identifies no class of persons at the Founding (or even at Reconstruction) who were "dangerous" for reasons comparable to marihuana users. Marihuana users are not a class of political traitors, as British Loyalists were perceived to be. Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists. And even if we consider the racially discriminatory laws at the Founding, Daniels is not like the minorities

---

[41] *Bruen*, 142 S. Ct. at 2133 n.7 ("[C]ourts may [not] engage in independent means-end scrutiny under the guise of an analogical inquiry. . . . Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, . . . not . . . revise that balance through means-end scrutiny.").

[42] The en banc Third Circuit recently followed that approach in *Range*, 69 F.4th at 104–05. Facing a challenge to § 922(g)(1), the felon-in-possession statute, the court acknowledged Founding-era evidence for disarming the dangerous. But it required the government to "analogize [historically disarmed] groups to [the defendant] and his individual circumstances." *Id.* "That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that [a defendant] is part of a similar group today." *Id.* at 105. The Third Circuit ultimately held that § 922(g)(1) was unconstitutional as applied to a non-violent felon. *Id.* at 106.

who the Founders thought threatened violent revolt.

The government suggests that, in the spirit of the drafts of the Second Amendment and the Militia Act, marihuana users threaten the public "peace." But at the time of the Founding, that notion referred specifically to violence or rebellion, not generalized public harm.[43] And § 922(g)(3) is not limited to those with a history of violent behavior—not all members of the set of "drug users" are violent. As applied in this case, the government has not shown how Daniels's marihuana use predisposes him to armed conflict or that he has a history of drug-related violence.

Furthermore, even as the Founders were disarming Catholics and politically disaffected citizens, they left ordinary drunkards unregulated. The government has no meaningful response to the fact that neither Congress nor the states disarmed alcoholics, the group most closely analogous to marihuana users in the 18th and 19th centuries. As with the government's analogy to mental illness, we must ask: Which are marihuana users more like: British Loyalists during the Revolution? Or repeat alcohol users? The answer is surely the latter.

The government asks us to set aside the particulars of the historical record and defer to Congress's modern-day judgment that Daniels is presumptively dangerous because he smokes marihuana multiple times a month. But that is the kind of toothless rational basis review that *Bruen* proscribes. Absent a comparable regulatory tradition in either the 18th or 19th century,

---

[43] *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 266 (2020); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting). Indeed, to the extent the Militia Act is probative, it was primarily used to disarm religious minorities and "disaffected persons," neither of which is comparable to Daniels. *See* O'Scannlain, *supra* note 34, at 405–06. The Militia Act of 1661 had also permitted law enforcement to disarm and detain "Disturbers of the Peace," but that statute was similarly targeted at insurrectionists. *See* 13 Car. 2. c. 6, § 2.

No. 22-60596

§ 922(g)(3) fails constitutional muster under the Second Amendment.[44]

## III.

Daniels's § 922(g)(3) conviction is inconsistent with our "history and tradition" of gun regulation. *Bruen*, 142 S. Ct. at 2128. We conclude only by emphasizing the narrowness of that holding. We do not invalidate the statute in all its applications, but, importantly, only as applied to Daniels. Nor do we suggest that a robust Second Amendment is incompatible with other reasonable gun regulations.[45] Such statutes just need to be consonant with the limits the Founding generation understood to be permissible when they ratified the Second Amendment. The government has failed to demonstrate that here.

The judgment of conviction is therefore REVERSED, and a judgment dismissing the indictment is RENDERED.

---

[44] Irrespective of any historical analysis, the government also asks us to side with the many district courts around the country that have upheld § 922(g)(3) in the face of constitutional challenges. Of those, however, the vast majority relied reflexively on pre-*Bruen* caselaw or the same loose analogies that the government advances in this case. We decline to follow those decisions for the reasons detailed above. The district courts that have engaged carefully with the historical sources and the strictures of *Bruen* have found that § 922(g)(3) violates the Second Amendment. *See, e.g.*, *United States v. Harrison*, No. CR-22-00328, 2023 WL 1771138, at *24–25 (W.D. Okla. Feb. 3, 2023); *United States v. Connelly*, No. EP-22-CR-229(2), 2023 WL 2806324, at *12 (W.D. Tex. Apr. 6, 2023).

