

**U.S. Department of Justice**

United States Attorney
Southern District of Mississippi

*1575 Twentieth Avenue*  *Telephone: (228) 563-1560*
*Gulfport, Mississippi 39501*

VIA ELECTRONIC CASE FILING                 July 29, 2024

Lyle W. Cayce, Clerk
United States Court of Appeals
  for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA  70130

Re:   *United States v. Daniels,* No. 22-60596:  Supplemental Letter Brief

Dear Mr. Cayce:

The Government respectfully submits this Supplemental Letter Brief to address the applicability of *United States v. Rahimi*, 144 S.Ct. 1889 (2024), to this appeal.  In *Rahimi*, the Supreme Court clarified the methodology for assessing whether a modern regulation is consistent with the history that underpins the Second Amendment. *Rahimi* supports the Government's position that 18 U.S.C. § 922(g)(3) is constitutional as applied to Daniels.

This Court's contrary panel decision rests on some of the methodological shortcomings that the Supreme Court identified in *Rahimi*.  Applying *Rahimi* on remand, this Court should hold that history and tradition support the Government's authority to prohibit firearm possession by individuals whose gun possession presents an inherent risk of danger to themselves and others.  Section 922(g)(3)'s temporary disarmament of unlawful drug users falls squarely within that tradition.

**1.    *Rahimi* Clarified *Bruen*'s Analytical Framework and Reiterated that the Second Amendment Does Not Demand a Historical Twin**

In *Rahimi*, the Supreme Court held that 18 U.S.C. § 922(g)(8), which prohibits firearm possession by an individual subject to a domestic violence restraining order, does not violate the Second Amendment on its face or as applied to the defendant in that case.

"Since the founding," the Court explained, "our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms"—provisions that include surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond," and going armed laws, which "provided a mechanism for punishing those who had menaced others with firearms." 144 S.Ct. at 1896, 1899-1901. "Taken together," those "laws confirm what common sense suggests": that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901.

In reaching that conclusion, the Court emphasized that "some courts have misunderstood the methodology of [the Court's] recent Second Amendment cases." 144 S.Ct. at 1897. Those cases "were not meant to suggest a law trapped in amber," because the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98. As Justice Barrett emphasized, "a test that demands overly specific analogues" would present "serious problems," including "assum[ing] that founding-era legislatures maximally exercised their power to regulate" and "forc[ing] 21st-century regulations to follow late 18th-century policy choices." *Id.* at 1925 (Barrett, J., concurring). The Court instead explained that even "when a challenged regulation does not precisely match its historical precursors," a court should consider whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" by ascertaining "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 1898. "[A] 'historical *twin*,'" the Court reiterated, "is not required." *Id.* at 1903 (quotation omitted).

Applying these principles, *Rahimi* held that historical surety laws and going armed laws were relevantly similar to Section 922(g)(8), notwithstanding differences between the historical evidence and Section 922(g)(8). For example, unlike Section 922(g)(8), which temporarily disarms someone deemed to be a credible threat to his intimate partner or child, surety laws were not solely focused on domestic strife and did not always disarm the offender, but rather burdened his right to bear arms by requiring him to post a bond or demonstrate a need for his firearms. *Rahimi*, 144 S.Ct. at 1899-1901; *see also id.* at 1939-40 (Thomas, J., dissenting) ("An accused arms-bearer could go on carrying without criminal penalty so long as he posted money that would be forfeited if he breached the peace or injured others.") (internal punctuation and citations omitted); *id.* at 1910 (Gorsuch, J., concurring) ("Notably, the surety laws that inform today's decision allowed even an individual found to pose a threat to another to 'obtain an exception if he needs his arms for self-defense.'"). Similarly, unlike Section 922(g)(8), going armed laws were

2

not directed at those found to be involved in domestic violence, only disarmed those convicted of a crime due to their imprisonment, and did not apply after a civil proceeding. *Id*. at 1900-01. Despite these differences, the Court found surety laws and going armed laws were analogous enough to Section 922(g)(8).

