# FEDERAL PUBLIC DEFENDER
## NORTHERN AND SOUTHERN DISTRICTS OF MISSISSIPPI

OMODARE B. JUPITER
Federal Public Defender

First Assistant
ABBY BRUMLEY EDWARDS
Senior Litigator
MICHAEL L. SCOTT
Assistant Federal Public Defender
PRINCESS ABBY
Research & Writing Specialists
TOM C. TURNER
KIMBERLY G. GORE
CARMEN G. CASTILLA

200 SOUTH LAMAR STREET ~ SUITE 200-N
JACKSON, MISSISSIPPI 39201
(601) 948-4284 FACSIMILE (601) 948-5510

1200 JEFFERSON AVENUE ~ SUITE 100
OXFORD, MISSISSIPPI 38655
(662) 236-2889 FACSIMILE (662) 234-0428

2510 14th STREET ~ SUITE 902
GULFPORT, MISSISSIPPI 39501
(228) 865-1202 FACSIMILE (228) 867-1907

Oxford
Assistant Federal Public Defenders
GREGORY S. PARK
M. SCOTT DAVIS
MERRILL K. NORDSTROM
Research & Writing Specialist
KIGER L. SIGH

Gulfport
Assistant Federal Public Defenders
LEILANI L. TYNES
Research & Writing Specialist
VICTORIA E. McINTYRE

July 29, 2024

Mr. Lyle W. Cayce
Clerk of the Court
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, Louisiana 70130

      Re:    *United States v. Daniels*, No. 22-60596
             Patrick Darnell Daniels' Supplemental Letter Brief

Dear Mr. Cayce:

      The Supreme Court's decision in *United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889 (2024), does not contradict this Court's previous analysis in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), *vacated and remanded*, No. 23-376, 2024 WL 3259662 (July 2, 2024). As set forth below, *Rahimi*'s holding resolved two issues in the ongoing saga of Second Amendment jurisprudence: (1) *Rahimi* broadly reaffirmed the "historical tradition" test set forth in *New York Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022); and (2) *Rahimi* narrowly held that, under the *Bruen* test, "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, 144 S. Ct. at 1903. Both of those holdings are consistent with this Court's original analysis, and *Rahimi*'s analysis undercuts the Government's arguments. Therefore, this Court should re-affirm its holding that 18 U.S.C. § 922(g)(3) is unconstitutional as applied to Mr. Daniels.

## I. The *Rahimi* decision

### A. *Rahimi* confirmed that the *Bruen* test applies to Second Amendment challenges.

The *Rahimi* decision solidified the Supreme Court's 2022 decision in *Bruen* – the "historical tradition" test is the proper standard to apply to Second Amendment challenges. *See Rahimi*, 144 S. Ct. at 1897. The Supreme Court first reiterated the broad outline of the *Bruen* test:

> [i]n *Bruen*, we directed courts to examine our "historical tradition of firearm regulation to help delineate the contours of the right. We explained that if a challenged regulation fits within that tradition, it is lawful under the Second Amendment. We also clarified that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to "justify its regulation."

*Id.* (quoting *Bruen*, 597 U.S. at 17, 24) (internal citation omitted). The Supreme Court further stated that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 26-31).

The Supreme Court then reiterated the finer points of the *Bruen* test – that lower courts must apply the "relevantly similar" standard to determine the "central" questions of "[w]hy and how" a regulation burdens the Second Amendment right. *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 26-31). "Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30).

Notably, the Supreme Court did not question or analyze whether Mr. Rahimi was among "the people" protected by the Second Amendment. Instead, the Supreme Court "reject[ed] the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.' 'Responsible' is a vague term. It is unclear what such a rule would entail." *Rahimi*, 144 S. Ct. at 1903. The Supreme Court also noted that neither *Heller* nor *Bruen* addressed the question and confirmed that its use of the

term "responsible" was shorthand for "the class of ordinary citizens who undoubtedly enjoy the Second Amendment right." *Id.* Moreover, Mr. Rahimi, despite his well-documented history of violence and misuse of firearms, still ranked among "the people."

