WILLIAM J. OLSON
(VA., D.C.)

ROBERT J. OLSON
(VA., D.C.)

JEREMIAH L. MORGAN
(D.C., CA ONLY)

———————

HERBERT W. TITUS
(1937-2021)

# WILLIAM J. OLSON, P.C.
### ATTORNEYS AT LAW
370 MAPLE AVENUE WEST, SUITE 4

VIENNA, VIRGINIA 22180-5615

TELEPHONE (703) 356-5070

FAX (703) 356-5085

E-MAIL: wjo@mindspring.com

http://www.lawandfreedom.com

114 CREEKSIDE LANE
WINCHESTER, VA 22602-2429
TELEPHONE (540) 450-8777
FAX (540) 450-8771

July 29, 2024

Lyle W. Cayce, Clerk
U.S. Court of Appeals for the Fifth Circuit
600 S. Maestri Place, Suite 115
New Orleans, LA 70130

Subject: *United States v. Daniels*
22-60596

Dear Mr. Cayce:

The following letter *amicus* brief is submitted together with a motion for leave to file, in response to this Court's directive dated July 3, 2024, requesting letter briefs addressing the applicability of *United States v. Rahimi*, U.S. Supreme Court, No. 22-915.

## Interest of the Amici

*Amici* are nonprofit organizations interested in preserving pre-existing rights recognized and guaranteed by the Second Amendment: Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Heller Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, America's Future, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund. Some of these *amici* filed an *amicus* brief[1] in this case in this Court on July 6, 2023 in response to this Court's June 7, 2023 invitation for *amicus* briefs "to supply relevant information

---

[1] http://www.lawandfreedom.com/wordpress/wp-content/uploads/2023/07/US-v-Daniels-Amicus-Brief.pdf.

regarding the history and tradition of restrictions on the use and possession of firearms as pertinent to the issues presented in this case."[2]

*Course of Proceedings*

Appellant Daniels was charged with "knowingly possessing a firearm while an unlawful user of a controlled substance," in violation of 18 U.S.C. § 922(g)(3). *United States v. Daniels*, 610 F. Supp. 3d 892 (S.D. Miss. 2022) ("*Daniels I*"). The district court denied Daniels' motion to dismiss, asserting "Congress enacted the exclusions in § 922(g)" to categorically "keep guns out of the hands of presumptively risky people." *Id.* at 897.

This Court reversed, finding that, in applying *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), "[j]ust as there was no historical justification for disarming a citizen of sound mind, there is no tradition that supports disarming a sober citizen who is not currently under an impairing influence." *United States v. Daniels*, 77 F.4th 337, 340 (5th Cir. 2023) ("*Daniels II*").

The government petitioned for certiorari, after which the Supreme Court decided *United States v. Rahimi*, 219 L. Ed. 2d 351 (2024). Then, the Supreme Court granted certiorari in *Daniels*, vacated this Court's judgment, and remanded the case for reconsideration in light of *Rahimi*. *See United States v. Daniels*, 2024 U.S. LEXIS 2910 (2024) ("*Daniels III*"). This was one of seven cases pending before the High Court which were handled in identical fashion.[3] Now on remand, this Court has requested letter briefs on the effect of *Rahimi* on this case.

*The Bruen Methodology*

Under *Bruen*, once a challenge is brought by a member of the polity to a restriction on the keeping or bearing of arms, the burden shifts to the government

---

[2] Memorandum to Counsel or Parties Listed Below, *United States v. Daniels*, No. 22-60596 (5th Cir. June 7, 2023), ECF No. 85.

