# FEDERAL PUBLIC DEFENDER
## NORTHERN AND SOUTHERN DISTRICTS OF MISSISSIPPI

OMODARE B. JUPITER
Federal Public Defender

First Assistant
ABBY BRUMLEY EDWARDS
Senior Litigator
MICHAEL L. SCOTT
Assistant Federal Public Defender
PRINCESS ABBY
Research & Writing Specialists
TOM C. TURNER
KIMBERLY G. GORE
CARMEN G. CASTILLA

200 SOUTH LAMAR STREET ~ SUITE 200-N
JACKSON, MISSISSIPPI 39201
(601) 948-4284 FACSIMILE (601) 948-5510

1200 JEFFERSON AVENUE ~ SUITE 100
OXFORD, MISSISSIPPI 38655
(662) 236-2889 FACSIMILE (662) 234-0428

2510 14ᵗʰ STREET ~ SUITE 902
GULFPORT, MISSISSIPPI 39501
(228) 865-1202 FACSIMILE (228) 867-1907

Oxford
Assistant Federal Public Defenders
GREGORY S. PARK
M. SCOTT DAVIS
MERRILL K. NORDSTROM
Research & Writing Specialist
KIGER L. SIGH

Gulfport
Assistant Federal Public Defenders
LEILANI L. TYNES
Research & Writing Specialist
VICTORIA E. McINTYRE

August 5, 2024

Mr. Lyle W. Cayce
Clerk of the Court
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, Louisiana 70130

      Re:   *United States v. Daniels*, No. 22-60596
           Patrick Darnell Daniels' Supplemental Letter Reply Brief

Dear Mr. Cayce:

In response to the Government's supplemental brief, Mr. Daniels respectfully submits that the Government's position violates the principles of the Supreme Court's decision in *United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889 (2024). The Government seeks to apply the historical tradition test set forth in *New York Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022) and *Rahimi* at such a high level of generality that it renders the test meaningless. Moreover, the Government asks this Court to adopt a position on marijuana that is contrary to its own position in other contexts in order to deprive Mr. Daniels of his Second Amendment rights.

As set forth below and in Mr. Daniels's previous briefing, 18 U.S.C. § 922(g)(3) is unconstitutional as applied to Mr. Daniels. Accordingly, this Court should hold that *Rahimi* does not alter this Court's previous decision and re-affirm the decision to vacate Mr. Daniels's conviction.

## I.    The Government misinterprets both *Bruen* and *Rahimi*.

In its supplemental brief, the Government essentially argues that *Rahimi* permits the Government to restrict the Second Amendment rights of presumptively dangerous people. Although the Government does not define what constitutes a

presumptively dangerous person, the Government argues that Mr. Daniels is presumptively dangerous because there was evidence that he used marijuana and that he possessed firearms. In so doing, the Government misinterprets both *Bruen* and *Rahimi* and asks this Court to ignore clear, near-identical historical analogues related to alcohol consumption and intoxication in favor of far-flung analogues regarding mental illness that still fail to support the Government's position.

*Rahimi* clarified, but did not retreat from, the *Bruen* test. The Government posits, however, that *Rahimi* now allows courts to adopt historical analogues that have little bearing on the regulation at issue. Govt. Supp. Br, ECF 156, 2-3. The Government seizes on two points in the *Rahimi* decision to argue that courts may utilize the historical analogue test much like they did the intermediate scrutiny test. First, the Government cites the Court's remark that its precedents, like the *Bruen* methodology of finding historical analogues, "were not meant to suggest a law trapped in amber." *See id.* at 2 (quoting *Rahimi*, 144 S.Ct. at 1897). That statement does not, as the Government argues, permit courts to cast a wide net when considering analogues. Instead, as the Court clarifies in the same breath, *Rahimi* merely acknowledges that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." 144 S. Ct. at 1897-98.

Second, the Government cites Justice Barrett's nonbinding concurrence to argue that "a test that demands overly specific analogues" presents "serious problems." *Id.* at 1925 (Barrett, J., concurring). The Government misinterprets this statement to argue that this Court should extrapolate historical analogues, which allowed minimal, temporary restrictions on the Second Amendment, to allow for broad, permanent restrictions that meet with the Government's current perspective of the Second Amendment.

