# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 6, 2025

Lyle W. Cayce
Clerk

No. 22-60596

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

PATRICK DARNELL DANIELS, JR.,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:22-CR-58-1

ON REMAND FROM THE UNITED STATES SUPREME COURT

Before SMITH, HIGGINSON, and WILLETT, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Title 18 U.S.C. § 922(g)(3) bars an individual from possessing a firearm if he is an "unlawful user" of a controlled substance. A jury found that Patrick Daniels, Jr., was such an unlawful user, and a judge sentenced him to nearly four years in prison. But the jury did not necessarily find that Daniels was intoxicated at the time of his arrest, nor did it identify the last time Daniels used an unlawful substance. So we reversed the conviction and held that § 922(g)(3), as applied to him, was inconsistent with the Second Amend-

No. 22-60596

ment.[1]  The Supreme Court granted certiorari, vacated, and remanded for reconsideration in light of *United States v. Rahimi*, 144 S. Ct. 1889 (2024).

After *Rahimi*, this circuit heard a similar challenge to a prosecution brought under § 922(g)(3).  In that case, *United States v. Connelly*, we held that the government could not constitutionally apply § 922(g)(3) to a defendant based solely on her "habitual or occasional drug use."  117 F.4th 269, 282 (5th Cir. 2024).  That case controls this one.  Because the jury did not necessarily find that Daniels was presently or even recently engaged in unlawful drug use, we reverse his conviction again and remand.

## I.

In April 2022, two officers pulled Daniels over for driving without a license plate.[2]  One—an agent with the Drug Enforcement Administration ("DEA")—approached the vehicle and smelled marihuana.  He searched the cabin and found several marihuana cigarette butts in the ashtray.  He also found two loaded firearms: a 9mm pistol and a semi-automatic rifle.  Daniels was taken into custody and transported to the local DEA office.

At no point that night did the DEA administer a drug test or ask Daniels whether he was under the influence; nor did the officers note or testify that he appeared intoxicated.  But after Daniels was read his *Miranda* rights at the station, he admitted that he had smoked marihuana since high school and was still a regular user.  When asked how often he smoked, he confirmed he used marihuana "approximately fourteen days out of a month."

Daniels was charged with violating § 922(g)(3), which makes it illegal

---

[1] *United States v. Daniels*, 77 F.4th 337, 340 (5th Cir. 2023), *cert. granted, judgment vacated*, 144 S. Ct. 2707 (2024).

[2] Our recitation of the facts here hews closely to our account in Daniels's original appeal.  *See id.* at 340–41.

No. 22-60596

for any person "who is an unlawful user of or addicted to any controlled substance . . . to . . . possess . . . any firearm." An "unlawful user" is someone who uses illegal drugs regularly and in some temporal proximity to the gun possession. *See United States v. McCowan*, 469 F.3d 386, 392 (5th Cir. 2006).

While Daniels was under indictment, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), and clarified that firearms regulations are unconstitutional unless they are firmly rooted in our nation's history and tradition of gun regulation, *see id.* at 22–24. Daniels immediately moved to dismiss the indictment, claiming that § 922(g)(3) is unconstitutional under that new standard.

The district court denied the motion. *See United States v. Daniels*, 610 F. Supp. 3d 892, 892 (S.D. Miss. 2022). The court found that § 922(g)(3) was a longstanding gun regulation, *see id.* at 895, and analogized § 922(g)(3) to laws disarming felons and the mentally ill—laws that the Supreme Court has called "presumptively lawful." *Id.* (internal quotation marks omitted) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008)). The district court noted that Congress enacted § 922(g)(3) in 1968 after many states had similarly banned habitual drug users from possessing guns. *Id.* at 896. The court placed great weight on that regulatory tradition but engaged with few historical sources from the Founding or Reconstruction, relying instead on statements from other courts—notably all predating *Bruen*—that § 922(g)(3) was supported by the historical practice of disarming those who "exhibit a dangerous lack of self-control." *Id.* at 897.