[45] *Bruen*, 142 S. Ct. at 2133; *cf. Heller*, 554 U.S. at 635 (leaving open the constitutionality of further "regulations of the right").

No. 22-60596

Stephen A. Higginson, *concurring*:

In the fifteen years since the Supreme Court first found in the Second Amendment an individual right to keep and bear arms to defend the home, *See District of Columbia v. Heller*, 554 U.S. 570, 595, 636 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010) (incorporating this right against the states), historians and legal scholars have continued to question this interpretation,[1] while the nation has continued to look for constitutionally permissible safeguards against gun violence and gun-related death rates that outstrip those of almost every other country.[2]

---

[1] See, e.g., Richard A. Epstein, *A Structural Interpretation of the Second Amendment: Why* Heller *is (Probably) Wrong on Originalist Grounds*, 59 Syracuse L. Rev. 171 (2008); Paul Finkelman, *It Really Was About a Well Regulated Militia*, 59 Syracuse L. Rev. 267 (2008); Saul Cornell, Heller*, New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss,"* 56 UCLA L. Rev. 1095 (2009); Patrick J. Charles, *The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing "Standard Model" Moving Forward*, 39 Fordham Urb. L.J. 1727 (2012); Lee Epstein & David T. Konig, *The Strange Story of the Second Amendment in the Federal Courts, and Why It Matters*, 60 Wash. U. J.L. & Pol'y 147 (2019); Darrell A. H. Miller, Owning Heller, 30 U. Fla. J.L. & Pub. Pol'y 153 (2020).

[2] *See, e.g.*, Evan D. Gumas, Munira Z. Gunja & Reginald D. Williams II, *The Health Costs of Gun Violence: How the U.S. Compares to Other Countries*, The Commonwealth Fund (Apr. 20, 2023), https://www.commonwealthfund.org/publications/2023/apr/health-costs-gun-violence-how-us-compares-other-countries (noting that the death rate from firearms-related causes in 2019 was around five times greater in the U.S. (10.4 deaths per 100,000 people) than in the high-income countries with the second- (France, 2.2) and third-highest rates (Switzerland, 2.1)); Chris Gilligan, *U.S. Remains an Outlier in Firearm Possession, Gun-Related Deaths*, U.S. News & World Rep. (Jan. 30, 2023, 3:42 p.m.),https://www.usnews.com/news/best-countries/articles/2023-01-30/how-the-u-s-compares-to-the-world-on-guns; *see also* John Gramlich, *What the Data Says About Gun Deaths in the U.S.*, Pew Rsch. Ctr. (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s (reporting that 48,830 people died from gun-related injuries in 2021, just over half of which were suicides); Stefanie Dazio & Larry Fenn, *Six Months. 28 Mass Killings in the US. That's the Worst Yet, and All But One Case Involved Guns*, AP News

No. 22-60596

Faced with this expanded Second Amendment reach and the corresponding wave of legal challenges to gun safety regulations, lower courts eventually "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny."[3] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111, 2125 (2022). In applying this framework, courts were attempting to balance *Heller*'s rejection, on originalist grounds, of the previously narrow focus on a militia interest in favor of an interest in self-defense, with *Heller*'s recognition that the Second Amendment contains limiting principles and exceptions. Specifically, *Heller* acknowledged that the Second Amendment does not curtail the legislative power to regulate and restrict the carrying of "dangerous and unusual weapons," 554 U.S. at 627, nor does it undermine "longstanding prohibitions" on the carrying of firearms in sensitive places or by certain persons, or "laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626-27.