**2.    *Rahimi* Supports Section 922(g)(3)'s Constitutionality**

Section 922(g)(3) prohibits a person who is an unlawful user of controlled substance or addicted to a controlled substance from possessing a firearm. The prohibition lasts only as long as a person remains a regular user of controlled substances. Congress adopted the prohibition to protect the public from the danger posed by firearms being in the possession of illegal drug users. *See, e.g.*, S. Rep. No. 1097, 1968 U.S. CODE CONG. & AD. NEWS 2112, *2114, 1968 WL 4956 (Leg. Hist.) (the ready availability of firearms for "***narcotic addicts***, mental defectives, … and others whose possession of firearms is similarly contrary to the public interest … is a matter of serious national concern") (emphasis added). As the Supreme Court has concluded: "Congress' intent in enacting [18 U.S.C. § 922(g)] was to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 113 n.6 (1983). *See also Abramski v. United States*, 573 U.S. 169, 172 (2014).

As the Government explained in its principal brief, Section 922(g)(3) is constitutional because it is consistent the nation's history and tradition of temporarily prohibiting firearm possession by individuals who present a special danger of misuse if armed. *Rahimi* recognized that legislatures may disarm those "who threaten physical harm to others from misusing firearms." 144 S.Ct. at 1896. As the Government has explained, English common law and early American practice establish the Government's authority to disarm persons who would pose a threat to others' safety if armed. See Gov't Br. at 39-45.

This historically justified category includes armed drug users. "[D]rugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993). Courts have long recognized that drug use often correlates to violent crime. *See Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J. concurring in part and concurring in judgment). As Justice Kennedy explained:

> Quite apart from the pernicious effects on the individual who consumes illegal drugs, such drugs relate to crime in at least three ways: (1) A drug

3

> user may commit crime because of drug-induced changes in physiological functions, cognitive ability, and mood; (2) A drug user may commit crime in order to obtain money to buy drugs; and (3) A violent crime may occur as part of the drug business or culture.

*Id.*; *see also Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 332 (2012) ("The use of drugs can embolden [individuals] in aggression.").[1] Furthermore, armed drug users pose a danger to police officers. *United States v. Carter,* 750 F.3d 462, 469 (4th Cir. 2014) (recognizing that due to the illegal nature of their activities drug user and addicts are more likely than ordinary citizens to have hostile run-ins with law enforcement that would threaten the safety of officers when guns are involved); *see also Michigan v. Summers*, 452 U.S. 692, 702 (1981) ("[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence.").

The dangers of coupling drug use, including marijuana, with the possession of firearms also are borne out by studies. Marijuana intoxication can lead to an altered perception of time, short-term memory loss, impaired perception and motors skills, paranoid thoughts, and even hallucinations. *See* National Academies of Sciences, Engineering, and Medicine*, The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research* 53 (2017) (Health Effects). Moreover, according to the Center for Disease Control, people who use marijuana are more likely to develop psychosis and long-lasting mental disorders, including schizophrenia—which is even more likely when the use begins at an early age and is frequent. Center for Disease Control, *Cannabis and Mental Health*, available at https://www.cdc.gov/cannabis/health-effects/mental-health.html. Marijuana use is also associated with depression, thoughts of suicide, suicide attempts, and suicide. *Id*.

---

[1] *See also Rosemond* v. *United States*, 572 U.S. 65, 75 (2014); *Muscarello* v. *United States*, 524 U.S. 125, 132 (1998); *Smith*, 508 U.S. at 240; see also *Johnson* v. *United States*, 576 U.S. 591, 642 (2015) (Alito, J., dissenting) ("Drugs and guns are never a safe combination."); *Harmelin*, 501 U.S. at 1003 (Kennedy, J., concurring in part and concurring in the judgment) ("[There is a] direct nexus between illegal drugs and crimes of violence."); *Richards* v. *Wisconsin*, 520 U.S. 385, 391 n.2 (1997) ("This Court has encountered before the links between drugs and violence."); *Carter*, 750 F.3d at 470 ("[D]rug use, including marijuana use, frequently coincides with violence."); *United States* v. *Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) ("[U]nlawful users of controlled substances pose a risk to society if permitted to bear arms.").