### B. The ruling in *Rahimi* is narrow.

In considering the statute at issue in *Rahimi* – 18 U.S.C. § 922(g)(8) – the Supreme Court analyzed the historical analogues that the Government presented: surety laws and "going armed" laws. *See Rahimi*, 144 S. Ct. at 1899-1902. The Supreme Court noted that the surety laws were a preventative measure to protect individuals against violence, and at least ten jurisdictions utilized surety laws to address prevent potential misuse of firearms. *See id.* at 1899-1900. The "going armed" laws were largely a product of the common law (although the Supreme Court noted that four states had codified a prohibition against such behavior) and served to punish those who threatened violence and terrorized the public. *See id.* at 1900-02. Applying the "why" of these two analogues, the Supreme Court concluded that history and tradition supported the principle of disarming a person who "poses a clear threat of physical violence to another." *Id.* at 1901.

The Supreme Court cited two errors in the *Rahimi* panel decision. First, the Supreme Court found that the panel focused too closely on finding a historical "twin" rather than a relevantly similar analogue. *Id.* at 1903. Second, the panel lost sight of the fact that Mr. Rahimi brought a facial challenge, rather than an as-applied challenge. *See id.* Accordingly, "[r]ather than consider the circumstances in which Section 922(g)(8) was most likely to be constitutional, the panel instead focused on hypothetical scenarios where Section 922(g)(8) might raise constitutional concerns." *Id.* Most of those concerns related to due process, which was not at issue in Mr. Rahimi's case – in fact, the Supreme Court's narrow ruling specifically cites to due process as a factor that supported the restriction. *See id.* at 1903 and n.2 (holding that "we conclude only this: An individual *found by a court* to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." (emphasis added)).

### II. This Court properly applied the *Bruen* test to hold that 18 U.S.C. § 922(g)(3) is unconstitutional as applied to Mr. Daniels, and the *Rahimi* decision does not impact this Court's analysis.

As this Court has held, a GVR (grant, vacate, remand) from the Supreme Court "is not a final determination on the merits." *Kenemore v. Roy*, 690 F.3d 639,

3

642 (5th Cir. 2012). "A GVR does not bind the lower court to which the case is remanded; that court is free to determine whether its original decision is still correct in light of the changed circumstances or whether a different result is more appropriate." *Id.*

Mr. Daniels submits that the GVR in this case provides no indication that the Supreme Court disagreed with the analysis in this Court's original decision. The Supreme Court issued the same order in the six other Second Amendment cases pending before it this past term, regardless of their posture on petition for writ of certiorari. *See Cunningham v. United States*, 2024 WL 3259684 (July 2, 2024); *Antonyuk v. James*, 2024 WL 3259671 (July 2, 2024); *Vincent v. Garland*, 2024 WL 3259668 (July 2, 2024); *United States v. Perez-Gallan*, 2024 WL 3259665 (July 2, 2024); *Garland v. Range*, 2024 WL 3259661 (July 2, 2024); *Doss v. United States*, 2024 WL 3259684 (July 2, 2024).

Reviewing Mr. Daniels' case in the context of *Rahimi* does not change the outcome. This Court properly applied the *Bruen* test in the first instance, and nothing in the *Rahimi* decision undercuts the analysis. To the contrary, the *Rahimi* decision supports this Court's decision in *Daniels* and undermines the Government's arguments.

### A.    As-applied v. facial challenge

At the outset, the *Rahimi* decision differs from Mr. Daniels' case in one significant aspect. *Rahimi* presented a facial challenge; Mr. Daniels has raised both a facial challenge and an as-applied challenge.[1] Accordingly, to succeed on the as-applied challenge, Mr. Daniels was not required to establish that § 922(g)(3) is unconstitutional in all applications – only with respect to the facts and circumstances of this case. This Court properly considered Mr. Daniels' case as an as-applied challenge and limited the scope of its review. Accordingly, this Court did not engage in the "straw man" fallacy that marked the panel decision in *Rahimi*. *See Rahimi*, 144 S. Ct. at 1903, n.2.

---

[1] This Court did not address Mr. Daniels' facial challenge in its decision, but Mr. Daniels preserves it here.

### B. *Rahimi* indicates that Mr. Daniels is one of "the people."

*Rahimi* resolves one question that the Government argued in its initial briefing to this Court: whether Mr. Daniels is one of "the people" protected by the Second Amendment. The Government argued that because Mr. Daniels was not "law-abiding" or "responsible," he was not entitled to the protections of the Second Amendment. Appellee's Brief, ECF 47, 40-46.