[3] *See* "The Second Amendment at the Supreme Court: Challenges to Federal Gun Laws," *Congressional Research Service* (July 8, 2024).

to demonstrate that the regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen* at 24. Further, that "historical tradition" must be pegged to the Founding era specifically: "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 37. Moreover, "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 36; *see also id.* at 37 ("19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established.'"). Finally, historical analogues rooted in the Founding era must be numerous enough to be "well-established and representative" of the "*Nation's* historical tradition," *id.* at 30, 24 (emphasis added), in addition to being "consistent with the principles that underpin our regulatory tradition...." *Rahimi* at 363; *see also Bruen* at 29 (identifying "how and why the regulations burden a law-abiding citizen's right to armed self-defense" as "'*central*' considerations" for historical analysis).

In *Rahimi*, the Supreme Court merely applied that methodology. The burden was placed on the government to demonstrate a Founding-era historical analogue that was "'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi* at 363. The Supreme Court only made two criticisms of this Circuit's decision under review in *Rahimi*:

> First … it read *Bruen* to require a historical twin rather than a historical analogue…. Second, it did not correctly apply our precedents governing facial challenges…. Rather than consider the circumstances in which Section 922(g)(8) was most likely to be constitutional, the panel instead focused on hypothetical scenarios where Section 922(g)(8) might raise constitutional concerns. [*Rahimi* at 369.]

Neither of those concerns is raised in this Court's decision in *Daniels II*, which faithfully followed *Bruen* and is entirely consistent with *Rahimi*.

*The Bruen Methodology Applied in Daniels*

In *Daniels*, the government offered three groups of colonial-era laws as possible historical analogues. First, it offered two statutes, one from Virginia in 1656 and one from New York in 1771, that forbade *firing* weapons while intoxicated. Neither prevented *possession* while intoxicated, and both were limited in time *to the period of actual intoxication*. *Daniels II* at 345. The second group of laws prohibited showing up intoxicated for militia service and selling liquor to militiamen. Again, neither appeared to affect *possession* by persons not *actively intoxicated*. *Id.* at 346. And the third disarmed "political dissidents" and "religious minorities," neither of which are at issue here. *Id.* at 350-51.

Based on the government's showings, this Court concluded that, while "history and tradition may support some limits on an intoxicated person's right to carry a weapon … it does not justify disarming a sober citizen based exclusively on his past drug usage." *Id.* at 340.

*Rahimi*'s *Applicability Here*

There is nothing in *Rahimi* indicating that the types of laws rejected in *Daniels II* have somehow now been transformed into "relevantly similar" analogues. Rather, *Rahimi* reiterated that "[w]hy and how the regulation burdens the right are central to this inquiry." *Rahimi* at 363. *Rahimi* dealt with a different subsection of 18 U.S.C. § 922(g) — § 922(g)(8), which prohibits possession by individuals under a very narrow type of court order which meets several elements, including being subject to a court order that —

> (A) was issued *after a hearing* of which such person received *actual notice*, and at which such person had an *opportunity to participate*;
> (B) restrains such person from harassing, stalking, or threatening an *intimate partner* of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C) (i) includes a *finding* that such person represents a *credible threat* to the physical safety of such intimate partner or child; or (ii) by its terms *explicitly prohibits the use*, attempted use, or threatened use of *physical force* against such intimate partner or child that would reasonably be expected to cause bodily injury[.] [18 U.S.C. § 922(g)(8) (emphasis added).]

The *Rahimi* Court made clear that it was not addressing any of the other subsections of § 922, even the very next subsection involving a prohibition of the use of physical force. The Court simply stated: "[o]ur analysis starts and stops with Section 922(g)(8)(C)(i) because the Government offers ample evidence that the Second Amendment permits the disarmament of *individuals* who pose a credible threat to the physical safety of others." *Rahimi* at 364 (emphasis added). The Court ruled only that, "[w]hen *an individual* poses a clear threat of physical violence to another, the threatening *individual* may be disarmed. Section 922(g)(8)['s] … prohibition on the possession of firearms by those *found by a court* to present a threat to others fits neatly within the tradition … surety and going armed laws represent." *Id.* at 367 (emphasis added).