Contrary to the Government's position, these statements in *Rahimi* only clarified *Bruen*'s methodology; *Rahimi* did not sanction a return to pre-*Bruen* analyses.[1] *Bruen* (and *Heller* before it) involved a "straightforward" analysis of a broad firearms regulation that limited the right to possess and carry firearms for self-defense. *Bruen*, 597 U.S. at 26-27. *Rahimi*, on the other hand, was the Supreme

---

[1] Although concurrences of Supreme Court Justices are not binding on this Court, Mr. Daniels notes that Justices Gorsuch warned courts to "proceed with care in making comparisons to historical firearm regulations, or else they risk giving away an individual right the people expressly preserved for themselves in the Constitutional text." *Rahimi*, 144 S. Ct. at 1908 (Gorsuch, J., concurring). And Justice Kavanaugh advised that courts cannot let their interpretation of the Supreme Court's early decisions on the Second Amendment "morph in policy preferences under the guise of a balancing test." *See id.* at 1924 (Kavanaugh, J., concurring).

Court's first Second Amendment decision restricting firearms possession in a criminal context, and so the analogues in question were not straightforward. However, neither of the statements the Government cites in support of its argument detract from *Rahimi*'s clear mandate that it is the Government's burden to present historical analogues that demonstrate that § 922(g)(3) "fits within the [Nation's] tradition of firearm regulation." *Rahimi*, 144 S. Ct. at 1896-97. The Government cannot meet this burden.

## II.    The Government's proposed analogues do not "fit[] within our tradition of firearm regulation.

### A. The intoxication statutes do not support the Government's position.

The Government implicitly acknowledges that the historical analogues it presented regarding intoxication are insufficient to uphold § 922(g)(3) as applied to Mr. Daniels. ECF 156, 5-6. The Government tips it hand by stating that at the founding, overconsumption of alcohol was not considered a general societal problem. *Id.* at 5-6. Instead, it argues that this Court should take the few statutes that provided temporary restrictions on *use* of a firearm during periods of *active intoxication* and expand them to an ill-defined total restriction of Second Amendment rights. To do so would violate the test set forth in *Bruen* and *Rahimi*.

As this Court held in its original opinion, restrictions on the use of alcohol and firearms together were nearly non-existent at the founding. *United States v. Daniels*, 77 F.4th 337, 345-46 (5th Cir. 2023), *cert. granted, judgment vacated, and remanded*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024). The few statutes that did exist imposed a limited restriction on the *use* of firearms during a period of active intoxication. *See id.* Post-bellum statutes were also limited in number and restricted Second Amendment rights only during periods of active intoxication. *See id.* at 346. In its original opinion, this Court noted that by the Government's rationale, "Congress could ban gun possession by anyone who has multiple alcoholic drinks a week from possessing guns based on the postbellum intoxicated carry laws. The analogical reasoning *Bruen* prescribed cannot stretch that far." *Id.* at 348.

This Court's analysis was correct, and *Rahimi* did not stretch *Bruen* in this respect. This Court was presented with historical analogues that addressed a societal concern (alcohol use) near identical to the one at issue in Mr. Daniels' case (marijuana use). The Government, now recognizing that those analogues are insufficient, asks this Court to ignore the "how" and "why" axes of *Bruen* completely and impose a total restriction of Second Amendment rights based on the presumption

that a person who becomes intoxicated occasionally is always dangerous. The Government presents no evidence that the historical analogues presented represent a partial use of Congress's power to impose Second Amendment restrictions in this context. And given the concerns expressed inside the text of those statutes themselves – attacks by Native Americans and militia readiness in the aftermath of the Revolutionary War[2] – it is unlikely that Congress believed it could or should exercise that power.

## B. The Government's analogues regarding mental illness are also insufficient.

After asking this Court to ignore near identical historical analogues governing intoxication, the Government claims that Second Amendment restrictions on the mentally ill are appropriately representative historical analogues of those who use intoxicants. In its initial appeal, the Government presented no historical analogues, instead relying on *dicta* from *Heller* and other appellate courts which presumed that the "mentally ill" could be disarmed. *See* ECF 47, 48-50. Now, the Government seeks to introduce new historical analogues at this late stage of the appeal. ECF 156, 6-9. This second bite at the apple is improper, but even if this Court considers these new analogues, they do not support Mr. Daniels's conviction.

The new historical analogues that the Government presents fail the *Bruen*/*Rahimi* test. ECF 156, 6-9. First, the tradition of disarming the mentally ill was performed on an *ad hoc* basis after the individual received due process. Section 922(g)(3) categorically disarms all persons who qualify as "unlawful users" without due process. The *Rahimi* decision relies heavily on the fact that Mr. Rahimi received due process and that a court adjudicated him to present a risk of harm to his girlfriend. *See Rahimi*, 144 S. Ct. at 1896, 1903.