A jury found Daniels guilty. He was sentenced to nearly four years in prison and three years of supervised release. By nature of his § 922(g)(3) felony, Daniels is also barred for life from possessing a firearm. *See* 18 U.S.C. § 922(g)(1).

Daniels appealed, reasserting the Second Amendment challenge that

No. 22-60596

he had raised before trial.[3]  We agreed with Daniels, holding that while "our history and tradition may support some limits on an intoxicated person's right to carry a weapon," neither our history of laws regulating the combination of guns and intoxicating substances nor "more generalized traditions of disarming dangerous persons" justify "disarming a sober citizen based exclusively on his past drug usage." *Daniels*, 77 F.4th at 340.

Eleven months later, after deciding *Rahimi*, the Supreme Court granted the government's petition for writ of certiorari.  144 S. Ct. 2707 (2024).  The Court then vacated the judgment and remanded for further consideration in light of *Rahimi*.  Both parties submitted additional briefing to discuss the effect of *Rahimi* and, several weeks later, *Connelly*.  As with all constitutional questions, we consider this issue *de novo*.  *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).[4]

## II.

Our analysis is largely controlled by *Connelly*.  At issue there was Connelly's motion to dismiss an indictment charging her with violating, *inter alia*, § 922(g)(3).  Connelly was indicted after telling officers who found a pistol in her bedroom that she occasionally smoked marihuana as a sleep-and-anxiety aid.  *Connelly*, 117 F.4th at 272.  The district court granted the motion, and a panel of this court then affirmed in part, holding that although § 922(g)(3) is not facially unconstitutional, the government could not apply the law to Connelly's conduct consistent with the Second Amendment.  *Con-*

_____

[3] Daniels also contended that § 922(g)(3) is unconstitutionally vague and that there was insufficient evidence for a reasonable jury to convict.  Because we held that § 922(g)(3) was unconstitutional as applied to Daniels, we did not address his additional challenges. *Daniels*, 77 F. 4th at 341 n.1.

[4] Because we again hold that § 922(g)(3) is unconstitutional as applied to Daniels, we do not address his void-for-vagueness and sufficiency-of-the-evidence challenges.

No. 22-60596

*nelly*, 117 F.4th at 272. In explaining its holding, the *Connelly* panel expounded the legal framework governing Second Amendment challenges to § 922(g)(3). That framework, which we reiterate here, controls.

A.

The Second Amendment protects the right of individuals to "keep and bear" firearms for their self-defense. U.S. Const. amend. II; *see Heller*, 554 U.S. at 595. When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. *See Bruen*, 142 S. Ct. at 2126. The right to bear arms is held by "the people," and that phrase "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Therefore, "the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. "Marijuana user or not," a "member of our political community . . . thus has a presumptive right to bear arms." *Connelly*, 117 F.4th at 274.

Like most rights, though, the rights secured by the Second Amendment are not unlimited. *See Rahimi*, 144 S. Ct. at 1897. We look to our nation's historical tradition of firearm regulation to help discern the boundaries of the right, asking whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. *See id.* at 1898 (noting *Bruen*, 142 S. Ct. at 2126). To do this, we must "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2133 n.7). "Why *and* how the regulation burdens the right are central to this inquiry." *Connelly*, 117 F.4th at 273.

"Why" and "how" a statute or regulation burdens an individual's Second Amendment right are two separate questions. The "why" analysis

No. 22-60596

instructs that "if laws at the Founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category" of firearms regulation. *Connelly*, 117 F.4th at 274 (quoting *Rahimi*, 144 S. Ct. at 1898). But the "how" analysis warns that "a law . . . may not be compatible with the right if it [is regulated] to an extent beyond what was done at the Founding," "even when that law regulates arms-bearing for a permissible reason." *Id.* (cleaned up).