Thus, even as the politics of gun safety remained hotly contested, the law had somewhat settled. And under this framework, courts generally

---

(July 13, 2023, 11:43 p.m.), https://apnews.com/article/mass-killings-record-gun-violence-0174103c37756fe4d247fd15cd3bc009; Kiara Alfonseca, *There Have Been More Mass Shootings Than Days in 2023, Database Shows*, ABC News (May 8, 2023, 9:24 a.m.), https://abcnews.go.com/US/mass-shootings-days-2023-database-shows/story?id=96609874; John Gramlich, *Gun Deaths Among U.S. Children and Teens Rose 50% in Two Years*, Pew Rsch. Ctr. (Apr. 6, 2023), https://www.pewresearch.org/short-reads/2023/04/06/gun-deaths-among-us-kids-rose-50-percent-in-two-years.

[3] Courts would first turn to text, history, and tradition to determine whether the challenged law or regulation burdens conduct protected by the Second Amendment, and then, if so, evaluate the law under a version of means-end scrutiny. *See* Mark Anthony Frassetto, *Judging History: How Judicial Discretion in Applying Originalist Methodology Affects the Outcome of Post-Heller Second Amendment Cases*, 29 Wm. & Mary Bill Rts. J. 413, 418-19 (2020).

No. 22-60596

permitted Americans, through both state and federal elected officials, to enact, or opt not to enact, gun safety regulations to address the ongoing crisis of gun violence.[4]

Last year, however, the Supreme Court again revised Second Amendment doctrine in *Bruen*, declaring that this "two-step" approach, which combined attentiveness to history with a traditional judicial balancing test, was "one step too many." *Id.* at 2127. Now, the Court has written, if "the Second Amendment's plain text covers an individual's conduct," then a gun regulation is presumptively unlawful unless the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."[5] *Id.* at 2126, 2129-30.

---

[4] This is not to say that courts disregarded *Heller* and *McDonald*, or otherwise relegated the Second Amendment to the status of a "second class" right. Indeed, some firearms restrictions were struck down, *see, e.g.*, *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (finding Illinois's ban on the carrying of ready-to-use weapons unconstitutional), and, although it is difficult to precisely calculate rates of gun ownership, *see* Jennifer Mascia, *How Many Guns Are Circulating in the U.S.?*, The Trace (Mar. 6, 2023), https://www.thetrace.org/2023/03/guns-america-data-atf-total, there are significantly more firearms in circulation today than ever before, and this expansion has primarily occurred post-*Heller*, *see* Daniel De Visé, *Americans Bought Almost 60 Million Guns During the Pandemic*, The Hill (Apr. 21, 2023, 6:00 a.m.), https://thehill.com/policy/national-security/3960527-americans-bought-almost-60-million-guns-during-the-pandemic, (noting that FBI firearm background checks more than doubled from 2005 to 2015, and then skyrocketed further between 2015 and 2020).

[5] Although *Bruen* appears to contemplate a "one-step" test, courts have correctly perceived it to require a new two-step analysis wherein courts first determine whether the challenged regulation or statute implicates the Second Amendment and then, if so, analyze the relevant history and tradition to decide if such a restriction is justified. *See Range v. Att'y Gen. U.S.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc) ("After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct. If it does, the government now bears the burden of proof: it 'must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'." (internal citations omitted)); *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (describing *Bruen* as having adopted a "two-

No. 22-60596

Bound by this interpretative sequence, we hold today that 18 U.S.C. § 922(g)(3), a decades-old felony provision of our federal firearms law, is unconstitutional as applied to Mr. Daniels. Although our decision is limited in scope, it is hard for me to avoid the conclusion that most, if not all, applications of § 922(g)(3) will likewise be deficient.[6] It is also important to acknowledge that other gun safety laws, especially longstanding status-based prohibitions previously understood to be constitutionally unassailable, have been recently struck down by courts across the country as they attempt to faithfully implement *Bruen*.[7]

---

part test"); *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) ("[W]hen the Second Amendment's 'plain text' covers the regulated conduct, the government has only one way to defend the regulation—by proving that it is 'consistent with this Nation's historical tradition of firearm regulation.'" (quoting *Bruen*, 142 S. Ct. at 2126)).