These findings, by courts and studies, are corroborated by real life stories of people losing their lives in drug deals gone bad. Such examples include people being killed during marijuana deals. *See, e.g.*, Chicago Tribune, *Whiting Man Convicted in Drug Deal Slaying*, available at https://www.chicagotribune.com/2024/05/04/gary-man-convicted-in-drug-deal-slaying/ (discussing killing during marijuana deal); *see also* KSTP*, Man gets 10 year sentence for fatal shooting during marijuana deal in Minneapolis*, available at, https://kstp.com/kstp-news/local-news/man-gets-10-year-sentence-for-fatal-shooting-during-marijuana-deal-in-minneapolis/; Ledger-Enquirer*, 'A long time coming': Columbus jury reaches verdict in murder trial over drug deal*, available at https://www.ledger-enquirer.com/news/local/crime/ article278164012.html. Clearly, a person's use of illegal drugs poses a higher risk of danger when armed.

Two particular categories of historical regulations disarming those who present a special danger of misuse bear an especially close similarity to Section 922(g)(3): regulations disarming the intoxicated and the mentally ill. In both instances, the danger arises from the distorted mental state of the person possessing the firearm.

**a. Laws addressing firearms possession by the intoxicated.** The founding generation recognized that those who regularly became intoxicated threatened the social and political order. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812). They thus implemented various measures restricting access to firearms by those likely to become intoxicated. See Act XII of 1655, 1655 Va. Laws 401, 401-02 (restricting gun use at drinking events); Ch. 1501, 5 Colonial Laws of New York 244-46 (1894) (restricting gun use during the New Year's holiday); An Act for preventing Mischief being done in the town of Newport, or in any other Town in this Government, 1731 R.I. Sess. Laws, pp. 240-41 (restricting gun use in taverns); 1844 R.I. Pub. Laws 503-16, § 1 (excluding "common drunkards" from the militia). Early laws predominantly regulated the militia or firearm use in proximity to alcohol. That focus was understandable; social norms at the founding "had an important restraining effect on intemperance" and there thus was "little public outcry against alcoholism." Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987). As societal conditions and firearm technology changed, however, states and territories began imposing criminal penalties on intoxicated members of the public who carried, used, or received firearms. *See* Gov't Br. at 34; *see also, e.g.*, 1867 Kan. Sess. Laws 25; 1878 Miss. Laws 175-76; Mo. Rev. Stat. § 1274 (1879); 1883 Wis. Sess. Laws 290; 1909 Idaho Sess. Laws 6. Such statutes were considered "in perfect harmony with the constitution" even where state constitutions were understood to secure an individual right to bear arms. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

Thus, the history from the colonial era, the founding, and the nineteenth- and early-twentieth centuries establishes an unbroken throughline of laws regulating the combination of firearm use and intoxication. And, critically, nothing in pre-19th-century practice suggests that legislatures were considered to *lack* authority to preclude the intoxicated public from using firearms. Concluding otherwise would erroneously "adopt[] a 'use it or lose it' view of legislative authority," *Rahimi*, 144 S.Ct. at 1925 (Barrett, J., concurring), or limit today's legislature because of "a distant generation's failure to consider that such a law might be necessary," *id.* at 1905 (Sotomayor, J., concurring).

    **b.**    **Restrictions on the mentally ill.** Regulations concerning the mentally ill similarly reflect the legislature's historic authority to restrict firearm possession by those who pose a risk of impairment. In England, the Vagrancy Act of 1744 allowed justices of the peace to lock up and seize the property of those "who by lunacy, . . . are furiously mad, or are so far disordered in their senses that they may be dangerous."[2] *See* 17 Geo. 2, c.5 (capitalization altered); Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487, 509-10 (1985). And in colonial and Founding-era America, those afflicted with mental illnesses "were generally treated as if they had been . . . stripped of all . . . their rights and privileges." Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* 41 (1949).