This Court rejected that argument in its initial decision, and *Rahimi* affirms that this Court decided that issue correctly. *See Daniels*, 77 F.4th at 342-43 (holding that *Heller* and *Bruen* did not limit Second Amendment protections to "model citizens"). The Supreme Court unequivocally rejected the Government's position in *Rahimi*, holding: "we reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.' 'Responsible' is a vague term. It is unclear what such a rule would entail. Nor does such a line derive from our case law." *Rahimi*, 144 S. Ct. at 1903.

Accordingly, Mr. Daniels is one of "the people" entitled to assert his rights under the Second Amendment. The only remaining question is whether the Supreme Court's decision in *Rahimi* overrules this Court's analysis in *Daniels*. It does not.

### C. *Rahimi*'s analysis affirms that this Court's original decision was well-reasoned and reached the correct result.

#### 1. *Rahimi* clarifies *Bruen* but does not retreat from it.

*Rahimi* clarified the *Bruen* decision in several ways, first and foremost by declaring that *Bruen*'s "historical tradition" test is the proper standard for analyzing challenges to the Second Amendment. *See Rahimi*, 144 S. Ct. at 1897-98. The Government bears the burden of proof to establish that a challenged regulation fits within that historical tradition. *See id.* at 1898.

Second, *Rahimi* purports to clarify that the methodology of the historical analogue test has flexibility – it is not "a law trapped in amber." *Id.* at 1898. But neither can a modern-day regulation rest on an amorphous principle. The *Rahimi* opinion still discusses concrete historical analogues and notes that those analogues were common at the time of the Founding, as evidenced by the number of jurisdictions that adopted them. *See id.* at 1900-01 (noting that Massachusetts and "[a]t least nine other jurisdictions" had surety laws to guard against the misuse of

5

firearms and that "at least four states . . . expressly codified prohibitions on going armed."). Additionally, Justice Barrett, in her concurrence, warned courts to "be careful not to read a principle at such a high level of generality that it waters down the right." *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring).

This limitation on the use of analogues to extrapolate "principles" is borne out in *Rahimi*. Any language that the Government reads as relaxing its burden of proof is undercut by the narrow holding in the case. The Supreme Court declined to make a broad ruling. In fact, even though § 922(g)(8)(c) has two subsections, the Supreme Court declined to rule on the second one. *See id.* at 1898-89. Instead, the Court held "we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 1903. In other words, the Court merely held that a historical tradition of temporarily disarming people who pose a specific threat in a general context (surety laws and "going armed" laws) permits the Government to temporarily disarm people in a specific context (domestic violence restraining orders).

      **2.**      **This Court applied the proper methodology in its original *Daniels* decision.**

This Court's analysis in *Daniels* follows the Supreme Court's rulings in both *Bruen* and *Rahimi*. The Government proposed three types of analogues – principles, if you will – to meet its burden of proof and establish that § 922(g)(3) is constitutional as applied to Mr. Daniels: (1) statutes regulating the use of firearms while intoxicated; (2) statutes regulating firearms for the mentally ill; and (3) a tradition of disarming "dangerous" people, with an emphasis on political enemies and racial/religious minorities. ECF 47, 44-66.

This Court examined each set of historical analogues in turn. *See Daniels*, 77 F.4th at 348-55. This Court identified the intoxication statutes as closest in principle to § 922(g)(3), noting the prevalence of alcohol and alcohol abuse at the time of the Founding and likening it to the use of other intoxicants, such as marijuana. *See id.* at 345-49. Those statutes, however, limited the *use* of firearms (but not *possession*) only during the period of active intoxication, on the principle that alcohol impaired the user to the point that he could not safely *use* a firearm. *See id.* at 347. Section 922(g)(3), then, met the "why" of the *Bruen* test in part, but this Court properly determined that it exceeded the outer bounds of constitutionality by banning

possession, even during periods of sobriety.[2] *Id.* at 347. Accordingly, § 922(g)(3) failed the "how" analysis completely. *Id.*

This Court then determined that § 922(g)(3) was analogous, to a lesser extent, to the statutes disarming the mentally ill based on the writings of Dr. Benjamin Rush and Thomas Cooley, who likened drunkenness to temporary insanity. *See id.* at 349. As this Court stated, however, any disarmament would be limited to those periods of in which a person was actively intoxicated. *See id.* The definition of an "unlawful user," while vague, also extends well outside periods of active intoxication. And in Mr. Daniels' case, there was **no** evidence of active intoxication or impairment.[3]