*Rahimi* ruled on a statute permitting *temporary* disarmament of an *individual* who has been *adjudicated dangerous* by a court of law, based on Founding-era surety and "going armed" laws. With regard to surety laws, the Court stressed the "*individualized*" nature of these regimes. *Id.* at 365. It further emphasized the requirement of an individual *determination* by a magistrate that an *individual* was dangerous before a bond could be required: "a magistrate could 'oblig[e] those persons, [of] whom there is a probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance … that such offence … shall not happen[,] by finding pledges or securities." *Id.*

*Rahimi* emphasized that surety laws relied on *individualized* judicial determinations of dangerousness before someone could be compelled just to post a bond to carry a firearm. The Court cited a 1795 Massachusetts statute as representative of Founding-era surety laws. Under that law:

[b]efore the accused could be compelled to post a bond for "go[ing] armed," a complaint had to be made to a judge or justice of the

> peace by 'any person having reasonable cause to fear' that the
> accused would do him harm or breach the peace.... The magistrate
> would take evidence, and — if he determined that cause existed for
> the charge — summon the accused, who could respond to the
> allegations. [*Id.* at 366.]

Even when surety bonds were required to possess firearms under surety statutes, they were generally *temporary*. The Massachusetts statute cited in *Rahimi* limited bonds to six months' duration. *Id.* The government's attempt to analogize a temporary "good behavior insurance" requirement to a flat ban on possession here (regardless of a person's *current* intoxication) fails under *Rahimi*.

The Court also reviewed the history of colonial "going armed" laws, again rooted in Founding-era tradition. In this regard, *Rahimi* must be read in light of *Bruen,* which already addressed "going armed" laws in detail. *Bruen* had noted that "the common law did not punish the carrying of deadly weapons per se, but only the carrying of such weapons 'for the purpose of an affray, and in such manner as to strike terror to the people.'" *Bruen* at 52. The Court stated: "[t]herefore, those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so." *Id.*

As with surety statutes, "going armed" laws were targeted at specific, dangerous behavior. *Rahimi* noted that "the going armed laws prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land.' 4 Blackstone 149 (emphasis deleted). Such conduct disrupted the 'public order' and 'le[d] almost necessarily to actual violence.'" *Rahimi* at 367. As the *Bruen* Court observed, "[a] by-now-familiar thread runs through [colonial 'going armed'] statutes: They prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people. [This] require[s] something more than merely carrying a firearm in public," let alone mere possession. *Bruen* at 50.

<u>Application of Rahimi to Daniels</u>

At the outset, any notion that *Rahimi* made some fundamental change to the *Bruen* methodology is unsupported. *See Rahimi* at 378 (Gorsuch, J.,

concurring) ("Among all the opinions issued in this case, its central messages should not be lost. The Court reinforces the focus on text, history, and tradition, following exactly the path we described in *Bruen*."). *Rahimi* merely clarified *Bruen*'s framework such that Founding-era and modern laws addressing a historically persistent societal issue need not be *identical*, in a case that involved a *prior judicial determination* that a *particular individual* was dangerous for a *temporary* period. Even so, "the lack of a distinctly similar historical regulation addressing that problem is *relevant evidence* that the challenged regulation is inconsistent with the Second Amendment," *Bruen* at 26 (emphasis added), and *Rahimi* reiterated that "[e]ven when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Rahimi* at 364. Accordingly, *Rahimi* does not in any way alter this Court's prior application of the *Bruen* methodology to determine the constitutionality of § 922(g)(3). And, quite unlike *Rahimi*, *Daniels* involves a broad, categorical ban on all persons who use controlled substances, regardless of any individualized dangerousness, and even regardless of whether impaired (*i.e.*, without regard to any perceived threat) at the time of possession.