Second, disarmament was a byproduct of judicial proceedings that declared a person mentally incompetent. Those proceedings, according to the Government's own argument, resulted in a total loss of rights, including the right to control one's own property and affairs. In some cases, the individual was also confined, resulting in a loss of liberty. These analogues are not even true firearms restrictions, calling into question their value in evaluating a Second Amendment challenge under *Bruen* and *Rahimi*.

---

[2] This Court noted the purpose of those statutes in its original decision. *See Daniels*, 77 F.4th at 345-46, nn.12-16.

Third, to the extent that some of the Government's analogues are statutes of general applicability that impose categorical restrictions, those statutes required a finding that the individual suffering from mental illness was dangerous. *See* ECF 156, 6-7 (citing the 1744 Vagrancy Act and Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774)). Dangerousness is the crux of the Government's argument, but it is so amorphous that it is useless under the *Bruen* test.

## C. The Government has failed to establish dangerousness as a viable principle in the context of § 922(g)(3), generally, and in Mr. Daniels's case, specifically.

The Government takes the position that all "unlawful users" can be totally disarmed because they are dangerous. Again, the Government's position ignores the "how" and "why" of the historical analogues regarding intoxication and the broad sweep of § 922(g)(3) which applies to all drugs and medications governed by the Controlled Substances Act, even drugs or medications that have no intoxicating effect. Instead, the Government asks this Court to adopt an amorphous principle that the Supreme Court specifically rejected in *Rahimi*. However, even if this Court did determine that "unlawful users" can be dangerous, the Government cannot prove that Mr. Daniels, a marijuana user, poses a danger to others.

### 1. The Supreme Court rejected the Government's argument in *Rahimi*.

The Government's "dangerousness" argument mirrors its "responsible, law-abiding citizens" argument in *Rahimi*. During oral argument in *Rahimi*, the Government argued that "responsible" means persons who do not pose an "unusual danger, beyond the ordinary citizen, with respect to harm to themselves or others." Transcript of Oral Argument at 6, 7, 12, 28, *United States v. Rahimi*, (No. 22-915). The Government conceded that "not responsible" and "dangerous" "are essentially getting at the same concept," as long as the Court did not "backtrack[]" from the principle that "you can disarm those who are not law-abiding, responsible citizens."[3] *Id.* at 28-19.

Unfortunately for the Government, the Supreme Court did not merely "backtrack" from that principle; it flatly rejected it. The Court explained:

---

[3] The Government also argued that it preferred the term "responsible" because it did not impose culpability or bad intent on groups like minors or the mentally ill. Transcript of Oral Argument at 12, 28, 29, *Rahimi*, (No. 22-915).

"'Responsible' is a vague term. It is unclear what such a rule would entail." *Rahimi*, 144 S. Ct. at 1903. The same rings true for "dangerousness."

Moreover, to adopt an amorphous concept like dangerousness would render the *Bruen* test meaningless. Justice Jackson recognized this flaw in the Government's argument during oral argument in *Rahimi* when she questioned the ability to apply the dangerousness "principle" to the *Bruen* test at such a high level of generality. Transcript of Oral Argument at 15, *Rahimi*, (No. 22-915). If, as the Government argued in *Rahimi*, modern day regulations are "not controlled by Founding-Era applications of the principle," *id.* at 18, then, as Justice Jackson asked, "what's the point of going to the Founding Era? I mean, I thought it was doing some work. But, if we're still applying modern sensibilities, I don't really understand the historical framing," *id.* at 18-19. Justices Gorsuch and Kavanaugh agreed with this point. *See Rahimi*, 144 S. Ct. at 1908 (Gorsuch, J., concurring); *id.* at 1924 (Kavanaugh, J., concurring).

## 2. The Government cannot establish that Mr. Daniels is dangerous because he used marijuana.

Because the Government's prosecution of Mr. Daniels rests on the principle that the Government may constitutionally disarm dangerous "unlawful users," the Government's argument fails. As a matter of law and fact, the Government cannot establish that Mr. Daniels's marijuana use made him dangerous.

The Government supports its position that marijuana is a dangerous substance by claiming that marijuana may cause paranoia, schizophrenia, and other mental disorders. ECF 156, 4-5. Thus, it claims that marijuana use is akin to mental illness. However, in every other arena, the Government argues the opposite – that marijuana does not render people dangerous.

As Mr. Daniels pointed out in his initial brief, the history of marijuana regulation is riddled with racial and political undertones. ECF 40, 29-34. Its categorization as a Schedule I drug was decidedly political. *See id.* In recent years, the U.S. Department of Justice (DOJ) has backed away from criminalizing marijuana, thereby recognizing its problematic history. Simple possession cases are no longer prosecuted in federal court, and DOJ has implemented the President's proclamation to issue pardons for convictions for simple possession of marijuana. *See* Office of Public Affairs, U.S. Department of Justice, *Justice Department Statement of President's Announcements Regarding Simple Possession of*

*Marijuana* (Oct. 6, 2022), https://www.justice.gov/opa/pr/justice-department-statement-president-s-announcements-regarding-simple-possession-marijuana.