Supreme Court and Fifth Circuit caselaw thus prescribes a two-step process for Second Amendment challenges. *Id.* We first ask whether the Second Amendment's plain text covers an individual's conduct. If it does, we then ask whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. *Id.* The government bears the burden to demonstrate that the challenged law is "relevantly similar" to laws our tradition is understood to permit, and the government meets its burden by finding and explicating "historical precursors" supporting the challenged law's constitutionality. *See id.* (quoting *Bruen*, 142 S. Ct. at 2133).

The challenged and historical laws are "relevantly similar" if they share a common "why" and "how": They must both (1) address a comparable problem (the "why") and (2) place a comparable burden on the right holder (the "how"). *Id.* The government need not present a "dead ringer" or "historical twin"; it can also present an analogous historical regulation with a sufficiently similar "why" and "how." *Id.* (quoting *Rahimi*, 144 S. Ct. at 98, and *Bruen*, 142 S. Ct. at 22133). "Deciding whether a conceptual fit exists between the old law and the new requires the exercise of both analogical reasoning and sound judgment." *Id.* We must hold the government to its heavy burden, as the Second Amendment "is not a second-class right." *Bruen*, 142 S. Ct. at 70 (quoting *McDonald v. City of Chicago,* 561 U.S. 742, 780 (2010)).

No. 22-60596

B.

In addition to elaborating this doctrinal framework, *Connelly* also addressed the relevance of the government's proffered historical analogues to the more modern firearms prohibition that is § 922(g)(3). In *Connelly*, the government offered three buckets of historical analogues to support § 922(g)(3)'s constitutionality as applied to Connelly: (1) laws disarming the mentally ill, (2) laws disarming individuals considered "dangerous," and (3) intoxication laws. We considered and rejected each. *Connelly*, 117 F.4th at 275.

The government first argued that Founding-era restrictions on the Second Amendment rights of mentally ill persons were "relevantly similar" to § 922(g)(3) as applied to unlawful users of controlled substances. *Id.* While mental illness and drug use are not the same thing, we granted that at first glance "one could draw an intuitive similarity: those who are briefly mentally infirm as a result of intoxication could be considered similar to those permanently mentally infirm because of illness or disability." *Id.* (quotation marks omitted). But we rejected the government's position because "institutionalizing those so mentally ill that they present a danger to themselves or others does not give clear guidance about which lesser impairments are serious enough to warrant constitutional deprivations." *Id.* Further, "laws designed to disarm the severely mentally ill do not justify depriving those of sound mind of their Second Amendment rights. The analogy stands only if someone is so intoxicated as to be in a state comparable to 'lunacy.'" *Id.*

"So," we said, "the *Bruen*-style analogical question is this: which is [the defendant] more like: someone whose mental illness is so severe that she presents a danger to herself and others (*i.e.*, someone who would be confined and deprived of firearms under this tradition and history of Second Amendment regulation)? Or a repeat alcohol user (who would not)?" *Id.* at 277.

No. 22-60596

We thought the defendant in *Connelly* fell into the latter camp because, at least "while sober, she is like a repeat alcohol user between periods of intoxication, whom the Founders would not disarm." *Id.* But, we added, the government "might succeed if it were able to demonstrate that [Connelly]'s drug use was so regular and heavy that it rendered her continually impaired." *Id.*

The government next argued that persons whom Congress deems "dangerous" can have their Second Amendment rights stripped. *Id.* There, as here, the government offered two kinds of examples: "*First*, laws barring political dissidents from owning guns in periods of conflict," and second, the English Militia Act of 1662, "which gave officials sweeping power to designate someone as 'dangerous' and so disarm him." *Id.* at 277–78. The relevant question, we said, was "why were the groups disarmed at the Founding considered to be dangerous and therefore disarmed, and is that 'why' 'relevantly similar' to § 922(g)(3)?" *Id.* at 278. We answered that it was not, because the government could identify "no class of persons at the Founding who were 'dangerous' for reasons comparable to marijuana users." *Id.*

Finally, we addressed our nation's history and tradition of intoxication laws. *Id.* at 279. The problem, as we perceived it, was that while this history shows "that some laws banned *carrying* weapons while under the influence, none barred gun *possession* by regular drinkers." *Id.* at 280. Also troubling was that "the government offer[ed] no Founding-era law or practice of disarming ordinary citizens for drunkenness, even if their intoxication was routine." *Id.* While some post-Civil War laws "barred citizens from carrying guns *while drunk*," we deemed this insufficient to support § 922(g)(3) as applied to Connelly. *Id.* at 281.