[6] Reviewing our precedent, many offenders convicted under § 922(g)(3) were not intoxicated *when* they were found to possess or receive a firearm, but rather were generally users of a controlled substance. *See, e.g.*, *United States v. Patterson*, 431 F.3d 832, 837 (5th Cir. 2005) (upholding the defendant's conviction where he admitted that he regularly used marijuana and where his urine sample tested positive for marijuana, which stays in the system of an occasional user for up to two weeks); *United States v. Edwards*, 182 F.3d 333, 335-36 (5th Cir. 1999) (rejecting the argument that the defendant's conduct did not constitute a violation of § 922(g)(3) because "he was not using drugs at the exact moment the police found him in possession of a firearm"); *cf. United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006) (finding that the defendant qualified as an "unlawful user" for the purposes of the Sentencing Guidelines because the evidence showed that he "followed a pattern of use over an extended period of time").

[7] In fact, there is already a circuit split on the constitutionality of § 922(g)(1), the federal felon-in-possession statute. *Compare Range*, 69 F.4th at 98 (holding § 922(g)(1) unconstitutional as applied), *with United States v. Jackson*, 69 F.4th 495, 501-02 (8th Cir. 2023) (upholding the constitutionality of § 922(g)(1) as applied and concluding that "there is no need for felony-by-felony litigation regarding the constitutionality" of that provision). Some courts, faced with *Bruen* challenges to multiple provisions of the federal criminal code, have upheld one provision while striking down another. *E.g.*, *United States v. Price*, No. 22-cr-97, 635 F. Supp. 3d 455, 464, 467 (S.D.W. Va. Oct. 12, 2022) (finding 18 U.S.C. § 922(k), which makes it unlawful to possess a firearm with an obliterated serial number, unconstitutional while holding that § 922(g)(1) "accords with the Second Amendment").

No. 22-60596

To be clear, I fully concur in the majority's reasoning—albeit with the caveat that the Supreme Court has granted *certiorari* in *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, No. 22-915, ___ S. Ct. ___, 2023 WL 4278450, at *1 (June 30, 2023)—as I believe that we have applied *Bruen* as well as possible in evaluating the constitutionality of § 922(g)(3). I write separately to highlight what has become increasingly apparent—that courts, operating in good faith, are struggling at every stage of the *Bruen* inquiry. Those struggles encompass numerous, often dispositive, difficult questions, including, but not limited to the following. First, who, and what conduct, is covered by the Second Amendment?[8] Second, how does the

---

Moreover, the effect of *Bruen* has been especially dramatic as to civil claims. *See* Jake Charles, *One Year of* Bruen*'s Reign: An Updated Empirical Analysis*, Duke Ctr. for Firearms Law (July 7, 2023), https://firearmslaw.duke.edu/2023/07/one-year-of-bruens-reign-an-updated-empirical-analysis.

[8] For instance, courts are divided as to whether the Supreme Court's description of the right as one belonging to "law-abiding, responsible citizens," *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635), is meant to exclude certain categories of citizens, such as those convicted of a crime, from the protection of the Second Amendment. *See United States v. Jackson*, No. 22-cr-141, 2023 WL 2499856, at *7 (D. Md. Mar. 13, 2023) (collecting cases in which courts "rejected post-*Bruen* challenges to status-based gun laws on the ground that the restricted people are not law-abiding, responsible citizens to whom the Second Amendment applies"). *Compare also United States v. Charles*, 633 F. Supp. 3d 874, 887-88 (W.D. Tex. 2022) (concluding that there is a historical basis for excluding felons under the Second Amendment), *and United States v. Hughes*, No. 22-cr-640, 2023 WL 4205226, at *5-8 (D.S.C. June 27, 2023) (discussing how several courts have concluded that "convicted felons have traditionally been excluded from the political community" and are therefore not part of "the people" protected by the Second Amendment), *with Range*, 69 F.4th at 103 (" [W]e reject the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment."). In other cases, the debate as to what constitutes a "bearable arm" covered by the Second Amendment has revitalized relevance. *See*, *e.g.*, Oral Argument at 1:10-2:10, *Bevis v. City of Naperville*, No. 23-1353, (7th Cir. June 29, 2023) (state and local defendants arguing that large-capacity magazines are not "arms" but "accessories that are not necessary to the operation of any firearm"); *see also Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *11-13 (D.R.I. Dec. 14, 2022) (finding at the preliminary-injunction stage that plaintiffs had not shown that large-capacity magazines are