Colonial America was more rural and dispersed than England, and "lacked large urban areas and complex institutional arrangements characteristic of" England. Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5, 13-14 (1994). Some areas even lacked "the luxury of a jail in the early days." Deutsch, *supra*, at 41. Because the "proportionately small number of 'distracted' persons did not warrant the creation of special facilities," persons with mental illnesses initially "were cared for on an ad hoc and informal basis either by the family or community."[3] Grob, *supra*, at 6. Given these societal conditions, early "legislation usually concerned itself more with [the mentally ill's] property than their persons." Deutsch, *supra*, at 53; *see also* Mary Ann

---

[2] Solely for accuracy, when directly quoting historical and secondary source material, the Government retains the use of outdated and in some cases discriminatory language used to describe the mentally ill.

[3] The first general hospital in America did not open until the 1750s (in Philadelphia) and the first asylum dedicated to care of the mentally ill did not open until 1773 (in Williamsburg, Virginia). Deutsch, *supra*, at 58-60, 66; *see* Grob, *supra*, at 18-20.

Jimenez, *Changing Faces of Madness: Early American Attitudes and Treatment of the Insane* 51 (1987) (describing 1694 Massachusetts law which "empowered justices of the peace to dispose of the estates of distracted persons and use the proceeds to support their families"). By the end of the 18th century, multiple jurisdictions had enacted laws that charged those appointed as guardians for mentally ill persons to "take care" of the person and his "estates, both real and personal"—thus including any firearms the person possessed—and provided that such property "shall be delivered[ ] and returned" to the person if he is "restored to [his] right mind." 1776-1789 N.H. Laws 235-237 (1776 law); *see also* 1737 Mass. Laws. 9-10; 1780-1788 Mass. Laws 135-136 (1784 law); 1788 N.Y. Laws 617; 1700-1797 Del. Laws 1055-1056 (1793 law); William Paterson, *Laws of the State of New-Jersey* 125 (1800) (1794 law); 1799 Miss. Laws 35-38 (law of Mississippi territory); *see also* 1804 Ohio Laws 163-165; 1805-1821 Mich. Territory Laws 376-378 (1818 law).

The English tradition of restricting a mentally ill person's liberty also carried into 18th-century America, albeit in a more decentralized way. "Local officials" typically dealt with the mentally ill "on an ad hoc basis," and the issue was not "perceived as a *social* problem requiring formal public policies." Grob, *supra*, at 15; *accord* Deutsch, *supra*, at 41 (explaining that "individual cases were considered and decided on as they arose"). Frequently, jurisdictions enacted laws aimed at particular individuals, which specified the care (including confinement) that their family or the community was charged with undertaking. *See, e.g.*, Deutsch, *supra*, at 42-43 (citing examples, including a 1676 Pennsylvania law directing that persons be hired "to build a little block-house at Amesland" to confine a mentally-ill person and a 1689 Massachusetts law directing a man to "build a little house . . . to secure his Sister good wife"); Grob, *supra*, at 15-16 (citing these and other examples).

Statutes of general applicability did eventually emerge. Some colonies authorized justices of the peace to "lock[ ] up" "lunatics" considered "dangerous to be permitted to go abroad." Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774). By around the time the Second Amendment was ratified, jurisdictions had enacted laws—tracking the language of the English Vagrancy Act—permitting the commitment of persons determined by justices of the peace, magistrates, or selectmen to be "[l]unatics" or of "unsound mind." *See, e.g.*, 1769 Va. Acts 13; 2 William Littell, *The Statute Law of Kentucky* 578 (1810) (1787 law); 1 Samuel Shepherd, *Statutes at Large of Virginia from October Session 1792, to December Session 1806, Inclusive* 163 (1835) (1792 law); 1798 Mass. Acts 813; 1 *The Public Statute Laws of the State of Connecticut* 386 (1808) (1793 law).