Finally, this Court considered the Government's argument that it may disarm broad categories of people that it deemed "dangerous." ECF 47, 60-62. The Government cited statutes from the Founding that disarmed Loyalists and Catholics, as well as enslaved people and Native Americans. The Government made the same argument in *Rahimi*, and the Supreme Court explicitly rejected the Government's position. First, the Supreme Court noted that the practice of disarming political enemies was largely abandoned by the time of the Founding, both by the Second Amendment and by state constitutions. *Rahimi*, 144 S. Ct. at 1899. Second, the Government likened "responsible" to "dangerous."[4] Transcript of Oral Argument at 28-29, *United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889 (2024) (No. 22-915). The Supreme Court also explicitly rejected that argument. *See Rahimi*, 144 S. Ct. at 1903.

Even if the Supreme Court had not explicitly rejected those arguments in *Rahimi*, this Court's analysis would still stand. In evaluating the Government's analogues for dangerous people, this Court reviewed the basis for those restrictions and determined that the "why" for disarming Catholics, Loyalists, the enslaved, and

---

[2] As part of the *Bruen* analysis, this Court also noted that the term "unlawful user" was vague. *Daniels*, 77 F.4th at 348. Mr. Daniels raised a void for vagueness argument in his appeal, and he preserves it for consideration here.

[3] Mr. Daniels preserved a sufficiency of the evidence claim that dovetails with his vagueness argument. Mr. Daniels preserves that argument here.

[4] The Government, during oral argument on *Rahimi*, stepped away from its position regarding enslaved people and Native Americans, arguing that those laws were based on the position that those groups were not among the people protected by the Second Amendment in the first instance. Transcript of Oral Argument at 4, 7, *Rahimi*, 144 S. Ct. 1889 (2024) (No. 22-915).

Native Americans was to prevent political upheaval and political violence. *Daniels*, 77 F.4th at 355-56. That reasoning strayed too far afield from the purpose of § 922(g)(3), so it could not serve as an analogue. Allowing such an analogue would, as Justice Barrett warned, "water down" the Second Amendment. *Rahimi*, 144 S. Ct at 1926 (Barrett, J., concurring). In this instance, the dangerousness analogue is so broad that it is akin to the Government's "responsible" argument.

This Court's methodology in *Daniels* adheres closely to the Supreme Court's methodology in *Rahimi* and, of course, in *Bruen*. Accordingly, *Rahimi* does nothing to undermine this Court's original analysis and should not impact this Court's decision that § 922(g)(3) is unconstitutional as applied to Mr. Daniels. Although this Court used the term "analogues" instead of "principles," this Court analyzed the Government's historical evidence precisely as *Rahimi* requires.

Moreover, this Court protected the Second Amendment in exactly the manner that the Supreme Court's jurisdiction requires. Just as *Rahimi* narrowly interpreted § 922(g)(8)'s restrictions on the Second Amendment, this Court jealously guarded Mr. Daniels' Second Amendment rights. Section 922(g)(3) sweeps broadly, but the historical evidence reveals that the Founders imposed minimal, temporary restrictions on people in Mr. Daniels' position. *Bruen* and *Rahimi* forbid exactly this type of intrusion on a person's Second Amendment rights.

### III. Conclusion

*Rahimi* clarified, but did not narrow the *Bruen* test, and in Mr. Daniels' case, *Rahimi*'s analysis only strengthens Mr. Daniels' position and undermines the Government's arguments. This Court properly held that § 922(g)(3) is unconstitutional as applied to Mr. Daniels. Accordingly, this Court should hold that its original opinion is consistent with *Rahimi* and re-enter the order vacating Mr. Daniels' conviction.

    Respectfully submitted,

    OMODARE B. JUPITER
    Federal Public Defender

    */s/ Leilani L. Tynes*
    LEILANI L. TYNES
    Assistant Federal Public Defender

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of July, 2024, I electronically filed the foregoing Supplemental Letter Brief with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

                                        */s/ Leilani Tynes*
                                        LEILANI L. TYNES
                                        Assistant Federal Public Defender