In *Rahimi*, the government at least had some historical analogues to offer. However, as this Court has noted in *Daniels*, there is a complete void of historical tradition viewing the mere possession of firearms by users of intoxicants as "terrify[ing] the good people of the land" or leading "almost necessarily to actual violence." *Rahimi* at 367. Instead, even Fourteenth Amendment-era restrictions forbade only carrying while actually intoxicated. "The Founders … allowed alcoholics to possess firearms while sober." *Daniels II* at 349. In stark contrast, Subsection (g)(3) operates as a complete ban on possession by any "unlawful user," at any time. Accordingly, it fails the second *Bruen* guidepost — whether there is a relevant historical analogue — and *Rahimi* does nothing to change that calculus.

As this Court has noted, the law applied to *Daniels* has none of the historical analogues of the sort the government offered in *Rahimi*. Rather, the Court noted that "Section 922(g)(8) applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another. 922(g)(8)(C)(i). That matches the surety and going armed laws, which involved

judicial determinations of whether a *particular* defendant likely would threaten or had threatened another with a weapon." *Id.* (emphasis added). In contrast, Section 922(g)(3) applies to an entire class of persons irrespective of individualized dangerousness.

Further, the *Rahimi* Court noted that "Section 922(g)(8)'s restriction was temporary as applied to the defendant. Section 922(g)(8) only prohibits firearm possession so long as the defendant 'is' subject to a restraining order." *Id.* at 368. Section 922(g)(8) passed muster because it "presumes, like the surety laws before it, that the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others." *Id.* at 368. In contrast, Section 922(g)(3) bans possession by a person not only while "subject to" the effects of a prohibited substance — but also at all times.

To be sure, the *Rahimi* Court added in dicta that "we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse...." *Rahimi* at 368. But neither did the Court advise that such categorical bans are constitutional, noting that Section 922(g)(8) is *particularized* and *specific*. *See id.* at 370 ("[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed...").

The ban challenged here involves none of those elements. Thus, *Rahimi* does not alter this Court's evaluation of the constitutionality of Section 922(g)(3). Subsection 3 is categorical and not individualized. It neither requires nor even permits any judicial determination of dangerousness, but simply preemptively labels an entire category of citizens as too dangerous to possess weapons, no matter their present sobriety.

Indeed, like the restraining order in *Rahimi*, as this Court noted previously, even Fourteenth Amendment-vintage restrictions on firearm use by the intoxicated were limited in scope: "[a]t most, the postbellum statutes support banning the *carry* of firearms *while under the influence*." *Daniels II* at 347 (emphasis original). Neither the Founding era nor the Fourteenth Amendment era supports categorical bans on possession by any individual who at any point is

9

an "unlawful user." *See Rahimi* at 367-68 (continuing to focus on the "why" *and* "how" of historical precursors). The prohibition of Subsection (g)(3) remains permanent, as long as an individual continues to be, however irregularly, an "unlawful user."

If there was any indication of how the High Court would consider this case, it came when the Court rejected the government's contention that Rahimi "may be disarmed simply because he is not responsible." *Rahimi* at 369-70; *see also id.* at 377 (Gorsuch, J., concurring) ("Nor do we purport to approve in advance other laws denying firearms on a categorical basis to any group of persons a legislature happens to deem, as the government puts it, 'not "responsible."'"). This Court already dispensed with that contention here, presciently noting that "we cannot read too much into the Supreme Court's chosen epithet. More than just 'model citizen[s]' enjoy the right to bear arms." *Daniels II* at 342. Much more is needed, and there is no historical tradition of banning simple possession while sober, based on prior drug use. No such tradition ever existed.

Accordingly, *Rahimi* provides no support to the government here. "Just as there was no historical justification for disarming a citizen of sound mind, there is no tradition that supports disarming a sober citizen who is not currently under an impairing influence." *Id.* at 349.

## Conclusion

This Court's prior decision in *Daniels II* properly followed *Bruen*, and *Rahimi* does not change the calculus of Section 922(g)(3)'s constitutionality. This Court should reach the same result as it previously did, explaining that *Rahimi* leaves its rationale unchanged.

Sincerely yours,

/s/
Robert J. Olson