In just two years, the Government has reversed its position on marijuana completely. In October of 2022, President Biden ordered federal agencies to review marijuana's listing as a Schedule I substance. DOJ and the U.S. Department of Health and Human Services (HHS) led that review. *See* HHS, *Basis for the Recommendation to Reschedule Marijuana Into Schedule III of the Controlled Substances Act* (Aug. 29, 2023), 1, *available at* https://tinyurl.com/MJHHSReport (hereinafter referred to "HHS Report"). HHS issued a report in October 2023, finding that marijuana should be rescheduled from a Schedule I drug to a Schedule III drug. *Id.* at 62-64. That report explains the parameters for a Schedule III classification and the reasons that marijuana belongs in that category. Notably, the HHS report includes a review and analysis of the 2017 study that the Government referenced in its supplemental briefing. *Id.* at 5, 17-18, 25, 29. Even after considering the Government's best evidence that marijuana is dangerous, the HHS report still concludes that marijuana should be rescheduled. This would place marijuana in the same schedule as testosterone, Tylenol with codeine, and cough medicines that contain pseudoephedrine. *See* 21 U.S.C. § 812; Drugs.com, *Schedule 3 (III) Drugs*, https://www.drugs.com/schedule-3-drugs.html.

Marijuana has a lower abuse potential compared to other controlled substances. *See* HHS Report, at 62. The researchers considered both prescribed and unprescribed use of marijuana. The report finds that "[d]espite the high prevalence of nonmedical use of marijuana, an overall evaluation of epidemiological indicators suggests that it does not produce serious outcomes compared to drugs in Schedules I or II." *Id.* at 62. The report also found credible evidence that marijuana can be utilized to treat a variety of symptoms and diagnoses, including "anorexia related to a medical condition, anxiety, epilepsy, inflammatory bowel disease, nausea and vomiting (e.g., chemotherapy-induced), pain, and posttraumatic stress disorder." *Id.* at 63. Finally, the report concluded that the risk to the public health was low. Notably, the report found that "the vast majority of individuals who use marijuana are doing so in a manner that does not lead to dangerous outcomes to themselves or others." *Id.* at 7; *see id.* at 6-7, 45-57, 64.

In response to the HHS report, on May 21, 2024, the Drug Enforcement Administration and DOJ issued a proposed rule that would reclassify marijuana from Schedule I to Schedule III. DEA, DOJ, *Schedules of Controlled Substances: Rescheduling of Marijuana* (May 21, 2024), https://www.federalregister.gov/documents/2024/05/21/2024-11137/schedules-of-

controlled-substances-rescheduling-of-marijuana. The comment period has closed, and the rule may be issued at any time.

If, as the Government now asserts in every context except its justification of § 922(g)(3), marijuana is no longer a dangerous substance, then Mr. Daniels cannot be a dangerous person because he has used marijuana. This is especially true considering the specific facts of Mr. Daniels's case. The Government presented minimal evidence that Mr. Daniels was a current user of marijuana, and it presented no evidence that Mr. Daniels was under the influence when he possessed firearms. Instead, the Government now uses supposition and innuendo to imply that any "bad behavior" from Mr. Daniels is attributable to his marijuana use. The Government's overreach is simply unsupported. Therefore, as applied to Mr. Daniels, § 922(g)(3) is unconstitutional.

## III.    Conclusion

*Rahimi* confirms that the Government must establish historical analogues that justify the total restriction on Mr. Daniels's Second Amendment rights. The Government's position overlooks concrete and near identical historical analogues of alcohol intoxication and asks this Court to adopt a "dangerousness" argument that the Supreme Court has rejected and that the Government itself has abandoned in every context except its prosecution of § 922(g)(3) cases. Such inapposite analogues and amorphous principles cannot justify the application of § 922(g)(3) in Mr. Daniels's case.

For these reasons, 18 U.S.C. § 922(g)(3) is unconstitutional as applied to Mr. Daniels. This Court should affirm its decision and vacate Mr. Daniels's conviction.

Respectfully submitted,

OMODARE B. JUPITER
Federal Public Defender

*/s/ Leilani L. Tynes*
LEILANI L. TYNES
Assistant Federal Public Defender

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of August, 2024, I electronically filed the foregoing Supplemental Letter Brief with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ Leilani Tynes
LEILANI L. TYNES
Assistant Federal Public Defender