"Boiled down," we wrote, "§ 922(g)(3) is much broader than historical intoxication laws. These laws may address a comparable problem—

8

No. 22-60596

preventing intoxicated individuals from carrying weapons—but they do not impose a comparable burden on the right holder. In other words, they pass the 'why' but not the 'how' test." *Id.* We concluded that while our nation's history provides some support for banning individuals from carrying firearms while actively intoxicated, § 922(g)(3) goes much further by banning all possession for an undefined set of "user[s]," even while they are not intoxicated. *Id.* at 281–82.

We found the statutory language "unlawful user" especially problematic because "there is a substantial difference between an actively intoxicated person and an 'unlawful user' under § 922(g)(3)." *Id.* at 282. The statutory term "unlawful user" captures regular marihuana users, and "the temporal nexus is most generously described as vague" because the law does not specify how recently an individual must "use" drugs to qualify for the prohibition. *Id.*[5] "Stunningly," we wrote, "an inference of 'current use' can be drawn even from 'a conviction for use or possession of a controlled substance within the past year.'" *Id.* (quoting 27 C.F.R. § 478.11). Thus, we held that by "regulating [Connelly] based on habitual or occasional drug use, § 922(g)(3) imposes a far greater burden on her Second Amendment rights than our history and tradition of firearms regulation can support." *Id.*

## III.

### A.

The question is what this means for Daniels. *Connelly* tells us at least two things: First, § 922(g)(3) is *not* facially unconstitutional, because our history can support gun regulations disarming the presently intoxicated. *See*

---

[5] *See also* 27 C.F.R. § 478.11 (defining terms in § 922(g)(3)) ("A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person . . . possesses a firearm.").

No. 22-60596

*id.* at 282 (discussing why Connelly's facial challenge fails). Second, § 922(g)(3) *is* unconstitutional where it seeks to disarm an individual solely "based on habitual or occasional drug use." *Id.* at 282. This panel is bound to follow *Connelly* under the rule of orderliness,[6] so we must once again find § 922(g)(3) unconstitutional as applied to Daniels unless the government can show that Daniels was disarmed for reasons above and beyond habitual or occasional marihuana use.[7]

This is a closer case than *Connelly* because, unlike *Connelly*, this case went to trial, and the facts at trial seemed to reveal a defendant who was often intoxicated while transporting weapons. Daniels admitted to using marihuana roughly half the days of each month. Officers twice saw him with guns and marihuana in his truck. The marihuana in his truck was burnt, that is, used. When he was pulled over, he had a loaded handgun within arm's length and a loaded rifle in the back seat. If *Connelly* was an easy case because the defendant there merely used marihuana occasionally before bed while keeping a gun for home defense, this case is far less clear cut; all signs here point to a defendant's routinely driving around town while intoxicated with loaded guns in his car.

---

[6] It is "well-settled" in the Fifth Circuit that, "even if a panel's interpretation of the law appears flawed," "one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court." *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). "This rule is strict and rigidly applied." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021). By this, we do not mean to suggest that *Connelly* is flawed.

[7] Like Connelly, Daniels is obviously part of "the people" protected by the Second Amendment, so this dispute concerns only *Bruen*'s second step: whether a given gun restriction is consistent with our nation's historical tradition of firearm regulation. The government invokes the same historical regulations to justify the application of § 922(g)(3) against Daniels as it did against Connelly: laws disarming the intoxicated and the mentally ill.