No. 22-60596

Government demonstrate a regulatory "tradition"? This inquiry implicates questions about how many states must have historically addressed an issue, or how many laws must have been passed—or some combination of the two[9]—for a historical practice to constitute a "tradition,"[10] *see Bruen*, 142 S. Ct. at 2142 ("[W]e doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation."), as well as the related issue of enforcement.[11] Third, what is the operative time period for such regulations—1791 or 1868?—and to what extent does post-ratification

---

"arms" within the "textual meaning of the Second Amendment"); *Nat'l Assoc. for Gun Rights v. Lamont*, No. 22-cv-1118, 2023 WL 4975979, at *26 (D. Conn. Aug. 3, 2023) (concluding that plaintiffs had failed to carry their burden of showing that statutorily defined assault weapons and large-capacity magazines are covered by the Second Amendment).

[9] For example, is it enough if the historical record shows that one state had passed and enforced numerous laws addressing a particular firearms issue, or must multiple states have taken action on an issue? *See Bruen*, 142 S. Ct. at 2154 ("[W]e will not stake our interpretation of the Second Amendment upon a law, in effect in a single State, or a single city, 'that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms' in public for self-defense." (quoting *Heller*, 554 U.S. at 632)).

[10] *See, e.g., Hardaway v. Nigrelli*, No. 22-cv-771, 2022 WL 16646220, at *14-17 (W.D.N.Y. Nov. 3, 2022) (discussing the necessary showing to establish a historical tradition before finding plaintiffs were likely to prevail on their claim that New York's "place of worship" ban on firearms possession violates the Second Amendment). *Compare also United States v. Rowson*, No. 22-cr-310, 2023 WL 431037, at *19-24 (S.D.N.Y. Jan. 26, 2023) (finding § 922(n) consistent with this nation's historical tradition of firearms regulations on the basis of colonial laws disarming groups of persons perceived as dangerous and historical surety laws), *with United States v. Hicks*, 21-cr-60, 2023 WL 164170, at *3-7 (W.D. Tex. Jan. 9, 2023) (finding these same historical analogies to be insufficient and holding § 922(n) to be unconstitutional).

[11] *See Bruen*, 142 S. Ct. at 2149 ("[R]espondents offer little evidence that authorities ever enforced surety laws."); *see also United States v. Combs*, No. 22-cr-136, 2023 WL 1466614, at *12 (E.D. Ky. Feb. 2, 2023) (explaining that the *Bruen* plurality rejected surety laws as a suitable historical analogue not because of a lack of evidence that these laws were enforced, but because they did not impose a comparable burden on the right).