Given these well-established practices, no historical evidence suggests that anyone in the Founding-era believed the Government lacked authority—consistent either with the preexisting right to keep and bear arms or the Second Amendment—to specifically disarm the mentally ill. And, as this Court has explained, greater restrictions on the liberty and property of persons who were mentally ill made firearm-specific restrictions unnecessary at the time. *Beers v. Attorney General*, 927 F.3d 150, 157 (3d Cir. 2019), *vacated on other grounds*, 140 S.Ct. 2758 (2020). The absence of any Founding-era laws specifically disarming such persons thus is readily explained by social and technological factors that have nothing to do with the Second Amendment. It was not until the 19th century that a "dramatic growth in population was accompanied by a proportionate increase in the number of [mentally ill] persons," which caused such persons to be "more visible, and public concern about security increased" particularly in "densely populated areas." Grob, *supra*, at 24. Nor would the specific combination of mental illness and firearms have posed the same threat in the 18th century that it did during subsequent decades because 18th-century guns generally fired only one shot, often misfired, took a long time to load, and could not be kept loaded for long periods. *See* Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker *et al*., eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). Accordingly, the absence of 18th-century regulations specifically addressing mental illness and firearm use does not reflect any doubt about such measures' constitutionality. The Supreme Court has dismissed as "bordering on the frivolous" the argument that the Second Amendment protects "only those arms in existence in the 18th century," *Heller*, 554 U.S. at 582, and the notion that the Amendment permits only those specific regulations that existed in the 18th century has no more merit. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is *ipso facto* unconstitutional.").

Tellingly, as relevant societal conditions changed, so too did the nature and specificity of mental-illness firearm regulations. As the 19th century wore on, several states banned the sale of guns to the mentally ill. *See* 1881 Fla. Laws 87; 1883 Kan. Sess. Laws 159; 1899 N.C. Pub. Laws 20-21; *see also* Sam Kimble, *Revised Ordinances of the City of Manhattan and Rules of the Council* 49 (1887). In the 20th century, new regulations on the delivery or sale of firearms were similarly extended to the mentally ill as well as drug addicts. *See, e.g.*, 1927 N.J. Laws 745; 1931 Pa. Laws 499; 1935 Ind. Acts 161; 1935 S.D. Sess. Laws 356; 1935 Wash. Sess. Laws 601; 1936 Ala. Acts 52; 47 Stat. 650, 652 (1932).

In short, although regulations addressing firearm possession by the mentally ill have evolved with societal and technological conditions, history confirms that "longstanding prohibitions on the possession of firearms" by "the mentally ill," *Heller*, 554 U.S. at 626, have a "well-established" historical tradition, *Bruen*, 142 S.Ct. at 2133.

\*\*\*

Accordingly, both historical regulations disarming the intoxicated and those disarming the mentally ill justify Section 922(g)(3). Although Section 922(g)(3) is not "identical" to either historical tradition, as *Rahimi* reiterated, it "does not need to be." 144 S.Ct. at 1901. Like its historical counterparts, Section 922(g)(3) applies to individuals "found to threaten the physical safety" of others because of their intoxication or impairment. *Id.* And Section 922(g)(3)'s prohibition is particularly narrow because it is a temporary restriction on firearm possession. In finding that Section 922(g)(8) itself was "sufficiently similar" to historical precursors, *Rahimi* emphasized that certain similar historical precursors were of "limited duration." *Id.* at 1902. While Section 922(g)(3) sweeps more broadly than regulations that were imposed on those who were intoxicated, at the time of the founding, consumption of alcohol was largely legal, while the conduct of drug users targeted by Section 922(g)(3), particularly as charged in Daniels's case, involves illegal activity. This is a key difference. This difference points to the additional principle that the Government may disarm those whose illegal and/or dangerous conduct demonstrates that their possession of firearms pose a heightened risk of danger. Historical analogues for such regulations include those set forth in the Government's brief (*see* Gov't Br. at 39-45) and also include the surety laws and going armed laws discussed in *Rahimi*.

### 3.    *Daniels* is Inconsistent with the Supreme Court's *Rahimi* Opinion

In *Daniels,* this Court correctly determined that widespread unlawful drug use was not an issue of major public concern at the time of the founding. Additionally, the Court properly held that the Government need only identify "relevantly similar" analogues to justify Section 922(g)(3). However, this Court's decision in *Daniels* is inconsistent with *Rahimi* for four reasons.