No. 22-60596

Crucially, though, that is not what the jury instruction required the government to prove at trial. The jury was instructed that, to find that Daniels was an "unlawful user," it need not find "that he used the controlled substance at the precise time he possessed the firearm" because "[s]uch use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before." Instead, the jury was instructed that it need only find "that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct."[8]

This language dooms Daniels's conviction. The jury did not necessarily find that Daniels had even used marihuana "within a matter of . . . weeks before" his arrest, but only that his use "occurred recently enough" to indicate Daniels was "actively engaged" in unlawful use. What precisely this means is nebulous, and we "resist[] inquiring into a jury's thought processes." *United States v. Powell*, 469 U.S. 57, 67 (1984). What we do know is that the jury could have found Daniels guilty even while believing that he had not used marihuana for several weeks. This would mean that Daniels was convicted for exactly the type of "habitual or occasional drug use" that we said, in *Connelly*, could not support an indictment (let alone a conviction). 117 F.4th at 282.

In other words, the government's burden of proof was too low, as it was not required to convince a jury that Daniels was presently or even regularly intoxicated at the time of arrest. And even if the government had persuaded the jury that Daniels was frequently intoxicated, here, as in *Connelly*, the government offers no Founding-era law or practice of disarming ordinary citizens "even if their intoxication was routine." *Id.* at 280. Because of this

---

[8] The jury then unanimously found Daniels guilty "beyond a reasonable doubt of knowingly possessing a firearm . . . while knowingly being an unlawful user of a controlled substance."

No. 22-60596

instructional error, § 922(g)(3) must thus again be held unconstitutional as applied to Daniels.

### B.

As in Daniels's first appeal, we "conclude only by emphasizing the narrowness of that holding." *Daniels*, 77 F.4th at 355. To reiterate our holding in *Connelly*: Section 922(g)(3) is not facially unconstitutional, 117 F.4th at 282, and our nation's "history and tradition may support some limits on a *presently* intoxicated person's right to carry a weapon," *id.* at 272. We need not decide now whether § 922(g)(3) could *also* be constitutionally applied to defendants who are *not* actively intoxicated when found in possession of a firearm. But because many § 922(g)(3) prosecutions will likely involve defendants who are not using or under the influence of a controlled substance at the precise moment that they are arrested, we make a few tentative observations gleaned from recent precedent.

First, although *Connelly* rejected a blanket analogy between all drug users and the mentally ill, we suggested that gun restrictions could be constitutionally applied to "someone whose mental illness is so severe that she presents a danger to herself and others." *Connelly*, 177 F.4th at 277. So, if the government could show that an individual's drug use was so frequent, severe, and impairing as to render him analogous to the dangerously mentally ill, disarming him under § 922(g)(3) might find support in the historical tradition of confining and disarming mental patients.[9]

Second, even where a defendant is not presently intoxicated, the historical intoxication laws invoked by the government might also support

---

[9] *See Connelly*, 177 F.4th at 277 (noting that the government "might succeed if it were able to demonstrate that [Connelly]'s drug use was so regular and heavy that it rendered her continually impaired").

No. 22-60596

some applications of § 922(g)(3), depending on the facts admitted by a defendant or proven at trial. Specificity in jury instructions will likely be crucial here. Instructions requiring jurors to find a tight temporal nexus between an individual's drug use and his possession of firearms could bring § 922(g)(3)'s application closer in line with historical laws targeting the presently intoxicated, the mentally ill, or those who pose a danger to others, and avoid concerns that § 922(g)(3) deprives individuals of a constitutional right merely for past or even habitual drug use.

Analogies to historical laws disarming the mentally ill or the intoxicated will likely find stronger footing if the government can establish a connection between the defendant's active or regular drug use and violent or dangerous conduct. For instance, the government could attempt to establish that a defendant's frequent or recent drug use renders him presumptively dangerous because laws throughout our nation's history have aimed "to keep guns out of the hands of presumptively risky people." *United States v. Veasley*, 98 F.4th 906, 915–16 (8th Cir. 2024) (quotation marks omitted).[10] Though the government's attempted dangerousness analogues in *Connelly* failed, *Connelly* addressed only the "two groups" of laws that the government had proffered: laws barring political dissidents from owning guns during periods of conflict and laws disarming religious minorities. *See* 117 F.4th at 277–79.