No. 22-60596

practice count? *See id.* at 2162-63 (Barrett, J., concurring).[12] Fourth—but again, this list is not exhaustive—how are courts to differentiate between "general societal problem[s]" that have "persisted since the 18th century," and those that "implicat[e] unprecedented societal concerns or dramatic technological changes," *id.* at 2131-32, and, moreover, between "historical analogue[s]" as distinct from "historical twin[s]"? *Id.* at 2133.[13]

More foundationally, courts are laboring to give meaning to the *Bruen* requirement of "historical inquiry." Must the Government provide expert testimony to prevail, or could a district court independently seek such evidence?[14] And in the event such evidence is lacking in the record below,

---

[12] *See, e.g.*, *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322-23 (11th Cir. 2023) (holding that because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," for purposes of a challenge to a *state* law, "the right's contours" turn on the understanding of the right "when the Fourteenth Amendment was ratified" (internal quotation marks and citations omitted)), *re'hg granted, vacated*, 72 F.4th 1346 (July 14, 2023); *Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *10-12 (D. Minn. Mar. 31, 2023) (noting that *Bondi* is "difficult to square with the Supreme Court's emphasis on applying the Bill of Rights against the states and federal government according to the same standards" and suggesting that 1791 would be the operative time period for defining the scope of the right).

[13] *See, e.g.*, *Alaniz*, 69 F.4th at 1129-30 (9th Cir. 2023) (describing "illegal drug trafficking" as "a largely modern crime" that is "not closely analogous to founding-era smuggling crimes" such that the Government's proposed analogues needed to be only "relevantly similar," in upholding the application of a sentencing enhancement pursuant to U.S.S.G. § 2D1.1(b)(1)"); *Range*, 69 F.4th at 120 (Krause, J., dissenting) (asserting that § 922(g)(1) implicates "unprecedented societal concerns" or dramatic technological changes" due to "the lethality of today's weaponry, the ubiquity of gun violence, the size and anonymity of the population, and the extent of interstate travel [which] were unknown at the Founding"); *see also Protecting Public Safety After* New York State Rifle & Pistol Association v. Bruen, *Hearing Before the Senate Comm. On the Judiciary*, 118th Cong. (Mar. 15, 2023) (written testimony of Eric Ruben, Assistant Professor of Law, SMU Dedman School of Law, at 9-12).

[14] *See Miller v. Bonta*, No. 19-cv-1537, Tr. of Proceedings at 9-10, ECF 162 (S.D. Cal., Dec. 12, 2022) (statement by the district court, at a hearing, that it does not have the staff nor the resources to create a historical survey of relevant laws and statutes in a timely

No. 22-60596

may courts of appeal collect their own history and make up for a party's earlier failing?[15] Going even further, should courts undertake discovery and evidentiary testing of historical evidence to perceive the existence of a sufficient regulatory tradition?[16] And, in making that conclusion, does the

fashion); *id.* Min. Entry, ECF 161 (Dec. 15, 2022) (ordering the state defendants to confer with the plaintiffs and to create a "survey or spreadsheet of relevant statutes, laws, or regulations in chronological order" that began at the time of the adoption of the Second Amendment and continued until twenty years past the adoption of the Fourteenth Amendment, and which contained specific directions as to the information that should be included); *see also United States v. Bullock*, No. 18-cr-165, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022) (ordering briefing as to whether the court should appoint a consulting historian to aid in evaluating the defendant's motion to dismiss his indictment under § 922(g)(1)); *United States v. Sims*, No. 22-cr-30081, 2023 WL 4461997, at *2 (C.D. Ill. July 11, 2023) (suggesting that both the government and the defendant "should freely cast a wider net and provide more detail about whatever history they rely on" and "freely employ the expert services of historians and historiographers" in briefing a motion to dismiss an indictment brought under § 922(g)(1) and § 922(d)) (internal quotation and citation omitted).

[15] Although the Supreme Court in *Heller*, *McDonald*, and *Bruen* received numerous unsolicited amici briefs from historians and other interested parties, as an inferior court, we rarely receive that amount of independent interest in our cases. Accordingly, in this case, we found it helpful to publish a court directive "invit[ing] briefs from amici curiae who wish to supply relevant information regarding the history and tradition of the issues presented in this case." *See also Alaniz*, 69 F.4th at 1129, n.2 (citing to a 113-page compilation of historical state firearms and weapons regulations which neither party had cited to in their briefing).