*First*, this Court considered each of the Government's proffered analogues separately and reduced the inquiry to a search for a specific historical analogue. This Court essentially examined the Government's historical analogues, determined which

9

specific analogue appeared to regulate conduct most like Section 922(g)(3), and discounted the remaining analogues. However, *Rahimi* clarified that courts should examine the historical analogues *together* to identify the principle they *collectively* represent and then determine whether the statute at issue is consistent with that principle. Thus, the issue is not whether an unlawful user of a controlled substance is most like someone who drinks alcohol, someone who suffers from mental illness, or lawbreakers or otherwise dangerous persons who were disarmed at the time of the founding. Instead this Court should determine whether this nation has historically disarmed those whose mental state and/or dangerous and illegal conduct demonstrates that they pose a high risk of danger if armed. The Government submits that the nation does, and therefore, Section 922(g)(3) is constitutional.

*Second*, this Court gave too much weight to the lack of historical laws prohibiting the possession of firearms by intoxicated persons at the founding. This Court's analysis, in contradiction to Justice Barrett's concurrence in *Rahimi,* 144 S.Ct. at 1925, assumed that founding-era legislatures maximally exercised their legislative power. *Daniels*, 77 F.4th at 345-48. In making that assumption, this Court endorsed a "use it or lose it" view and sought a historical mold. Instead, this Court should reexamine *Daniels* and determine whether the proffered "historical regulations reveal a principle, not a mold." *Rahimi*, 144 S.Ct. at 1925 (Barrett, J. concurring). The dangers of this assumption are compounded by the fact that the opposite ledger is completely void of any cases declaring regulations on the possession of firearms by intoxicated persons unconstitutional. Further still, in light of this Court's implied determination that pre-ratification history of the regulation of firearms by intoxicated persons was elusive and/or inconclusive, the post-ratification history of regulating firearms possession by intoxicated person and drug users should have been treated with special importance. *Rahimi*, 144 S.Ct. at 1916 (Kavanaugh, J. concurring) ("When the text is vague and the pre-ratification history is elusive or inconclusive, post-ratification history becomes especially important.").

*Third*, this Court discounted historical analogues based any individual differences at the "how" and the "why" step of the analysis. For example, the Court discounted founding era restrictions concerning shooting guns at drinking and later restrictions on those who were intoxicated possessing firearms in connection with militia duty because the "why" of the regulations did not match Section 922(g)(3). However, *Rahimi*, instructs that the "how" and even the "why" of prior regulations does not have to match on all fours. In *Rahimi*, the Court explicitly relied on going armed laws to justify Section 922(g)(8) when such laws did not deal solely with the risk of domestic violence and/or

strife, and only disarmed offenders after a criminal conviction. Nevertheless, the Court found them sufficiently similar to Section 922(g)(8) because, at a general level, they were used to disarm those who were found by a court to be a credible threat. 144 S.Ct. at 1908-09.

***Fourth***, this Court's decision appears to be influenced by Section 922(g)(1)'s prohibition on felon's possessing firearms and implies that Section 922(g)(3) results in permanent disarmament due to past drug use. "By nature of his [Section] 922(g)(3) felony, Daniels is barred for life from possessing a firearm. *Daniels*, 77 F.4th 340. "In short, our history and tradition may support some limits on an intoxicated person's right to carry a weapon, but it does not justify disarming a sober citizen based exclusively on his ***past*** drug usage." *Id*. at 340 (emphasis added). However, much like Section 922(g)(8) only disarms individuals while they are subject to a domestic violence restraining order, Section 922(g)(3), as charged in this case, only disarms those who a jury finds were unlawful drug users at the time they possessed the firearm. In fact, the jurors were explicitly instructed that, in order to convict Daniels, they had to find that he was an unlawful user of a controlled substance at the time he possessed the firearm, and that the defendant "must have been actively engag[ed] in the use of a controlled substance during the time he possessed the firearm. ROA.270-71. Thus, Section 922(g)(3) is not a permanent ban on firearm possession, and it is not based upon past drug use. Instead, similar to the statute at issue in *Rahimi*, Section 922(g)(3) it temporarily bans unlawful users of controlled substances from possessing firearms so long as they remain unlawful users.