Our analysis in *Connelly* does not foreclose the government from attempting to reformulate its dangerousness argument in the context of dif-

_____

[10] *Cf. Rahimi*, 144 S. Ct. at 1901 ("When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."); *see also Daniels*, 77 F.4th at 352 (noting the "undeniable throughline" in early American sources conveying that "Founding-era governments took guns away from persons perceived to be dangerous").

No. 22-60596

ferent as-applied challenges moving forward. *Connelly* held only that, because the government had "not shown how [Connelly's] marijuana use predisposed her to armed conflict or that she had a history of drug-related violence . . . the government's attempt to analogize non-violent marijuana users to dangerous persons failed to present a relevantly similar 'why.'" 117 F.4th at 278–79 (citations and quotation marks omitted). The analysis as applied to a different defendant could vary depending on that defendant's history and conduct.[11]

The government has not pointed to sufficiently analogous historical laws to establish why Daniels himself should be considered presumptively dangerous.[12] And, as explained, even had the government supplied sufficient historical briefing to support a theory of dangerousness, the jury instruction employed in Daniels's trial was too open-ended to support his conviction because it left open the possibility that Daniels had not even unlawfully used a controlled substance in several weeks.

But our holding is not a windfall for defendants charged under § 922(g)(3), present company included. The government remains free to reprosecute Daniels under a theory consistent with a proper understanding of

---

[11] *See Kanter v. Barr*, 919 F.3d 437, 468 (7th Cir. 2019) (Barrett, J., dissenting) (suggesting that the government can attempt "to show that [a defendant's] history or characteristics make him likely to misuse firearms"); *see also Veasley*, 98 F.4th at 917–18 (contemplating that an "80-year-old grandmother who regularly and continually uses marijuana for a chronic medical condition" could potentially raise a successful as-applied challenge were she charged under of § 922(g)(3) because it "is exceedingly unlikely she will pose a danger or induce terror in others").

[12] Following the principle of party presentation, we generally limit ourselves to the record amassed by the district court and the parties. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Heeding *Bruen*, we do the same here. *Bruen*, 142 S. Ct. at 2130 n.6 ("*Heller*'s text-and-history test . . . [requires] resolv[ing] legal questions presented in particular cases or controversies . . . . Courts are thus entitled to decide a case based on the historical record compiled by the parties." (cleaned up)).

No. 22-60596

the Second Amendment.[13]  We hold only that the first prosecution failed to meet that bar.

## C.

Our concurring colleague conscientiously reads *Connelly* as stating "that a § 922(g)(3) conviction is constitutional when "the temporal nexus is one of contemporaneity—meaning the jury found that the defendant possessed a firearm while presently (that is, actively) using controlled substances unlawfully." *Post* at 3 (Higginson, J., concurring).  While such a formulation has the merit of providing a clear rule to the government and potential defendants, we do not read *Connelly* so narrowly.  *Connelly* concluded that "[t]he history and tradition *before us* support, at most, a ban on carrying firearms while an individual is presently under the influence." 117 F.4th at 282 (emphasis added).

Courts reviewing a Second Amendment challenge can follow the principle of party presentation, *see Bruen*, 142 S. Ct. at 2130 n.6, so we do not read this passage to hold that § 922(g)(3) can apply only to situations where a defendant is caught using unlawful drugs while simultaneously carrying a firearm.  If more analogous historical research reveals that the states routinely disarmed drunkards or drug addicts even when they were not actively intoxicated, for example, we do not read *Connelly* to foreclose a future court from considering that evidence and rejecting a § 922(g)(3) defendant's as-applied challenge on that basis.

Further, *Connelly* contemplates other potential applications of

---

[13] *See Ball v. United States*, 163 U.S. 662, 672 (1896); *accord Langley v. Prince*, 926 F.3d 145, 153 (5th Cir. 2019) (reiterating the "general rule" that the Double Jeopardy Clause "does not bar reprosecution of a defendant whose conviction is overturned on appeal").