[16] *See, e.g., Atkinson v. Garland*, 70 F.4th 1018, 1022-24 (7th Cir. 2023) (remanding to the district court for a "proper, fulsome analysis of the historical tradition" and identifying specific questions to help focus that analysis as the district court's ruling occurred pre-*Bruen* and thus the parties had not yet developed that record); *Oregon Firearms Fed.'n v. Kotek*, Nos. 2:22-cv-01815, 22-cv-01859, 22-cv-01862, 22-cv-01869, 2023 WL 3687404, *5 (D. Or. May 26, 2023) (denying cross-motions for summary judgment, noting that "the threshold question of whether [the challenged restrictions] involve conduct covered by the plain text of the Second Amendment" is a disputed fact); *id.*, 2023 WL 4541027, at *3 (D. Or. July 14, 2023) (findings of fact and conclusions of law followed from a weeklong bench trial involving "testimony from twenty witnesses" and "more than 100 exhibits"). *Compare Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, at *6 (9th Cir. Aug. 7, 2023) (denying a request for a remand so that the district court, which

No. 22-60596

constitutionality of any given provision rise or fall with the strength of the historical record as to a specific case, or will rulings be treated as establishing a single historical truth?

The majority in *Bruen*, responding to unworkability concerns identified by the dissent and echoed by courts over the past year, may have intimated answers. Specifically, the majority insisted that, as in other legal disputes, "historical evidence" is predicated on our "adversarial system of adjudication," in which courts must "decide [the] case based on the historical record compiled by the parties." *Id.* at 2130, n.6. In my view, this suggests that *Bruen* requires that an evidentiary inquiry first be conducted in courts of original jurisdiction, subject to party presentation principles, aided by discovery and cross-examination and with authority to solicit expert opinion. [17]

In granting *certiorari* in *Rahimi*, the Supreme Court likely will resolve some of these questions. Of course, in the meantime, it is our job as an inferior court to apply the Supreme Court's mandates and aid the development of this field of law. But the uncertainty and upheaval resulting from best efforts to apply *Bruen* now extend far beyond our dockets. Myriad and obvious public safety laws, some over a century old, face inconsistent invalidation.

---

had issued its ruling pre-*Bruen*, could conduct further factual development on the basis that "the historical research required under *Bruen* involves issues of so-called 'legislative facts' . . .rather than 'adjudicative facts'" such that no additional inquiry from the district court was required).

[17] This reading of *Bruen* seems to me to be supported by the single authority cited in the majority's answer to the dissent, which frames its discussion of originalist methodology with reference to a title dispute in which the court was required to trace a chain of title, that is, develop and decide adjudicative facts, and where the court simply had to determine whether prior precedent had been overruled. William Baude & Stephen E. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 809-10 (2019). Notably, in *Bruen*, the Supreme Court speaks of historical "evidence" over fifty times.

No. 22-60596

The impact of these challenges, outside of the evident yet indescribable tragedies of victims of gun violence, will fall heavily on states, which exercise most police power and must assure public safety. *See Teter v. Lopez*, No. 20-15948, 2023 WL 5008203 (9th Cir. Aug. 7, 2023) (striking down Hawaii's ban on butterfly knives as unconstitutional under *Bruen*). Already, as courts work through the impact of *Bruen*, defendants guilty of a gun crime in one jurisdiction are presently innocent of it in another.[18]

In attempting to navigate this new landscape, it is prudent to first return to the text of the Second Amendment, which states, in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Just as the doctrine corrected in *Heller* was held to have over-emphasized the first third of the text ("[a] self regulated Militia"), it is possible that inferior judicial officers such as myself are misinterpreting *Bruen* by pressing too much on the last ("the right . . . to keep and bear Arms"). It may be that the Supreme Court will remind us of the Second Amendment's middle, where the Framers stated explicitly that they were fashioning a right "necessary to the security of a free State." In this sense,