Accordingly, in light of *Rahimi*, the proffered historical analogues demonstrate that Section 922(g)(3) is constitutional. Application of the *Rahimi* Court's rationale to the proffered historical analogues demonstrates this point. First, historical regulations prohibited intoxicated persons from using and carrying firearms. Second, historically the mentally impaired were frequently subject to detention and disarmament. Third, this nation has a history and tradition of categorically disarming those whose possession of firearms poses a heightened risk of danger due to their illegal and/or dangerous conduct, as evidenced by *Rahimi's* own discussion of surety and going armed laws. Therefore, this Court should find that Section 922(g)(3) passes constitutional muster.

### 4. Section 922(g)(3) is Constitutional as Applied to Daniels, an Admitted Regular Marijuana User Who Committed Misconduct with Guns

The constitutionality of Section 922(g)(3) is evident when applied to Daniels. Daniels was not charged with being addicted to a controlled substance; he was charged with being an unlawful user of a controlled substance at the time that he possessed the weapon. Accordingly, the jury was instructed and found beyond a reasonable doubt that Daniels actively engaged in the use of a controlled substance during the time he possessed the firearm. ROA.270-71.[4] Thus, Daniel's own illegal conduct in connection with his possession of the firearm posed a risk of dangers to others.

Further, Daniels's conduct demonstrates the impact of marijuana use on his decision making. After all, Daniels admitted to law enforcement officers that he used marijuana 14 days out of the month and first began using marijuana in high school. ROA.201. He also admitted to the probation officer that at age 18, he began using marijuana "every other day up to the day before his arrest." ROA.483 (PSR ¶ 61). Thus, Daniel's admitted continuous use of marijuana would have covered August 26, 2020, when he admittedly fired three shots at a juvenile's vehicle, allegedly in self-defense, ROA.478-79 (PSR ¶ 43) and October 24, 2021, when Daniels broke his girlfriend's car window after an altercation, ROA.479 (PSR ¶ 45).[5] According to Daniels, part of the altercation occurred after he entered their residence to retrieve his clothes and *marijuana*. ROA.479 (PSR ¶ 45). Daniels was on bond at the time of his gun offense for a simple domestic violence charge due to this altercation and as part of his bail, he prohibited from using alcohol, illegal drugs, or drugs that were not prescribed to him. ROA.474 (PSR ¶ 17). Daniels's marijuana use also included the time between March 20, 2022, when he was first encountered by officers with the guns and April of 2022, when he was ultimately arrested. Finally, on the day of his arrest, officers observed burned marijuana cigarettes and smelled burnt marijuana, all of which demonstrates he did possess firearms

---

[4] The jury was instructed that the law did not "require that he used the controlled substance at the precise time he possessed the firearm, […] but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct." ROA.271

[5] The date of arrest referenced in the PSR is October 24, 2021, ROA.479 (PSR ¶ 45). The summary of the incident in the PSR indicates that the incident occurred on October 24, 2018. ROA.479 (¶ 45). However, based on a comparison of the incident with Daniels's own sequence of acquiring one of his weapons from his girlfriend in 2021 and then moving out of her residence, it appears that this domestic violence charge originated in 2021. ROA.474 (PSR ¶¶ 16-7).

while intoxicated by marijuana. Thus, Daniels's use of marijuana in connection with his possession of firearms demonstrates that he did pose a danger and could be disarmed.

## 5. Oral Argument

Given the procedural history of this case and the impact of *Rahimi* on this Court's prior decision, oral argument would benefit the Court and the parties.

Respectfully,

TODD W. GEE
*United States Attorney for the*
*Southern District of Mississippi*

GAINES H. CLEVELAND
*Assistant U.S. Attorney*

By: /s/ Jonathan D. Buckner

JONATHAN D. BUCKNER
*Assistant U.S. Attorney*

cc: Kymberly Gore
Leilani Tynes
*Assistant Federal Defenders*