No. 22-60596

§ 922(g)(3) beyond prosecutions solely targeting active use. *Connelly* notes that the "undeniable throughline" running through our history suggests that Founding-era governments took away guns from those perceived to be dangerous. *Connelly*, 117 F.4th at 278. While *Connelly* concluded that the government could identify "no class of persons at the Founding who were 'dangerous' for reasons comparable to marijuana users" such as Paola Connelly, *id.*, *Connelly* did not decide that regular users of unlawful drugs could *never* be disarmed. As discussed above, *Connelly* noted that the government "might succeed if it were able to demonstrate that [Connelly's] drug use was so regular and heavy that it rendered her continually impaired." *Id.* at 277. This differs from the concurrence's conclusion that *Connelly* requires contemporaneity to support a § 922(g)(3) conviction. Contra the concurrence, we leave open the possibility that, for example, a heavy user of methamphetamine could potentially be disarmed because of his regular use of a drug causing erratic behavior, even if at the moment of his arrest he is not ingesting crystals.[14]

We sympathize with the desire to articulate a bright-line rule that district courts could apply going forward. But, with due respect, the "contemporaneity-only" rule advanced by the concurrence relies on an unduly narrow reading of *Connelly* and an understandable but unwarranted aversion to letting Second Amendment doctrine develop more fully as more cases involving different fact patterns arise. A piecemeal approach to laws such as § 922(g)(3), determining the contours of acceptable prosecutions through the resolution of continual as-applied challenges, is what *Bruen* and

---

[14] *Cf. Veasley*, 98 F.4th at 910, 917–18 (noting that, because "[o]n its face, § 922(g)(3) applies to everyone from the frail and elderly grandmother to regular users of a drug like PCP, which can induce violence," § 922(g)(3) is likely constitutional as applied to some defendants and unconstitutional as applied to others).

No. 22-60596

*Rahimi* require.[15]  We decline to short-circuit that process now.[16]

\* \* \* \* \*

Daniels's § 922(g)(3) conviction is inconsistent with our "history and tradition" of gun regulation.  *Bruen*, 142 S. Ct. at 2128.  We do not invalidate the statute in all its applications, nor do we decide that § 922(g)(3) could never cover the conduct of which Daniels stands accused.  But applications of § 922(g)(3) must accord with our nation's history of firearm regulations, and disarming individuals solely for their prior, occasional, or habitual marihuana use does not.

The judgment of conviction is REVERSED and REMANDED.

---

[15] *See* William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1511 (2024) ("Exactly where in between to draw the line [in § 922(g)(1) cases] is something the courts are currently debating and would eventually resolve in common-law fashion."); *id.* at 1514 ("[T]his kind of general common-law exposition is what *Bruen* calls for—not blanket deference to the legislature or the mindless parsing of historical analogies.").

[16] *See Range v. Att'y Gen. United States*, No. 21-2835, ____ F.4th ____ n.13, 2024 WL 5199447, at *8 n.13 (3d Cir. Dec. 23, 2024) (en banc) ("[I]n this as-applied constitutional challenge, our task is to decide only Mr. [Daniels]'s case, rather than preview how this Court would decide future Second Amendment challenges.").

No. 22-60596

Stephen A. Higginson, *Circuit Judge*, concurring:

I concur because I agree that *United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024), is dispositive and requires reversal of Daniels's conviction in this case because of jury instructional error. *See United States v. Guidry*, 406 F.3d 314, 321 (5th Cir. 2005).