---

[18] Our holding today conflicts with decisions from district courts across the country upholding the constitutionality of § 922(g)(3). *See United States v. Seiwert*, No. 20-cr-443, 2022 WL 4534605 (N.D. Ill. Sept. 28, 2022); *United States v. Posey*, No. 22-cr-83, 2023 WL 1869095 (N.D. Ind. Feb. 9, 2023); *United States v. Randall*, No. 22-cr-99, 2023 WL 3171609 (S.D. Iowa Feb. 14, 2023); *United States v. Stennerson*, No. 22-cr-139, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Cleveland-McMichael*, No. 21-cr-119, 2023 WL 2613548 (D. Alaska Mar. 23, 2023); *United States v. Le*, No. 23-cr-14, 2023 WL 3016297 (S.D. Iowa Apr. 11, 2023); *United States v. Costianes*, No. 21-cr-0458, 2023 WL 3550972 (D. Md. May 18, 2023); *United States v. Hart*, No. 22-cr-114, 2023 WL 4144834 (W.D. Mo. June 6, 2023) (report and recommendation), *adopted by* 2023 WL 4141044 (W.D. Mo. June 22, 2023); *United States v. Ray*, No. 21-cr-57, 2023 WL 4378152 (W.D. Va. July 6, 2023); *United States v. Lewis*, No. 22-cr-222, 2023 WL 4604563 (S.D. Ala. July 18, 2023); *United States v. Beaty*, No. 22-cr-95, 2023 WL 4662247 (M.D. Fla. July 20, 2023).

No. 22-60596

unlike the textually unbounded pledges assuring freedom of speech and conscience, "the right of the people to keep and bear Arms" is less about the antithesis of liberty and control, and is more designed to assure "domestic Tranquility [and] . . . the general Welfare." U.S. Const. pmbl. Put another way, the Second Amendment is not only a right to have, but is especially a right to have to protect the state. That right to protect, as both *Heller*, *McDonald*, and *Bruen* affirmatively acknowledged, incorporates significant public safety exceptions.[19]

Importantly, the Supreme Court in *Bruen* saw itself as continuing with, rather than breaking from, *Heller*, which recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. Thus, although in *dicta*, the *Heller* majority was confident that, though never conceived of by the Framers and hence never subject to public safety regulation, certain "dangerous and unusual weapons" could properly be banned. *Id.* at 624, 627. Similarly, the majority assured that "nothing in our opinion should be taken to cast doubt on" some of the most critical tools for combatting gun violence, including both people- and place-based restrictions. *Id.* at 626-27; *see also McDonald*, 561 U.S. at 786 (plurality) ("We repeat [*Heller's*] reassurances here."); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, CJ., concurring). These assurances are a recognition that the Second Amendment, explicitly and unlike the other original ten amendments in our Bill of Rights, ties to the "security" of our country. The Second Amendment assured a vigilant, armed citizenry and it did so for an explicit purpose, i.e. "being necessary to the security of a free

---

[19] Indeed, the *Bruen* majority was careful to emphasize that its opinion was not meant to "suggest the unconstitutionality" of all licensing regimes and specifically highlighted that "shall-issue" licensing regimes, "which often require applicants to undergo a background check or pass a firearms safety course," are unlikely to pose a constitutional problem. *Bruen*, 142 S. Ct. at 2138, n.9.

No. 22-60596

State….” To read the Second Amendment as providing an ever-expanding individual right, without limits, therefore, runs counter to both its text and the Framers' own understanding.

As should be evident, I am appreciative that the court that speaks the final word has agreed to provide more guidance on an issue of such national importance. I cannot help but fear that, absent some reconciliation of the Second Amendment's *several* values, any further reductionism of *Bruen* will mean systematic, albeit inconsistent, judicial dismantling of the laws that have served to protect our country for generations. Furthermore, such decisions will constrain the ability of our state and federal political branches to address gun violence across the country, which every day cuts short the lives of our citizens. This state of affairs will be nothing less than a Second Amendment caricature, a right turned inside out, against freedom and security in our State.