As important, I read *Connelly* to *confirm* the constitutionality of 18 U.S.C. § 922(g)(3) prosecutions at least when the defendant possesses a firearm while "presently" unlawfully using drugs. *Compare Connelly*, 117 F.4th at 272 ("The short of it is that our history and tradition may support some limits on a presently intoxicated person's right to carry a weapon[.]"), 276 ("[T]here is no historical justification for disarming sober citizens not *presently* under an impairing influence."), 279 ("The Founders were well familiar with the commonsense notion that those presently impaired by alcohol lack the restraint needed to handle firearms safely."), 282 ("The history and tradition before us support, at most, a ban on carrying firearms while an individual is presently under the influence."), 283 ("There undoubtedly exist circumstances where § 922(g)(3) may apply constitutionally, such as when it bans a presently intoxicated person from carrying firearms."), *with United States v. McCowan*, 469 F.3d 386, 391-92 (5th Cir. 2006) (defining the term "unlawful user" in the context of "contemporaneousness and regularity," to include use of drugs "within a matter of days or weeks before" the firearm possession and that may be inferred from "a pattern of use" (quoting 27 C.F.R. § 478.11)).

Here, the parties and the district court did not have the *Connelly* decision during the jury charging stage. The district court, consistent with *McCowan*, instructed the jury using the definition of "unlawful user" found in 27 C.F.R. § 478.11. Under those instructions, the jury was allowed to conclude that Daniels was an "unlawful user" based on use of controlled

No. 22-60596

substances "within a matter of days or weeks" or based on a "pattern of use or possession." But we are obliged by *Connelly* to hold that this instruction was constitutionally deficient.

As an intermediate appellate court, it is our imperative both to faithfully apply the Supreme Court's constitutional corrections of our caselaw, as in *Rahimi*, and also to provide district courts with clear, exact, and workable instructions moving forward. It is crucial for our district court colleagues, who adjudicate § 922(g)(3) prosecutions daily across the country—as well as for the government, defendants, and indeed, all Americans—that we clarify the precise contours of constitutionally *sound* convictions for firearm possession. *United States v. Daniels*, 77 F.4th 337, 360 (5th Cir. 2023) (Higginson J., concurring), *cert. grante*d, *judgment vacated*, 144 S. Ct. 2707 (2024). We should not allow some Americans to be imprisoned for conduct that deemed criminal in some districts, while such convictions are invalidated elsewhere. Americans must be given clear notice of what conduct *is* criminal. *Id.*

Here, the error was instructional, not evidentiary. As the district court held when denying Daniels's motion for judgment of acquittal, the trial evidence was open to the assessment that Daniels was presently an unlawful user of controlled substances when he possessed two guns:

> The evidence adduced at trial, including both testimonial and photographic evidence, established that Defendant was in possession of two loaded firearms *at the same time* that he was in possession of smoked marijuana blunts. *The arresting officer testified that he detected the odor of marijuana.* Defendant later admitted to officers that he smoked marijuana approximately fourteen days a month in the years since his graduation from high school.

Critically, however, the jury was told that it could convict Daniels on the broader basis that Daniels had used drugs "weeks before" he was

No. 22-60596

apprehended with the two guns. Although that "recency" gloss adhered to the temporal nexus we specified in *McCowan*, it was deemed constitutionally deficient by *Connelly*.[1] As I interpret *Connelly*, we stated that a conviction under § 922(g)(3) is historically rooted, and thus constitutionally *sufficient*, when the temporal nexus is one of contemporaneity—meaning the jury found that the defendant possessed a firearm while presently (that is, actively) using controlled substances unlawfully. Because the jury instruction here allowed the jury to convict Daniels based solely on the conclusion that he had used drugs weeks before he was found in possession of firearms, I would say no more than that his conviction is unconstitutional under *Connelly*'s binding precedent.

Because of the foregoing legal instructional error, *see United States v. Miller*, 952 F.2d 866, 870-71 (5th Cir. 1992), I concur that Daniels's judgment of conviction must be reversed and remanded.

---

[1] The majority offers "tentative observations" that different historical evidence could be presented in other cases, perhaps resuscitating our *McCowan* rule. It also implies that even present users who may not be "dangerous" might not be constitutionally prosecutable. I lack confidence in this dicta. It seems to me that both points could inject constitutional uncertainty in every § 922(g)(3) prosecution and might prompt parties to relitigate precedent based on either perceived, new historical evidence or each defendant's "history and conduct" showing dangerousness or lack thereof.